Paula Mrs. Lorona
12705 W. Sierra Cir.
El Mirage, AZ 85335
(623) 875-9543
plorona@cox.net
*Plaintiff Pro Se*

MAR -2 2015 FILED 4:47 pm
MICHAEL K. JEANES, Clerk
By J. Kiraly
J. Kiraly, Deputy

PAID
$319.00
R# 24359232

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA

PAULA C. LORONA, pro se

Plaintiff,

      vs.

ARIZONA SUMMIT LAW SCHOOL LLC, a
Delaware limited liability company;
INFILAW CORPORATION, a Delaware
corporation; STEPHANIE and JASON LEE,
husband and wife, SCOTT and JANE DOE
THOMPSON, husband and wife; JOHN AND
JANE DOES 1-100; BLACK
CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;

Defendants.

**COMPLAINT AND DEMAND
FOR JURY TRIAL**

CV2015-000681

Plaintiff Paula C. Lorona, for her Complaint against the above-named Defendants, alleges as

follows:

### PARTIES, VENUE, AND JURISDICTION

1.    Plaintiff Paula Mrs. Lorona ("Lorona") is a resident of Maricopa County, Arizona, and all

times pertinent to this Complaint, Lorona was employed by Arizona Summit Law School, formerly

known as Phoenix School of Law, in Phoenix, Arizona.

2.    Defendant Arizona Summit Law School ("ASLS" or "the School") is a for-profit Arizona

limited liability company and was Lorona's employer.

3.     Defendant Scott Thompson ("Thompson") is the President of ASLS and a resident of Maricopa County, Arizona.

4.     Defendant Stephanie Lee ("Lee") was the Director of Human Resources for ASLS and a resident of Maricopa County, Arizona.

5.     Defendant Infilaw Corporation is a Delaware corporation with a primary place of business in Naples, Florida, and is the parent company of ASLS.

6.     At all times pertinent to this Complaint, Thompson and Lee were officials representing ASLS and Infilaw Corp., and in doing the acts complained of herein, were acting under the color and pretense of statutes, ordinances, regulations, customs of the State of Arizona, and Department of Education, ABA and any other pertinent accrediting agencies.

7.     At all times pertinent to this Complaint, Thompson and Lee were acting within the course and scope of employment with ASLS, and as a result thereof, ASLS and Infilaw are liable for the acts of Thompson and Lee under the principle of *respondeat superior*.

8.     Defendants Jason Lee and Jane Doe Thompson are named as defendants because at all times, Defendants Stephanie Lee and Scott Thompson were acting on behalf of their marital community and the marital community is liable for the actions of Stephanie Lee and Scott Thompson.

9.     Defendants Jane Does and 1-100, Black Corporations 1-100, and White Partnerships 1-100 are certain unknown individuals or entities who through their own actions or inactions have caused or assisted others in causing the incidents and resulting harms set forth below. Despite diligent efforts by Plaintiff, the identity of these individuals has not yet been ascertained but they are well known by the Defendants. Plaintiffs will amend their complaint to allege the true names and capacities of the various Doe Defendants when they are learned.

10.     This court has jurisdiction because the amount in question exceeds the jurisdictional limits of all inferior courts.

11.     This Court is the appropriate venue because the actions giving rise to this Complaint occurred in Maricopa County, Arizona.

## DEFENDANTS DISCHARGE PLAINTIFF OUT OF RETALIATION
## FOR REFUSING TO FILE FRAUDLENT TAX FORMS

12.     Lorona was hired in November 2009 as an administrative assistant and received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

13.     One benefit given to employees of ASLS is a full tuition waiver to attend law school, beginning 12 months after full-time employment and continuing throughout employment.

14.     One of the factors Lorona considered when accepting employment with ASLS was the full tuition waiver described above, and if fact based on her job performance was permitted a pro rata early tuition waiver starting at 9 months.

15.     Before her employment, Lorona reviewed the evening school plan, statistics of school completion, and bar passage rates, among other factors, and decided that ASLS would be a good place for her to work and attend school.

16.     In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

17.     Throughout her employment, Lorona has received excellent employee reviews and as alleged above, has been offered the opportunity for advancement commensurate with her skills and experience.

18.     In 2012 Judy Smith ("Smith") Director of Finance, presented Mrs. Lorona with Arizona Department of Revenue ("ADOR") documents, including ADOR 10194 (7/11) (the "Tax Form"). *See Tax Form* as Exhibit 1-9.

19.     Smith ordered that Lorona review and upload the Tax Form to the ADOR's website.

20.     The reason that Lorona was ordered to review and upload the Tax Form was because ASLS had failed to register with ADOR or pay state sales tax since beginning operations in 2005.

21.     Before presenting the Tax Form to Lorona, Smith had knowingly filled in the Tax Form with false and incorrect information by listing in Section B 1 that the date business started in Arizona as 7/1/2008 and B 2, Date Sales began as 8/1/2010. *See Tax Form* Exhibit 1.

22.     After seeing the Tax Form that Smith had provided to her, Lorona advised Smith that the information was grossly inaccurate.

23.     Further, Lorona stated that she would not file false documents with the ADOR.

24.     Lorona then advised Smith that the school began doing business for purposes of the Tax Form in 2005.

25.     After learning this, Smith crossed out the date 7/1/2008 and wrote to the right of the incorrect date, in her own handwriting, 7/1/2011. *See Tax Form* Exhibit 1.

26.     Further, Smith crossed out "2011" changed box B 2 to read "8/1/2012." *See Tax Form* Exhibit 1.

27.     Smith then asked Lorona if she felt better about those dates.

28.     Lorona responded that she did not feel better about those dates because the altered dates were still false and inaccurate and reasonably believed that doing so would be considered a fraudulent filing with ADOR and would violate the law, including but not limited to A.R.S. § 42-1109.

29.     Accordingly, Lorona told Smith that she would not file the Tax Form documents with incorrect dates.

30.     Thereafter, Lorona was pressured and harassed daily by Smith to complete and file the Tax Form.

31.    For example, Smith visited Lorona's office multiple times daily for updates on the status of the tax documents.  Smith also stated that Lorona's previous supervisor was fired for failure to terminate Lorona's employment and she would not be terminated for that reason.

32.    These pressures led Lorona to fear that she would lose her job.

33.    In response, Lorona sought advice from ASLS General Counsel, Alicia Togno.

34.    Ms. Togno advised Lorona that under no circumstances should she file the fraudulent Tax Form, even if the failure to do so resulted in the termination of her employment.

35.    Lorona then met with Defendant Lee, the Human Resources Manager, to discuss the Tax Form and the pressures that Smith was putting on her.

36.    Incredibly, Lee advised Lorona that she would not do anything to resolve the harassment to complete the Tax Form using false and inaccurate information, and perhaps she could try the whistleblower hotline.

37.    Lee advised Lorona that she was not in a position to offer assistance.  Lorona was told to speak with Thompson for relief of harassment.

38.    Lee further stated if Thompson would not stop the harassment to contact the whistleblower hotline, and under no circumstances should Lorona mention Lee's name in the complaint.

39.    Thompson refused to become involved by speaking with Smith about the Tax Form.

40.    Via email, Plaintiff sent requests for meetings with Thompson and Lee to discuss Smith and her demand for Lorona to complete the Tax Form using false and incorrect data.

41.    However, Thompson and Lee failed to respond to Lorona's requests.

42.    After several weeks without response, and feeling daily pressure to complete the Tax Form using false and incomplete data, Lorona faxed a complaint to Infilaw's corporate whistle-blower hotline explaining the harassment occurring in at ASLS.

43.   In the fax, Lorona also complained about the failure of management, including Thompson's and Lee's, to address the harassment.

44.   The fax also notified Infilaw of management's failure to address demands that employee's work on Sunday's violating their religious beliefs, and daily threats of termination.

45.   Tellingly, Smith was terminated within days of Lorona's complaint to Infilaw's whistle-blower hotline.

46.   However, Defendants Thompson and Lee continued harassing Lorona.

47.   For example, when Lorona inquired about promotion for Director of Finance or Assistant Controller, she was denied the opportunity to interview for the position without consideration.

48.   Without reviewing Lorona's qualifications for Director of Finance or Controller, Lee told Lorona that she was not qualified to interview for the position.

49.   However, had Lee actually looked, she would have found that Lorona met or exceeded the minimum qualifications for the position.  See Controller Posting Exhibit

50.   When Lorona met with Lee in person in Lee's office, Lorona informed Lee that she was indeed qualified, Lee curtly told Lorona that would not be getting an interview either way in the presence of Angelique Artigua, Lee's Administrative Assistant.

51.   Ultimately, ASLS filled the position with a candidate that did not meet the minimum qualifications for the position.

52.   Lee and Thompson continued to harass Lorona in all facets of her employment, including excluding her completely from departmental meetings, excluding her while in meetings, taking Mrs. Lorona's corporate credit card while other employees in similar positions retained theirs, gossiping about Lorona, and ignoring her throughout the workday.

53.   ASLS has a written telecommuting policy that allows employees to occasionally work remotely while caring for sick or disabled family members.

54.   After Lorona refused to complete the Tax Forms with false and inaccurate information, Defendants inexplicably treated Lorona differently than every other employee at ASLS.

55.   During the course of Lorona's employment she was forced to work away from the office, due to lack of cross training of employees.

56.   After refusing to complete the Tax Forms, Lee knew that Lorona was caring for her disabled daughter and son, yet Lee unilaterally charged Lorona PTO hours without discussing such with Lorona.

57.   ASLS employee Viki Coen spoke with Thompson notifying him that Lorona was working and corresponding with her while Lorona was working away from the office.  However, Lee did not change the record and still charged Lorona PTO.

58.   Lee was aware that Lorona had disabled children because she had many discussions regarding her children's health.

59.   In fact, on at least one occasion, Lee delivered Lorona's work laptop to Lorona at the Thunderbird Banner Hospital so she could work remotely while caring for her child and not being forced to use PTO because Lorona was actually working.

60.   Other similarly situated employees were, and still to this day are, permitted to work remotely for myriad reasons, including reasons less meritorious than caring for a disabled child.

61.   In early 2011, Lorona also had expressed concerns in meetings with Dean Shirley Mays, Thompson, the admissions staff, and financial aid staff that the school was being deceptive in marketing to incoming students, in violation of 34 C.F.R. § 668.6.  Lorona also expressed concern that the School was also providing misleading data to investors and incoming students regarding how successful those students were likely to be, as well as which students were actually paying students as opposed to "trying law school" or being funded by ASLS.

62.     For example, Dean Mays stated during a meeting including Admissions, Finance, Financial Aid staff, Dean Mays, and Scott Thompson that students coming in through the Alternative Admissions Model for Legal Education ("AAMPLE") program, rather than traditional means of admission were just as successful in the classroom.

63.     Lorona told Dean Mays and others in the meeting that her statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment.

64.     Student's entering law school through AAMPLE may appear to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

65.     Lorona's concerns were based on the School's cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding placement of AAMPLE students in internship/externship programs as well as final placements.

66.     In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions.

67.     Such reports were intended to mislead prospective students in violation of A.R.S. § 44-1521 *et seq.*

68.     On April 13, 2013, Lorona was called to a conference room under the pretense that Gail Sauers and Vanessa Ethier needed assistance with a report.

69.     Upon arrival in the conference room Mrs. Lorona was met by Sauers, and Ethier, and Defendant Lee.

70.     Lorona was advised by Lee that Lorona and the School were going to be "mutually separating" and that if she signed a waiver of rights and confidentiality agreement she would receive three weeks of pay.

71.     Lorona did not agree to "mutually separate" her employment.

72.     Mrs. Lorona asked Lee why she was being terminated because in multiple meetings just weeks prior Lee had assured Lorona that her job was not in jeopardy and she had no performance concerns.

73.     Lee replied that Lorona was not being fired for cause, that Lorona had not done anything wrong, and that the company just felt she would be happier somewhere else.

74.     Lorona refused to sign the waiver of rights and/or confidentiality agreement.

75.     In response, Lorona filed appropriate complaints with the Arizona Attorney General's Office for whistleblower protection and the EEOC for discrimination.

76.     Unsurprisingly, ASLS responded to the EEOC with a number of made up and unsupported reasons for Lorona's termination.

77.     For example, ASLS replied to the EEOC that the reasons for Lorona's termination were recognized and documented in disciplinary forms. *See ASLS's Response to EEOC* Exhibit 2.

78.     However this is patently false because Lorona had never had a disciplinary report at ASLS.

79.     Further, as Lee acknowledged at the time when Lorona was fired, Lorona was told she was not being fired for cause and had done nothing wrong to warrant termination.

## DEFENDANTS MISLEAD AND FRAUDULENTLY INDUCE STUDENTS TO ENROLL IN ASLS

80.     Infilaw has studied bar passage rates for its students and based on its findings, Infilaw and ASLS have developed a bar exam failure predictor formula.

81.     The failure predictor formula includes LSAT scores, undergraduate gpa, and law school gpa, among the factors.

82.    Beginning in May 2014, ASLS along with its sister schools Florida Coastal School of Law, and Charlotte School of Law began paying students not to take the bar exam upon graduation based on these calculated failure predictors.

83.    This is an attempt to deceive the ABA accrediting board, and Department of Education, incoming students, existing students, and graduating students by attempting to increase bar passage percentages.

84.    ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

85.    In addition, ASLS students who were unable to afford bar prep courses that requested financial assistance, but did not fall within Infilaw's Failure Predictor Formula criteria, were denied financial assistance to prepare for the February 2015 bar exam.

86.    The effect of Infilaw's and ASLS's actions was to prevent students who ASLS predicted would fail the bar exam from taking the bar exam and thereby gaming the bar test passage rates in order to retain accreditation and receive other benefits, such as retain Title IV eligibility from the Department of Education.

87.    This position is a direct contradiction to the public marketing intended to induce students, including those who enroll via non-traditional methods, to enroll at ASLS and take institutional and federally-backed student loans in order to pay tuition.

88.    Further, this is evidence of Defendants' attempts to deceive and misrepresent actual data concerning bar passage rates, a vital measurement of success of law schools, in violation of A.R.S. § 44-1421 *et seq.*

89.     As alleged above, Plaintiff informed ASLS through its Dean, Shirley Mays, President, Scott Thompson, and Assistant Dean of Admissions, Glen Fogerty that students who were admitted through non-traditional means, such as AAMPLE, had lower success rates on the bar exam.

90.     However, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same, thereby violating A.R.S. § 44-1521.

91.     ASLS overall bar passage rate in July 2014 was approximately 48%.  This number represents a significant decline in passage rate, due in part to students enrolling at ASLS via nontraditional methods, including AAMPLE, were graduating from ASLS and began taking the bar exam.

92.     Dean Mays attempted to mislead current students, faculty, staff, and alumni by sending out an email documenting the bar passage percentage in a combined calculation representing a bar passage rate of over 80%.

93.     As a recent graduate of ASLS by traditional application, Lorona received an email from ASLS on 12/23/2014 indicating the anticipated bar passage rate for ASLS students on the February 2015 bar exam was 47% compared with a state average of 70%.

94.     This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

95.     On February 11, 2015 Mrs. Lorona received a phone call stating she was on a list of students not likely to pass the February bar exam based on lack of participation in on-campus optional simulated bar exams other predictors.

96.     Lorona's school assigned bar coach told Lorona that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

97.    The School then offered to pay Lorona monthly to defer the bar exam until July 2015, as explained above, in an attempt to inflate the passage numbers.

98.    Lorona was informed that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential new students.

99.    Lorona declined to participate in program and did not take the $5,000 to defer taking the bar exam.

100.    ASLS possesses cumulative data demonstrating that its students do not pass the bar exam at the rate that it publicly states on its websites, in brochures, and in its face-to-face marketing and enrollment counseling.

101.    The omission of data is a material misrepresentation designed to mislead prospective students, including Lorona, to enroll and pay tuition and other expenses to the School.

102.    After her termination, Lorona was expected to pay lump sum taxes on previous tuition waiver benefits that she received when she was a full-time employee as well as finance the final trimesters of school.

103.    Lorona has obtained a Right to Sue Letter from the Arizona Attorney General's Office.

104.    Likewise, Lorona has also requested, and is awaiting the Right to Sue from the EEOC.

105.    Lorona will amend her initial pleading upon receipt of the Right to Sue Letter from the EEOC to encompass violations of federal employment law.

**CLAIMS FOR RELIEF**
**Count One – Retaliatory Discharge in violation of A.R.S. § 23-1501 *et seq.***
(All Defendants)

106.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

107.     As alleged above, Plaintiff was an employee of Defendant ASLS and responsible for managing and reporting various financial data of the School, including the completion of the Tax Form that is reported the Arizona Department of Revenue.

108.     As alleged above, Plaintiff was approached by Smith of ASLS, and was told by that employee to use false and incorrect information on the Tax Form that would be reported to the Arizona Department of Revenue.

109.     As alleged above, the effect of using false and incorrect information would constitute a violation of a known statute, specifically A.R.S. § 42-1109.

110.     As alleged above, another effect of using false and incorrect information is that Plaintiff would jeopardize her potential status as an attorney, and her Arizona Department of Insurance licenses because an attorney violating A.R.S. § 42-1109, even at the behest of an employer, would violate the Arizona Ethical Rules for Attorneys.

111.     As alleged above, Plaintiff refused to complete the Tax Form using false and incorrect information.

112.     As alleged above, Plaintiff spoke with General Counsel for ASLS and was told not to use false and incorrect information on the Tax Form even if such would result in the termination of her employment.

113.     As alleged above, after Plaintiff refused to complete the Tax Form with false and incorrect information, Defendants began a coordinated, intentional, and unlawful plan designed to deny Plaintiff opportunities for promotion within ASLS and color Plaintiff's employee record with unfavorable, unfounded, and undeserved employee evaluation system that they alone controlled.

114.     As alleged above, Plaintiff told ASLS management, including Shirley Mays, that the enrollment and bar passage data were incorrect and therefore misleading to students and prospective students.

115.   As alleged above, Plaintiff told Shirley Mays, the Dean of the School, that these statistics and statements were false and misleading.

116.   Plaintiff reasonably believed that these misrepresentations were fraudulent and in violation of statute, including A.R.S. § 44-1521 *et seq.*

117.   As a result of Defendants' coordinated, intentional, and unlawful plan to punish Plaintiff for not completing the Tax Form with false and incorrect information and for speaking out about the misleading bar passage statistics, Defendants unilaterally terminated Plaintiff's employment from ASLS, thereby violating A.R.S. § 23-1501(A)(3)(c)(i)-(ii).

118.   Defendants Lee and Thompson were acting in the scope and course of their employment with ASLS and Infilaw, accordingly ASLS and Infilaw are liable for the actions of Thompson and Lee under the theory of *respondeat superior*.

119.   As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistleblower and will be forever publicly linked to a whistleblower complaint.

120.   Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result.  As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

**Count Two - Violation of 34 CFR Parts 600, *et seq.***
(Defendants Infilaw and ASLS)

121.   Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

122.    Mrs. Lorona expressed that ASLS was in violation of Program Integrity Regulations under 34 C.F.R. Parts 600, 602, 603, *et seq.* requiring accurate reporting as required for eligibility of Title IV HEA funding.

123.    Mrs. Lorona expressed concerns that admissions marketing, policies of actively recruiting students unlikely to succeed in a law school program likely constituted fraud against the aforementioned students is also protected behavior pursuant to A.R.S. § 44-1531(A), and A.R.S. § 44-1521 *et seq.* As a result of her report, Lorona was fired by employees or agents of Defendants ASLS and Infilaw.

124.    As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistle-blower and will be forever publicly linked to a whistleblower complaint.

125.    Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result. As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

### Count Three -- Consumer Fraud in violation of A.R.S. § 44-1521 *et seq.*
(Defendants Infilaw and ASLS)

126.    ASLS is a private, for-profit post-secondary school, owned and managed by Infilaw Corp. that offers Legal Education Programs in Phoenix, Arizona. ASLS is licensed by the Arizona State Board for Private Post-Secondary Education and is accredited by the American Bar Association (ABA).

127.    In 2012, the school began marketing the MyBar Program in an effort to comply with the Department of Education 90/10 requirements.

128.    On 12/12/2013 ASLS sent an email advising students not to sign up for Kaplan bar review, and touting higher bar passage rates for students taking MyBar as opposed to Barbri or Kaplan.

129.   Advertisements on the ASLS website; https://www.azsummitlaw.edu/student-resources/student-success-programs/mybar/mybar-faqs include statements such as:

Why is myBAR the best?

The myBAR Program has been specially designed to offer you the best of everything—including live lectures and practice tests by the two nationally-known bar prep companies (BarBri and Kaplan) and personalized assistance from the myBAR team of experts and fellow bar-takers.

With myBAR you are able to get a jump start on your bar review.  You can request materials before the lectures start and get access to BarBri AMP.
BarBri AMP combines brain science techniques with cutting-edge game studies research to fully engage and teach you in the most effective way possible. Its unique functionality – a multiple-choice testing format like no other – and proven memory-recall devices help you grasp the law faster and retain it longer. Exactly what you need to reinforce all the material you'll cover during the myBAR program.

According to LSAC, ASLS reports an average bar pass rate, LSAT scores, and average admissions grade point average intentionally disregarding students not admitted through traditional enrollment.

130.   ASLS reports on the school website at increase in enrollment through non-traditional enrollment (AAMPLE) from 11% in 2005 to 80% in spring 2011.

131.   However, admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions.

132.   Reporting enrollment and success statistics based on 20% or less of the student population is grossly misleading to incoming students, and existing students.

133.   Bar passage rates are advertised as 68.85% for first time takers.

134.   Bar exam results sent in misleading emails to faculty, staff, and student purport bar exam passage rates at 87%, when actual rates are approximately 47%.

135.   Recent graduates, after spending hundreds of thousands of dollars in tax payer backed loans were informed via email that their anticipated bar passage rate for the February 2015 Arizona Bar exam were 45%, in stark comparison to the rosy projections presented before and at the time of enrollment.

136.   ASLS deceptively represented that its Legal Education Program provided "We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers**."

137.   ASLS misrepresented the existence of success of past, present, and future graduate's ability to meet job qualification requirements, including but not limited to: graduation; bar passage; character and fitness; and other job requirements.

138.   ASLS misleads students by enrolling students ineligible for federal financial aid based on credit by "giving students time to fix their credit to receive loans" knowing with certainty that Department of Education does not lend to students for specified time periods with specific credit blemishes include foreclosures, and bankruptcies.

139.   The school provided institutional loans causing students to incur debt, without the means to repay such debt in an effort to deceive the students and investors that students would somehow be able to continue at ASLS without funding.

140.   As alleged above, Defendants published misleading representations about school success and bar passage rates of its students.

141.   But for Defendant's misrepresentations, Plaintiff would not have enrolled in ASLS.

142.   Plaintiff has suffered damages, including student loan debt that includes accruing interest and fees throughout its term.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests the Court to enter judgment in favor of Plaintiff and against Defendants as follows:

A.   An award of actual, consequential, statutory, and incidental damages in an amount to be proven at trial; and

B.   Awarding to Plaintiff her costs, expenses, and attorneys' fees incurred herein pursuant to A.R.S. §§ 23-1501 and other applicable law; and

C.   Other relief as the court deems just and proper.

Dated this 2nd day of March, 2015

Paula C. Lorona, Plaintiff

Original filed this 2nd day of March, 2015:

MARICOPA COUNTY SUPERIOR COURT
14264 W. Tierra Buena Lane
Surprise, AZ 85374

- 18 -

JT-1/UC-001 (7/11)                                     Lorona-00000001

# ARIZONA JOINT TAX APPLICATION

**IMPORTANT:** *Incomplete applications WILL NOT BE PROCESSED. All required information is designated with asterisk* *
To complete this application see attached instructions. Please return Complete application with appropriate license fee(s) to: License & Registration Section, Department of Revenue, PO BOX 29032, Phoenix AZ 85038-9032.

| To complete this online, go to www.aztaxes.gov ✓ |
|---|

---

**Section A: Taxpayer Information** (Print legibly or type the information on this application.)

**1. License Type** (Check all that apply) *
- ☐ Transaction Privilege Tax (TPT)
- ☐ Withholding/Unemployment Tax (*if hiring employees*)
- ☒ Use Tax
- ☐ TPT For Cities ONLY

**2. Type of Ownership** *
- ☐ Individual / Sole Proprietorship
- ☐ Partnership
- ☐ Professional Limited Liability
- ☒ Limited Liability Company
- ☐ Limited Liability Partnership
- ☐ Corporation
  - State of Inc. _____
  - Date of Inc. _____
- ☐ Sub-Chapter S Corporation
- ☐ Association
- ☐ Trust
- ☐ Government
- ☐ Estate
- ☐ Joint Venture
- ☐ Receivership

*Tax exempt organizations must attach a copy of the Internal Revenue Service letter of determination.*

**3. Federal Employer Identification Number** (Required for Employers and Entities other than Sole Proprietors) or Social Security Number *
14-▓▓▓▓▓▓

**4. Legal Business Name / Owner / Employing Unit** *
Phoenix School of Law, LLC

**5. Business or "Doing Business As" Name** *
Phoenix School of Law

**6. Business Phone Number** *
602.682.6815

**7. Fax Number**
602.682.6998

**8. Mailing Address** (Street, City, State, ZIP code) * Suite 1400   85004
ONE NORTH CENTRAL AVE PHOENIX AZ,

**9. Country**
U.S.A.

**10. Email Address**
jsmith@phoenixlaw.edu

**11. Is your business located on an Indian Reservation?**
- ☐ Yes   If yes,   (See Section G for listing of Reservations)
- ☒ No

**12. Physical Location of Business** (Street, City, State, ZIP code) Do not use PO Box or Route No. *

**13. County**
USA MARICOPA

*For additional business locations, complete Section B-12*

**14. Are you a construction contractor?** *
- ☐ Yes   (See Bonding Requirements below)
- ☒ No

**15. Did you acquire, or change the legal form of business of, all or part of an existing business?** *
- ☐ Yes   If yes, you must complete the Unemployment Tax Information (Section D)
- ☒ No

**Bonding Requirements:** Prior to the issuance of a Transaction Privilege Tax license, new or out-of-state contractors are required to post a Taxpayer Bond for Contractors, unless the Contractor qualifies for an exemption from the bonding requirement. The primary type of contracting being performed determines the amount of bond to be posted. Bonds may also be required from applicants who are delinquent in paying Arizona taxes or have a history of delinquencies. For more information on bonding, please see the "Taxpayer Bonds" publication, which is available online or at the Department of Revenue offices.

**16. Description of Business** (Must include type of merchandise sold or taxable activity; for employers, the type of employment) *
LAW School LEGAL EDUCATN.

**17. NAICS Code:** (Select at least one. Go to www.aztaxes.gov for a listing of codes) *
611310                                                                      Account.

**18. Identification of Owner, Partners, Corporate Officers, Members / Managing Members or Officials of this employing unit**

| A. Name (Last, First, MI) * | B. Soc. Sec. No. * | C. Title * | D. % Owned * | E. Complete Residence Address * | F. Phone Number * |
|---|---|---|---|---|---|
| Scott Thompson | ▓▓▓▓▓ | DIRECTOR OF FIN | 0 | ONE N. CENTRAL AVE, STE 1400, PHX, AZ 85004 | 602-682-6815 |
| Judy Smith | ▓▓▓▓▓ | | | | |
| | | | | | |
| | | | | | |

If the owner, partners, corporate officers or combination of partners or corporate officers, members and/or managing members own more than 50% of or control another business in Arizona, attach a list of the businesses, percentages owned and unemployment insurance account numbers.

---

**THIS BOX FOR AGENCY USE ONLY**

- ☐ New       Acct. No. _____       LIAB _____       DLN _____
- ☐ Change   Start _____           LIAB Est. _____   TPT _____
- ☐ Revise
- ☐ Reopen    S/E Date _____                            WH _____

ADOR 10194 (7/11)

Lorona-00000002

# APPLICATION FOR TRANSACTION PRIVILEGE (SALES) TAX LICENSE

ACCOUNT NO.



City of Phoenix
Finance Department
Tel:   602-262-6785,
        press 4,1
TTY: 602-534-5500

 FEE MUST BE MAILED WITH APPLICATION (see page 3)



PATO711

| Check one: ● Permanent ○ Temporary | Check one: ☒ New Business ○ New Owner of Existing Business | Previous City License # | Former Owner (if applicable) |
|---|---|---|---|

**Section I. Business Information**   Verify if your business is in Phoenix http://phoenix.gov/webpmo.html

| | OFFICE USE ONLY |
|---|---|
| Business Name (Individual, Company or "DBA" first name first): **PHOENIX SCHOOL OF LAW, LLC**    Owning Entity Name (Corp, LLC etc.): **A LLC** | NOV Date or DISV # |
| Physical Business Street Address of retail store, rental property, etc (NOT a P.O. Box Number, a PMB, or single family home rentals) **ONE N. CENTRAL AVE, STE 1400** | ST Code |
| City, State, Country, Zip Code +4: **PHOENIX, AZ  85004-4460**    Business Phone (Including Area Code) **602-682-6815** | / |
| When did your tax liability start in Phoenix?    E-Mail address: | / |
| State License #:    Federal ID #: | / |

NAICS Code

**Section II. Mailing Address & Phone Number**

Enter Name if Different from Section I (above) or Enter Care-of Name:

Mailing Address:

| City, State, Country, Zip Code +4: | Phone (Including Area Code) |
|---|---|

Rental Units

Owner Type

**Section III. Business Ownership**   * Sole and Husband/Wife must submit a photo ID with application See instructions for more info.

Report Method  C  A

| Ownership | ☐ *Sole   ☐ *Husband/Wife   ☒ LLC   ☐ Corp.-State Inc. ____   ☐ Gen. Partnership   ☐ Ltd. Partnership |
|---|---|
| | ☐ Revocable Trust   ☐ Irrevocable Trust   ☐ Other explain |

Liability Date

| List of officers attached? ○ Yes ○ No | 1) Name | Title |
|---|---|---|
| | Home Address | SSN # |
| | City, State, Country, Zip Code +4: | Phone No. |
| | 2) Name | Title |
| | Home Address | SSN # |
| | City, State, Country, Zip Code +4: | Phone No. |

Entered by

I Edited by

Approved by

**Section IV. Business Type** (Check all that apply) Provide a detailed description of your business.

| Do you sell Liquor? ☐ Yes ☒ No | ☐ Retail   ☐ Restaurant/Bar   ☐ Hotel/Motel | NAICS Code: (6 digit) |
|---|---|---|
| Accounting Method | ☐ Commercial Rental Property   ☐ Residential Rental Property-# of Units ____ | **6 1 1 3 1 0** |
| ☐ Cash | ☐ Advertising   ☐ Job Printing   ☐ Personal Property Rental | Principal business codes |
| ☒ Accrual | ☐ Short Term Motor Vehicle Rental   ☐ Telecommunications   ☐ Amusement | available at: |
| | ☐ Construction Contracting  AROC# _____   ☐ Home Builder/Spec. Sale | www.naics.com/search.htm |
| | ☒ Use Tax (Phoenix Business)   ☐ Use Tax (Out of State Business with no AZ Nexus) | |

Describe Nature of Business:   **PRIVATE UNIVERSITY**

**Section V. Business Premises Status**

Do you own your business location? ☐ Yes ☒ No   If yes, is this your residence? ☐ Yes ☒ No   If yes, skip to Signature
Do you rent a portion of the business premises to another entity or business? ☒ No ☐ Yes   If yes, see instructions for more info.

| Landlord/Property Manager **RYAN** | Mailing Address **One N. Central - Phoenix AZ** | Phone Number |
|---|---|---|

I certify that the statements made in this application are true and complete to the best of my knowledge. I accept the permit authorized and issued in response to this application with the condition that I report timely and pay any and all taxes due by me to the City of Phoenix.
*IF APPLICABLE, BE SURE ALL SALES TAX HAS BEEN PAID BY FORMER OWNER.*
*BY LAW YOU MAY BE LIABLE FOR ANY UNPAID TAX.*

FOR CITY USE ONLY BELOW

*Applications received incomplete or without payment may not be processed.*

| Print Name | Title |
|---|---|
| Signature | Date |

Checks Payable to Phoenix City Treasurer, P.O. Box 2005 , Phoenix, AZ 85001-2005

**Office Location: 3rd Floor, 251 W. Washington St.** Lorona-00000003                      Page 2
Mailing Address: P.O. Box 2005, Phoenix, AZ 85001-2005
Telephone: (602) 262-6785, press 4
    TDD (602)534-5500
www.phoenix.gov/plt   email tax @phoenix.gov
This material is available in alternative formats.

## WHO IS REQUIRED TO HAVE A PRIVILEGE (SALES) LICENSE? (See Phoenix Tax Code Section 14-300)
1.  Every person desiring to engage or continue in business activities within the City upon which a Privilege Tax is imposed.
2.  Every person, engaging or continuing in business within the City, storing or using tangible personal property in this City upon which a Use Tax is imposed.
3.  Every person required to report and pay a tax upon Rental Occupancy, as imposed by Phoenix Tax Code Section 14-440.
A person engaged in more than one activity subject to City Privilege and Use Taxes at any one business location is not required to obtain a separate license for each activity provided that, at the time such person makes application for a license, he shall list on such application each category or activity in which he is engaged.  The licensee shall inform the Tax Collector of any changes in his business activities within thirty (30) days.
This license does not preclude the authority of other city agencies.  You should call the Planning and Zoning Department, (602) 262-7844, if you have any questions concerning land use or sign placement before engaging in business.

## GENERAL INSTRUCTIONS
*All information given on this application is public information (except Social Security number)*
The application is used for data entry and must be TYPED OR PRINTED IN BLACK INK.  Return the completed application to the City of Phoenix, enclosing the appropriate fee with a check payable to Phoenix City Treasurer.  There is also an annual license fee that must be paid prior to issuance of a license.

*If you are a new owner of an existing business, please provide the name and Phoenix license number of the previous owner.  Check to be sure that the person you are buying the business from owes no back taxes or fees to the City of Phoenix.  By law you may be responsible for all back taxes and fees.*

The Privilege License shall be nontransferable between owners and shall be on display to the public in the licensee's place of business.  Except as provided in Phoenix Tax Code Section 14-320, the Privilege License shall be valid until request for cancellation and/or surrender of the license by the licensee of the business activity for which it was issued.

Application must be completed, signed and returned with fees to be processed.  **Incomplete applications or applications submitted without payment may not be processed and will delay your business activity.** Your license must be obtained and fees fully paid prior to engaging in business.
Permanent licenses are for an on-going year around business. Temporary licenses or Special Events licenses are issued only for periods of up to 30 consecutive days for a total fee of $25.00. Complete the following sections:

Check one: O Permanent     Check one: O New Business        Previous City License #     Former Owner (if applicable)
            O Temporary                O New Owner of Existing Business

**Section I – Business Information** Verify if your business is in Phoenix www.phoenix.gov/webgno.html

| | |
|---|---|
| Business Name: | Business name if using one. If not, list name of the business owner.  Property managers applying on behalf of a client should indicate the property owner's name in this section. |
| Owning Entity Name: | List the ownership name of the business if different from business name. |
| Business Address & Phone: | Physical address of your Phoenix business location, including suite, unit, or apartment number.  A P.O. Box or PMB is not acceptable for a business location.  A separate license application must be completed for each multi-unit property and/or all commercial property. For single family residential rental property please use the owners home address. The phone number listed here should correspond to the Phoenix business location. (For further information regarding residential rentals see Quick Fact Sheet located in the Residential Rentals section) |
| Liability Start Date: | The date (month/day/year) in which you will begin taxable business activity in Phoenix. Licensing fees are based on this date. |
| E-mail address: | The email address for the person who should receive general Phoenix Privilege (Sales) and Use Tax information and updates |
| State Tax License #: | www.revenue.state.az.us |
| Federal ID #: | www.irs.gov |

## Section II – Mailing Address & Phone Number-Complete this area only if the information is different from Section I.
This area is for the name of the person and the address to which the business license and tax return mail will be sent.  Please include suite, unit, or apartment numbers.

Lorona-00000004

## Section III – Business Ownership (Please indicate the type of ownership. If you mark "Other" please describe.)

Ownership:
Sole or Husband/Wife ownerships must provide a color copy of their identification. See website for acceptable forms of identifications. All corporations must provide the State of incorporation and at least two officers information. A "LLC" must have at least the Managing Member. General Partnerships must provide the names of the general partner(s). You may attach a list to the application

Owners/Partners/Corporate Officers/LLC Members
List complete owner/officer/partner information as requested including names and titles. Please use the home (not business) address for each officer/partner. P.O. Box numbers or PMB's are not acceptable for home addresses.

## Section IV – Business Type (Check all that apply)

Do you sell Liquor? If "Yes" contact License Services @ (602) 262-4638 Option #3 or email: clk.liquor.license@phoenix.gov.

Mark "Cash" if you recognize income based upon the date funds are received. Mark "Accrual" if you recognize income when earned regardless of when the cash is received.

*Provide a detailed description of business activity. If retail sales, list type of items to be sold; if construction contracting, list type of contracting, etc. Please indicate your Contractor's number with the Arizona Registrar of Contractors if you checked construction contracting.*
NAICS Code: (6 digit) Principal business codes available at: www.naics.com/search.htm

## Section V – Business Premises Status

Please indicate whether or not you own your business location. If you answer "No", please provide the name of the legal owner or property manager along with their mailing address and phone number. *If you lease or take considerations for use of property from a related entity you own, this is taxable as commercial rental and an additional license would be needed.*

# FEE SCHEDULE

**A NON-REFUNDABLE APPLICATION FEES MUST BE PAID AT THE TIME OF APPLICATION:** Any combination of activities may result in additional fees. If license fees are not paid in full within 30 days of start date, a 50 percent late fee will be assessed.

| Commercial Rental or Use Tax Activity only. | For persons engaged exclusively in the rental and leasing of nonresidential real property or Use Tax a $20 application fee is charged. | | $20 total due | |
|---|---|---|---|---|
| Residential Rental Activity | For persons engaged in the rental of residential real property, a $2 pro-rated fee per unit is charged with an annual cap of fifty $50 dollars per license, based on the Phoenix Tax Liability Start Date, per the chart below: | | $20 Application Fee **plus** pro-rated Annual License Fee | |
| | Start Date | Pro-Rated Annual Fee Per Unit | 50% Late Tax Per Unit | |
| | January 1 – March 31 | $2.00 | $1.0 | |
| | April 1 – June 30 | $1.50 | .75 | |
| | July 1 – September 30 | $1.00 | .50 | |
| | October 1 – December 31 | .50 | .25 | |
| All other types of business excluding Residential Rental, Commercial Rental and Use Tax | For persons engaged in the activities listed, a $50 pro-rated fee is charged, based on the Phoenix Tax Liability Start Date, per the chart below: | | $20 Application Fee **plus** pro-rated Annual License Fee | |
| | Start Date | Pro-Rated Annual Fee | 50% Late Fee | |
| | January 1 – March 31 | $50.00 | $25.00 | |
| | April 1 – June 30 | $37.50 | $18.75 | |
| | July 1 – September 30 | $25.00 | $12.50 | |
| | October 1 – December 31 | $12.50 | $ 6.25 | |

*Any licensee who permits his license to expire through cancellation as provided in Phoenix Tax Code Section 14-320, by his request for cancellation by surrender of the license, or by the cessation of the business activity for which the license was issued, and who thereafter applies for a license, shall be granted a new license as an original application and shall pay the current license fee. Any licensee who loses or misplaces his Privilege License that is still in effect shall be charged the current license fee for each reissuance of a license.* Rev. 10/20/09

JT-1/UC-001 (7/11)                          Lorona-00000005                          Page 2

## Section B:  Transaction Privilege Tax (TPT)

| 1. Date Business Started in Arizona * | 2. Date Sales Began * | 3. What is your anticipated annual income for your first twelve months of business? |
|---|---|---|
| 7-1-07  7/1/08 | 8/1/18 | 30 mil/a.t. |

**4. Business Classes (Select at least one. See Section H for a listing of business classes on page 4) ***

029   USE TAX PURCHASES

| 5. TPT Filing Method | 6. Does your business sell tobacco products? | 7. Does your business sell new motor vehicle tires or vehicles? |
|---|---|---|
| ☐ Cash Receipts  ☒ Accrual | ☐ Yes  If yes,  ☐ Retailer **OR** ☒ No  ☐ Distributor | ☒ No ☐ Yes  (You will be required to file a TR-1.) |

**8. Are you a seasonal filer?**  ☐ Yes  ☒ No    If yes, please check the months in which you intend to do business:

| Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ | ✓ |

**9. Location of Tax Records (Street Address, City, State and ZIP code) Do not use PO Box or Route No. ***

| 10. Name of Company or Person to Contact | 11. Phone Number |
|---|---|
| Judy Smith | 602-682-6815 |

**For additional locations, complete the following:  (If more space is needed, please attach additional sheets)**

| 12. "Doing Business As" Name for this Location | 13. Phone Number |
|---|---|
| | |

| 14. Physical Location Address (Do not use PO Box or Route No.) |
|---|
| |

| 15. City | 16. County | 17. State | 18. ZIP code |
|---|---|---|---|
| | | | |

| 19. "Doing Business As" Name for this Location | 20. Phone Number |
|---|---|
| | |

| 21. Physical Location Address (Do not use PO Box or Route No.) |
|---|
| |

| 22. City | 23. County | 24. State | 25. ZIP code |
|---|---|---|---|
| | | | |

## Section C:  Program Cities / License Fees  Below is a list of cities and towns licensed by the Arizona Department of Revenue.

| City/Town | Code | Fee | No. of Loc | Total | City/Town | Code | Fee | No. of Loc | Total | City/Town | Code | Fee | No. of Loc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benson | BS | 5.00 | | | Hayden | HY | 5.00 | | | Show Low | SL | 2.00 | | |
| Bisbee | BB | 1.00 | | | Holbrook | HB | 1.00 | | | Sierra Vista | SR | 1.00 | | |
| Buckeye | BE | 2.00 | | | Huachuca City | HC | 2.00 | | | Snowflake | SN | 2.00 | | |
| Camp Verde | CE | 2.00 | | | Jerome | JO | 2.00 | | | South Tucson | ST | 2.00 | | |
| Carefree | CA | 10.00 | | | Kearny | KN | 2.00 | | | Springerville | SV | 5.00 | | |
| Casa Grande | CG | 2.00 | | | Kingman | KM | 2.00 | | | St. Johns | SJ | 2.00 | | |
| Cave Creek | CK | 20.00 | | | Lake Havasu | LH | 5.00 | | | Star Valley | SY | 2.00 | | |
| Chino Valley | CV | 2.00 | | | Litchfield Park | LP | 2.00 | | | Superior | SI | 2.00 | | |
| Clarkdale | CD | 2.00 | | | Mammoth | MH | 2.00 | | | Surprise | SP | 10.00 | | |
| Clifton | CF | 2.00 | | | Marana | MA | 5.00 | | | Taylor | TL | 2.00 | | |
| Colorado City | CC | 2.00 | | | Maricopa | MP | 2.00 | | | Thatcher | TC | 2.00 | | |
| Coolidge | CL | 2.00 | | | Miami | MM | 2.00 | | | Tolleson | TN | 2.00 | | |
| Cottonwood | CW | 2.00 | | | Oro Valley | OR | 12.00 | | | Tombstone | TS | 1.00 | | |
| Dewey/Humboldt | DH | 2.00 | | | Page | PG | 2.00 | | | Tusayan | TY | 2.00 | | |
| Duncan | DC | 2.00 | | | Paradise Valley | PV | 2.00 | | | Wellton | WT | 2.00 | | |
| Eagar | EG | 10.00 | | | Parker | PK | 2.00 | | | Wickenburg | WB | 2.00 | | |
| El Mirage | EM | 15.00 | | | Patagonia | PA | 25.00 | | | Williams | WL | 2.00 | | |
| Eloy | EL | 10.00 | | | Payson | PS | 2.00 | | | Winkelman | WM | 2.00 | | |
| Florence | FL | 2.00 | | | Pima | PM | 2.00 | | | Winslow | WS | 10.00 | | |
| Fountain Hills | FH | 2.00 | | | Pinetop/Lakeside | PP | 2.00 | | | Youngtown | YT | 10.00 | | |
| Fredonia | FD | 10.00 | | | Prescott Valley | PL | 2.00 | | | Yuma | YM | 2.00 | | |
| Gila Bend | GI | 2.00 | | | Quartzsite | QZ | 2.00 | | | | | | | |
| Gilbert | GB | 2.00 | | | Queen Creek | QC | 2.00 | | | | | | | |
| Globe | GL | 2.00 | | | Safford | SF | 2.00 | | | | | | | |
| Goodyear | GY | 5.00 | | | Sahuarita | SA | 5.00 | | | | | | | |
| Guadalupe | GU | 2.00 | | | San Luis | SU | 2.00 | | | | | | | |

▶ **Please Note:** City fees are subject to change (go to our website for updates). For cities not listed above, please contact the cities directly. Your license will not be issued until all fees are paid.

| Total of City Fees: | |
|---|---|
| State Fees $12.00 X _____ Number of Locations: | |
| TOTAL Fees: | |

ADOR 10194 (7/11)

CORRECTED
By Clerk of the Court

MICHAEL A. JEANES, CLERK
BY _____ DEP
FILED

~~15 MAR -1~~ PM 4: 43
15 MAR 2

Paula Lorona
Pro Se
12705 West Sierra Circle
El Mirage, Arizona 85335
(623) 875-9543
(623) 875-9543 (Fax)
E-mail:  plorona@cox.net
Paula C. Lorona, Pro Se

## SUPERIOR COURT OF ARIZONA
## MARICOPA COUNTY

PAULA C. LORONA, pro se          )   No. CV CV2015-000681
                                 )
          Plaintiff,             )
                                 )   **CERTIFICATE REGARDING**
vs.                              )   **COMPULSORY ARBITRATION**
                                 )
ARIZONA SUMMIT LAW SCHOOL LLC,   )
a Delaware limited liability company; )
INFILAW CORPORATION, a Delaware  )
corporation; STEPHANIE and JASON LEE, )
husband and wife, SCOTT and JANE DOE )
THOMPSON, husband and wife; JOHN )
AND JANE DOES 1-100; BLACK       )
CORPORATIONS 1-100; WHITE        )
PARTNERSHIPS 1-100;              )
                                 )
          Defendants.            )

        The undersigned certifies that he knows the dollar limits and any other limitations set forth by

the local rules of practice for the Maricopa County Superior Court, and further certifies that this case is

NOT subject to compulsory arbitration, as provided by Ariz. R. Civ. P. 72 through 76.

        **DATED** this 28 day of February, 2015 .

                              By:  _____
                                   Paula Lorona
                                   12705 W Sierra Cir. El Mirage, AZ 85335
                                   El Mirage, Arizona 85335
                                   Pro Se

1

Superior Court of Arizona In Maricopa County

**CV2015-000681**

CORRECTED
By Clerk of the Court

MICHAEL K. JEANES, CLERK
BY
DEP
FILED
15 MAR -1  PM 4: 37
15 MAR 2

**CIVIL COVER SHEET- NEW FILING ONLY**
(Please Type or Print)

Is Interpreter Needed? ☐ Yes ☒ No

If yes, what language: _____

Plaintiff's Attorney:
Paula C Lorona   Pro Se

**Attorney's Bar Number:** _____

To the best of my knowledge, all information is true and correct.

Paula

**Attorney/Pro Per Signature** (If no attorney, YOUR signature)

Plaintiff's Name(s):  (List all)
Paula Lorona

_____

_____

Plaintiff's Address:
Paula Lorona

12705 W. Sierra Cir.

El Mirage, AZ 85335

(List additional plaintiffs on page two and/or attach a separate sheet).

Defendant's Name(s):  (List all.)
Arizona Summit Law School LLC, Infilaw Corp., Scott Thompson, Stephanie Lee, Jason Lee, Jane Doe Thompson,
JOHN AND JANE DOES 1-100; BLACK CORPORATIONS 1-100; WHITE PARTNERSHIPS 1-100;

_____

_____ (List additional

defendants on page two and/or attach a separate sheet).

EMERGENCY ORDER SOUGHT:        ☐ Temporary Restraining Order        ☐ Provisional Remedy
(if applicable)                                    ☐ OSC – Order to Show Cause           ☐ Election Challenge
                                                   ☐ Employer Sanction                  ☐ Other

☒ RULE 8(i) COMPLEX LITIGATION DOES NOT APPLY.  (Mark appropriate box under **Nature of Action**).

☐ RULE 8(i) COMPLEX LITIGATION APPLIES   Rule 8(i) of the Rules of Civil Procedure defines a "Complex
Case" as civil actions that require continuous judicial management. A typical case involves a large number of
witnesses, a substantial amount of documentary evidence, and a large number of separately represented parties.
(Mark appropriate box on page two as to complexity, **in addition** to the Nature of Action case category).

## NATURE OF ACTION

(Place an **"X"** next to the **one** case category that most accurately describes your primary case.)

**100 TORT MOTOR VEHICLE:**
☐ 101 Non-Death/Personal Injury
☐ 102 Property Damage
☐ 103 Wrongful Death
**110 TORT NON-MOTOR VEHICLE:**
☐ 111 Negligence
☐ 112 Product Liability – Asbestos
☐ 112 Product Liability – Tobacco
☐ 112 Product Liability – Toxic/Other
☐ 113 Intentional Tort
☐ 114 Property Damage
☐ 115 Legal Malpractice
☐ 115 Malpractice – Other professional
☐ 117 Premises Liability
☐ 118 Slander/Libel/Defamation
☐ 116 Other (Specify)

**120 MEDICAL MALPRACTICE:**
☐ 121 Physician M.D.   ☐ 123 Hospital
☐ 122 Physician D.O    ☐ 124 Other
**130 CONTRACTS:**
☐ 131 Account (Open or Stated)
☐ 132 Promissory Note
☐ 133 Foreclosure
☐ 138 Buyer-Plaintiff
☐ 139 Fraud
☐ 134 Other Contract (i.e. Breach of Contract)
☐ 135 Excess Proceeds - Sale
☐ Construction Defects (Residential/Commercial)
      ☐ 136 Six to Nineteen Structures
      ☐ 137 Twenty or More Structures

(All other tax matters must be filed in the AZ Tax Court)

## 150-199 OTHER CIVIL CASE TYPES:
- ☐ 156 Eminent Domain/Condemnation
- ☐ 151 Eviction Actions (Forcible and Special Detainers)
- ☐ 152 Change of Name
- ☐ 153 Transcript of Judgment
- ☐ 154 Foreign Judgment
- ☐ 158 Quiet Title
- ☐ 160 Forfeiture
- ☐ 175 Election Challenge
- ☐ 179 Employer Sanction Action (A.R.S. §23-212)
- ☐ 180 Injunction against Workplace Harassment
- ☐ 181 Injunction against Harassment
- ☐ 182 Civil Penalty
- ☐ 186 Water Rights (Not General Stream  Adjudication)
- ☐ 187 Real Property
- ☐ Sexually Violent Persons (A.R.S. §36-3704)
     (Except Maricopa County)
- ☐ Minor Abortion (See Juvenile in Maricopa County)
- ☐ Special Action Against Lower Courts
     (See lower court appeal cover sheet in Maricopa)
- ☐ 194-Immigration Enforcement Challenge
     (§§1-501, 1-502, 11-1051)

## 150-199 UNCLASSIFIED CIVIL CASE TYPES:
- ☐ Administrative Review
     (See lower court appeal cover sheet in Maricopa)
- ☐ 150 Tax Appeal

Case No. _____

- ☐ 155 Declaratory Judgment
- ☐ 157 Habeas Corpus
- ☐ 184 Landlord Tenant Dispute - Other
- ☐ 159 Restoration of Civil Rights (Federal)
- ☐ 159 Clearance of Records (A.R.S. §13-4051)
- ☐ 190 Declaration of Factual Innocence(A.R.S.§12-771)
- ☐ 191 Declaration of Factual Improper Party Status
- ☐ 193 Vulnerable Adult (A.R.S. §46-451)
- ☐ 165 Tribal Judgment
- ☐ 167 Structured Settlement (A.R.S. §12-2901)
- ☐ 169 Attorney Conservatorships (State Bar)
- ☐ 170 Unauthorized Practice of Law (State Bar)
- ☐ 171 Out-of-State Deposition for Foreign Jurisdiction
- ☐ 172 Secure Attendance of Prisoner
- ☐ 173 Assurance of Discontinuance
- ☐ 174 In-State Deposition for Foreign Jurisdiction
- ☐ 176 Eminent Domain–Light Rail Only
- ☐ 177 Interpleader– Automobile Only
- ☐ 178 Delayed Birth Certificate (A.R.S. §36-333.03)
- ☒ 183 Employment Dispute - Discrimination
- X 185 Employment Dispute - Other
- ☐ 195(a) Amendment of Marriage License
- ☐ 195(b) Amendment of Birth Certificate
- ☒ 163 Other _____ CIVIL RIGHTS _____
     (Specify)

## COMPLEXITY OF THE CASE

If you marked the box on page one indicating that Complex Litigation applies, place an "X" in the box of no less than one of the following:

- ☐ Antitrust/Trade Regulation
- ☐ Construction Defect with many parties or structures
- ☐ Mass Tort
- ☐ Securities Litigation with many parties
- ☐ Environmental Toxic Tort with many parties
- ☐ Class Action Claims
- ☐ Insurance Coverage Claims arising from the above-listed case types
- ☐ A Complex Case as defined by Rule 8(i) ARCP

Additional Plaintiff(s)

_____

_____

Additional Defendant(s)

_____

_____

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
S. Bagnall, Deputy
4/22/2015 1:51:00 PM
Filing ID 6551948

Paula Mrs. Lorona
12705 W. Sierra Cir.
El Mirage, AZ 85335
(623) 875-9543
plorona@cox.net
*Plaintiff Pro Se*

# IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| PAULA C. LORONA, pro se )<br><br>Plaintiff, )<br><br>vs. )<br>ARIZONA SUMMIT LAW SCHOOL LLC, a )<br>Delaware limited liability company; )<br>INFILAW CORPORATION, a Delaware )<br>corporation; STEPHANIE and JASON LEE, )<br>husband and wife, SCOTT and JANE DOE )<br>THOMPSON, husband and wife; JOHN AND )<br>JANE DOES 1-100; BLACK )<br>CORPORATIONS 1-100; WHITE )<br>PARTNERSHIPS 1-100; )<br><br>Defendants. )<br>)<br>)<br>) | CASE NO.  CV 2015-000681<br><br>MOTION TO AMEND COMPLAINT<br><br>(Assigned to the Honorable Dawn Bergin) |

Plaintiff hereby submits her Motion to Amend Complaint pursuant to Rule 15(a) Arizona Rules of Civil Procedures.  Plaintiff requests leave to file an Amended Complaint adding three claims.  Plaintiff noted in her original Complaint filed March 2, 2015 that she was awaiting a Right to Sue Letter from the EEOC.  The additional claims stem from the EEOC charges, and Plaintiff is now in possession of the Right to Sue Letter.  The first additional claim is based on violations of the ADA, Family Caregiver And Family Responsibilities Association Discrimination and The Americans With Disabilities Act.  The second additional claim is based on FMLA Denial and

FMLA Interference and the third additional claim is based on Disparate Treatment Arizona Civil Rights Act of 1974, A.R.S §§ 41-1463, -1464.

Pursuant to Rule 15(a)(1), Ariz.R.Civ.P., "A party may amend the party's pleading once as a matter of course." Plaintiff has not yet served any Defendant in an attempt to ensure judicial economy. Further, "Leave to amend shall be freely given when justice requires."

As these are additional, sole and separate, non-redundant bases for this Court to rule in the Plaintiff's favor, and as the information supporting these claims was only recently obtained, justice requires this Court permit amendment. Attached hereto as Exhibit 1, is a copy of the proposed amended complaint. Pursuant to Rule 15(a)(2), Arizona Rules of Civil Procedure, the additional language added to the complaint is underlined.

Dated this *22* day of April, 2015

Paula Lorona

Pro Se

- 2 -

EXHIBIT 1

Paula Mrs. Lorona
12705 W. Sierra Cir.
El Mirage, AZ 85335
(623) 875-9543
plorona@cox.net
*Plaintiff Pro Se*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| PAULA C. LORONA, pro se | CV2015-000681 |
| Plaintiff, | |
| vs. | |
| ARIZONA SUMMIT LAW SCHOOL LLC, a Delaware limited liability company; INFILAW CORPORATION, a Delaware corporation; STEPHANIE and JASON LEE, husband and wife, SCOTT and JANE DOE THOMPSON, husband and wife; JOHN AND JANE DOES 1-100; BLACK CORPORATIONS 1-100; WHITE PARTNERSHIPS 1-100; | **FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Defendants. | |

Plaintiff Paula C. Lorona, for her Complaint against the above-named Defendants, alleges as follows:

### PARTIES, VENUE, AND JURISDICTION

1.    Plaintiff Paula Mrs. Lorona ("Lorona") is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was employed by Arizona Summit Law School, formerly known as Phoenix School of Law, in Phoenix, Arizona.

2.    Defendant Arizona Summit Law School ("ASLS" or "the School") is a for-profit Arizona limited liability company and was Lorona's employer.

- 1 -

3.      Defendant Scott Thompson ("Thompson") is the President of ASLS and a resident of Maricopa County, Arizona.

4.      Defendant Stephanie Lee ("Lee") was the Director of Human Resources for ASLS and a resident of Maricopa County, Arizona.

5.      Defendant Infilaw Corporation is a Delaware corporation with a primary place of business in Naples, Florida, and is the parent company of ASLS.

6.      At all times pertinent to this Complaint, Thompson and Lee were officials representing ASLS and Infilaw Corp., and in doing the acts complained of herein, were acting under the color and pretense of statutes, ordinances, regulations, customs of the State of Arizona, and Department of Education, ABA and any other pertinent accrediting agencies.

7.      At all times pertinent to this Complaint, Thompson and Lee were acting within the course and scope of employment with ASLS, and as a result thereof, ASLS and Infilaw are liable for the acts of Thompson and Lee under the principle of *respondeat superior*.

8.      Defendants Jason Lee and Jane Doe Thompson are named as defendants because at all times, Defendants Stephanie Lee and Scott Thompson were acting on behalf of their marital community and the marital community is liable for the actions of Stephanie Lee and Scott Thompson.

9.      Defendants Jane Does and 1-100, Black Corporations 1-100, and White Partnerships 1-100 are certain unknown individuals or entities who through their own actions or inactions have caused or assisted others in causing the incidents and resulting harms set forth below.  Despite diligent efforts by Plaintiff, the identity of these individuals has not yet been ascertained but they are well known by the Defendants. Plaintiffs will amend their complaint to allege the true names and capacities of the various Doe Defendants when they are learned.

10. This court has jurisdiction because the amount in question exceeds the jurisdictional limits of all inferior courts.

11. This Court is the appropriate venue because the actions giving rise to this Complaint occurred in Maricopa County, Arizona.

## DEFENDANTS DISCHARGE PLAINTIFF OUT OF RETALIATION FOR REFUSING TO FILE FRAUDLENT TAX FORMS

12. Lorona was hired in November 2009 as an administrative assistant and received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

13. One benefit given to employees of ASLS is a full tuition waiver to attend law school, beginning 12 months after full-time employment and continuing throughout employment.

14. One of the factors Lorona considered when accepting employment with ASLS was the full tuition waiver described above, and if fact based on her job performance was permitted a pro rata early tuition waiver starting at 9 months.

15. Before her employment, Lorona reviewed the evening school plan, statistics of school completion, and bar passage rates, among other factors, and decided that ASLS would be a good place for her to work and attend school.

16. In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

17. Throughout her employment, Lorona has received excellent employee reviews and as alleged above, has been offered the opportunity for advancement commensurate with her skills and experience.

18. In 2012 Judy Smith ("Smith") Director of Finance, presented Mrs. Lorona with Arizona Department of Revenue ("ADOR") documents, including ADOR 10194 (7/11) (the "Tax Form"). *See Tax Form* as Exhibit 1-9.

19.    Smith ordered that Lorona review and upload the Tax Form to the ADOR's website.

20.    The reason that Lorona was ordered to review and upload the Tax Form was because ASLS had failed to register with ADOR or pay state sales tax since beginning operations in 2005.

21.    Before presenting the Tax Form to Lorona, Smith had knowingly filled in the Tax Form with false and incorrect information by listing in Section B 1 that the date business started in Arizona as 7/1/2008 and B 2, Date Sales began as 8/1/2010. *See Tax Form* Exhibit 1.

22.    After seeing the Tax Form that Smith had provided to her, Lorona advised Smith that the information was grossly inaccurate.

23.    Further, Lorona stated that she would not file false documents with the ADOR.

24.    Lorona then advised Smith that the school began doing business for purposes of the Tax Form in 2005.

25.    After learning this, Smith crossed out the date 7/1/2008 and wrote to the right of the incorrect date, in her own handwriting, 7/1/2011. *See Tax Form* Exhibit 1.

26.    Further, Smith crossed out "2011" changed box B 2 to read "8/1/2012." *See Tax Form* Exhibit 1.

27.    Smith then asked Lorona if she felt better about those dates.

28.    Lorona responded that she did not feel better about those dates because the altered dates were still false and inaccurate and reasonably believed that doing so would be considered a fraudulent filing with ADOR and would violate the law, including but not limited to A.R.S. § 42-1109.

29.    Accordingly, Lorona told Smith that she would not file the Tax Form documents with incorrect dates.

30.    Thereafter, Lorona was pressured and harassed daily by Smith to complete and file the Tax Form.

31.     For example, Smith visited Lorona's office multiple times daily for updates on the status of the tax documents.  Smith also stated that Lorona's previous supervisor was fired for failure to terminate Lorona's employment and she would not be terminated for that reason.

32.     These pressures led Lorona to fear that she would lose her job.

33.     In response, Lorona sought advice from ASLS General Counsel, Alicia Togno.

34.     Ms. Togno advised Lorona that under no circumstances should she file the fraudulent Tax Form, even if the failure to do so resulted in the termination of her employment.

35.     Lorona then met with Defendant Lee, the Human Resources Manager, to discuss the Tax Form and the pressures that Smith was putting on her.

36.     Incredibly, Lee advised Lorona that she would not do anything to resolve the harassment to complete the Tax Form using false and inaccurate information, and perhaps she could try the whistleblower hotline.

37.     Lee advised Lorona that she was not in a position to offer assistance.  Lorona was told to speak with Thompson for relief of harassment.

38.     Lee further stated if Thompson would not stop the harassment to contact the whistleblower hotline, and under no circumstances should Lorona mention Lee's name in the complaint.

39.     Thompson refused to become involved by speaking with Smith about the Tax Form.

40.     Via email, Plaintiff sent requests for meetings with Thompson and Lee to discuss Smith and her demand for Lorona to complete the Tax Form using false and incorrect data.

41.     However, Thompson and Lee failed to respond to Lorona's requests.

42.     After several weeks without response, and feeling daily pressure to complete the Tax Form using false and incomplete data, Lorona faxed a complaint to Infilaw's corporate whistle-blower hotline explaining the harassment occurring in at ASLS.

43. In the fax, Lorona also complained about the failure of management, including Thompson's and Lee's, to address the harassment.

44. The fax also notified Infilaw of management's failure to address demands that employee's work on Sunday is violating their religious beliefs, and daily threats of termination.

45. Tellingly, Smith was terminated within days of Lorona's complaint to Infilaw's whistle-blower hotline.

46. However, Defendants Thompson and Lee continued harassing Lorona.

47. For example, when Lorona inquired about promotion for Director of Finance or Assistant Controller, she was denied the opportunity to interview for the position without consideration.

48. Without reviewing Lorona's qualifications for Director of Finance or Controller, Lee told Lorona that she was not qualified to interview for the position.

49. However, had Lee actually looked, she would have found that Lorona met or exceeded the minimum qualifications for the position.  See Controller Posting Exhibit

50. When Lorona met with Lee in person in Lee's office, Lorona informed Lee that she was indeed qualified, Lee curtly told Lorona that would not be getting an interview either way in the presence of Angelique Artigua, Lee's Administrative Assistant.

51. Ultimately, ASLS filled the position with a candidate that did not meet the minimum qualifications for the position.

52. Lee and Thompson continued to harass Lorona in all facets of her employment, including excluding her completely from departmental meetings, excluding her while in meetings, taking Mrs. Lorona's corporate credit card while other employees in similar positions retained theirs, gossiping about Lorona, and ignoring her throughout the workday.

53. ASLS has a written telecommuting policy that allows employees to occasionally work remotely while caring for sick or disabled family members.

54.     After Lorona refused to complete the Tax Forms with false and inaccurate information, Defendants inexplicably treated Lorona differently than every other employee at ASLS.

55.     During the course of Lorona's employment she was forced to work away from the office, due to lack of cross training of employees.

56.     After refusing to complete the Tax Forms, Lee knew that Lorona was caring for her disabled daughter and son, yet Lee unilaterally charged Lorona PTO hours without discussing such with Lorona.

57.     ASLS employee Viki Coen spoke with Thompson notifying him that Lorona was working and corresponding with her while Lorona was working away from the office.  However, Lee did not change the record and still charged Lorona PTO.

58.     Lee was aware that Lorona had disabled children because she had many discussions regarding her children's health.

59.     In fact, on at least one occasion, Lee delivered Lorona's work laptop to Lorona at the Thunderbird Banner Hospital so she could work remotely while caring for her child and not being forced to use PTO because Lorona was actually working.

60.     Other similarly situated employees were, and still to this day are, permitted to work remotely for myriad reasons, including reasons less meritorious than caring for a disabled child.

61.     In early 2011, Lorona also had expressed concerns in meetings with Dean Shirley Mays, Thompson, the admissions staff, and financial aid staff that the school was being deceptive in marketing to incoming students, in violation of 34 C.F.R. § 668.6.  Lorona also expressed concern that the School was also providing misleading data to investors and incoming students regarding how successful those students were likely to be, as well as which students were actually paying students as opposed to "trying law school" or being funded by ASLS.

62.     For example, Dean Mays stated during a meeting including Admissions, Finance, Financial Aid staff, Dean Mays, and Scott Thompson that students coming in through the Alternative Admissions Model for Legal Education ("AAMPLE") program, rather than traditional means of admission were just as successful in the classroom.

63.     Lorona told Dean Mays and others in the meeting that her statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment.

64.     Students entering law school through AAMPLE may appear to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

65.     Lorona's concerns were based on the School's cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding placement of AAMPLE students in internship/externship programs as well as final placements.

66.     In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions.

67.     Such reports were intended to mislead prospective students in violation of A.R.S. § 44-1521 *et seq.*

68.     On April 13, 2013, Lorona was called to a conference room under the pretense that Gail Sauers and Vanessa Etheir needed assistance with a report.

69.     Upon arrival in the conference room Mrs. Lorona was met by Sauers, and Ethier, and Defendant Lee.

70.     Lorona was advised by Lee that Lorona and the School were going to be "mutually separating" and that if she signed a waiver of rights and confidentiality agreement she would receive three weeks of pay.

71.     Lorona did not agree to "mutually separate" her employment.

72.     Mrs. Lorona asked Lee why she was being terminated because in multiple meetings just weeks prior Lee had assured Lorona that her job was not in jeopardy and she had no performance concerns.

73.     Lee replied that Lorona was not being fired for cause, that Lorona had not done anything wrong, and that the company just felt she would be happier somewhere else.

74.     Lorona refused to sign the waiver of rights and/or confidentiality agreement.

75.     In response, Lorona filed appropriate complaints with the Arizona Attorney General's Office for whistleblower protection and the EEOC for discrimination.

76.     Unsurprisingly, ASLS responded to the EEOC with a number of made up and unsupported reasons for Lorona's termination.

77.     For example, ASLS replied to the EEOC that the reasons for Lorona's termination were recognized and documented in disciplinary forms. *See ASLS's Response to EEOC* Exhibit 2.

78.     However this is patently false because Lorona had never had a disciplinary report at ASLS.

79.     Further, as Lee acknowledged at the time when Lorona was fired, Lorona was told she was not being fired for cause and had done nothing wrong to warrant termination.

## DEFENDANTS MISLEAD AND FRAUDULENTLY INDUCE STUDENTS TO ENROLL IN ASLS

80.     Infilaw has studied bar passage rates for its students and based on its findings, Infilaw and ASLS have developed a bar exam failure predictor formula.

81.     The failure predictor formula includes LSAT scores, undergraduate gpa, and law school gpa, among the factors.

82.     Beginning in May 2014, ASLS along with its sister schools Florida Coastal School of Law, and Charlotte School of Law began paying students not to take the bar exam upon graduation based on these calculated failure predictors.

83.     This is an attempt to deceive the ABA accrediting board, and Department of Education, incoming students, existing students, and graduating students by attempting to increase bar passage percentages.

84.     ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

85.     In addition, ASLS students who were unable to afford bar prep courses that requested financial assistance, but did not fall within Infilaw's Failure Predictor Formula criteria, were denied financial assistance to prepare for the February 2015 bar exam.

86.     The effect of Infilaw's and ASLS's actions was to prevent students who ASLS predicted would fail the bar exam from taking the bar exam and thereby gaming the bar test passage rates in order to retain accreditation and receive other benefits, such as retain Title IV eligibility from the Department of Education.

87.     This position is a direct contradiction to the public marketing intended to induce students, including those who enroll via non-traditional methods, to enroll at ASLS and take institutional and federally-backed student loans in order to pay tuition.

88.     Further, this is evidence of Defendants' attempts to deceive and misrepresent actual data concerning bar passage rates, a vital measurement of success of law schools, in violation of A.R.S. § 44-1421 *et seq.*

89.     As alleged above, Plaintiff informed ASLS through its Dean, Shirley Mays, President, Scott Thompson, and Assistant Dean of Admissions, Glen Fogerty that students who were admitted through non-traditional means, such as AAMPLE, had lower success rates on the bar exam.

90.     However, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same, thereby violating A.R.S. § 44-1521.

91.     ASLS overall bar passage rate in July 2014 was approximately 48%. This number represents a significant decline in passage rate, due in part to students enrolling at ASLS via nontraditional methods, including AAMPLE, were graduating from ASLS and began taking the bar exam.

92.     Dean Mays attempted to mislead current students, faculty, staff, and alumni by sending out an email documenting the bar passage percentage in a combined calculation representing a bar passage rate of over 80%.

93.     As a recent graduate of ASLS by traditional application, Lorona received an email from ASLS on 12/23/2014 indicating the anticipated bar passage rate for ASLS students on the February 2015 bar exam was 47% compared with a state average of 70%.

94.     This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

95.     On February 11, 2015 Mrs. Lorona received a phone call stating she was on a list of students not likely to pass the February bar exam based on lack of participation in on-campus optional simulated bar exams other predictors.

96.     Lorona's school assigned bar coach told Lorona that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

97.    The School then offered to pay Lorona monthly to defer the bar exam until July 2015, as explained above, in an attempt to inflate the passage numbers.

98.    Lorona was informed that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential new students.

99.    Lorona declined to participate in program and did not take the $5,000 to defer taking the bar exam.

100.    ASLS possesses cumulative data demonstrating that its students do not pass the bar exam at the rate that it publicly states on its websites, in brochures, and in its face-to-face marketing and enrollment counseling.

101.    The omission of data is a material misrepresentation designed to mislead prospective students, including Lorona, to enroll and pay tuition and other expenses to the School.

102.    After her termination, Lorona was expected to pay lump sum taxes on previous tuition waiver benefits that she received when she was a full-time employee as well as finance the final trimesters of school.

103.    Lorona has obtained a Right to Sue Letter from the Arizona Attorney General's Office.

104.    Likewise, Lorona has also requested, and is awaiting the Right to Sue from the EEOC.

105.    Lorona will amend her initial pleading upon receipt of the Right to Sue Letter from the EEOC to encompass violations of federal employment law.

**CLAIMS FOR RELIEF**
**Count One – Retaliatory Discharge in violation of <u>ADA, Title VII, ACRA: A.R.S. § 23-1501 *et seq.* and FMLA</u>**
(All Defendants)

106.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

107. As alleged above, Plaintiff was an employee of Defendant ASLS and responsible for managing and reporting various financial data of the School, including the completion of the Tax Form that is reported the Arizona Department of Revenue.

108. As alleged above, Plaintiff was approached by Smith of ASLS, and was told by that employee to use false and incorrect information on the Tax Form that would be reported to the Arizona Department of Revenue.

109. As alleged above, the effect of using false and incorrect information would constitute a violation of a known statute, specifically A.R.S. § 42-1109.

110. As alleged above, another effect of using false and incorrect information is that Plaintiff would jeopardize her potential status as an attorney, and her Arizona Department of Insurance licenses because an attorney violating A.R.S. § 42-1109, even at the behest of an employer, would violate the Arizona Ethical Rules for Attorneys.

111. As alleged above, Plaintiff refused to complete the Tax Form using false and incorrect information.

112. As alleged above, Plaintiff spoke with General Counsel for ASLS and was told not to use false and incorrect information on the Tax Form even if such would result in the termination of her employment.

113. As alleged above, after Plaintiff refused to complete the Tax Form with false and incorrect information, Defendants began a coordinated, intentional, and unlawful plan designed to deny Plaintiff opportunities for promotion within ASLS and color Plaintiff's employee record with unfavorable, unfounded, and undeserved employee evaluation system that they alone controlled.

114. As alleged above, Plaintiff told ASLS management, including Shirley Mays, that the enrollment and bar passage data were incorrect and therefore misleading to students and prospective students.

115. As alleged above, Plaintiff told Shirley Mays, the Dean of the School, that these statistics and statements were false and misleading.

116. Plaintiff reasonably believed that these misrepresentations were fraudulent and in violation of statute, including A.R.S. § 44-1521 *et seq.*

117. As a result of Defendants' coordinated, intentional, and unlawful plan to punish Plaintiff for not completing the Tax Form with false and incorrect information and for speaking out about the misleading bar passage statistics, Defendants unilaterally terminated Plaintiff's employment from ASLS, thereby violating A.R.S. § 23-1501(A)(3)(c)(i)-(ii).

118. Defendants Lee and Thompson were acting in the scope and course of their employment with ASLS and Infilaw, accordingly ASLS and Infilaw are liable for the actions of Thompson and Lee under the theory of *respondeat superior*.

119. As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistleblower and will be forever publicly linked to a whistleblower complaint.

120. Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result. As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

**Count Two - Violation of 34 CFR Parts 600, *et seq.***
(Defendants Infilaw and ASLS)

121. Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

122.    Mrs. Lorona expressed that ASLS was in violation of Program Integrity Regulations under 34 C.F.R. Parts 600, 602, 603, *et seq.* requiring accurate reporting as required for eligibility of Title IV HEA funding.

123.    Mrs. Lorona expressed concerns that admissions marketing, policies of actively recruiting students unlikely to succeed in a law school program likely constituted fraud against the aforementioned students is also protected behavior pursuant to A.R.S. § 44-1531(A), and A.R.S. § 44-1521 *et seq.* As a result of her report, Lorona was fired by employees or agents of Defendants ASLS and Infilaw.

124.    As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistle-blower and will be forever publicly linked to a whistleblower complaint.

125.    Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result. As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

### Count Three – Consumer Fraud in violation of A.R.S. § 44-1521 *et seq.*
(Defendants Infilaw and ASLS)

126.    ASLS is a private, for-profit post-secondary school, owned and managed by Infilaw Corp. that offers Legal Education Programs in Phoenix, Arizona. ASLS is licensed by the Arizona State Board for Private Post-Secondary Education and is accredited by the American Bar Association (ABA).

127.    In 2012, the school began marketing the MyBar Program in an effort to comply with the Department of Education 90/10 requirements.

128.    On 12/12/2013 ASLS sent an email advising students not to sign up for Kaplan bar review, and touting higher bar passage rates for students taking MyBar as opposed to Barbri or Kaplan.

- 15 -

129.   Advertisements on the ASLS website; https://www.azsummitlaw.edu/student-resources/student-success-programs/mybar/mybar-faqs include statements such as:

Why is myBAR the best?

The myBAR Program has been specially designed to offer you the best of everything—including live lectures and practice tests by the two nationally-known bar prep companies (BarBri and Kaplan) and personalized assistance from the myBAR team of experts and fellow bar-takers.

With myBAR you are able to get a jump start on your bar review.  You can request materials before the lectures start and get access to BarBri AMP.

BarBri AMP combines brain science techniques with cutting-edge game studies research to fully engage and teach you in the most effective way possible. Its unique functionality – a multiple-choice testing format like no other – and proven memory-recall devices help you grasp the law faster and retain it longer. Exactly what you need to reinforce all the material you'll cover during the myBAR program.

According to LSAC, ASLS reports an average bar pass rate, LSAT scores, and average admissions grade point average intentionally disregarding students not admitted through traditional enrollment.

130.   ASLS reports on the school website at increase in enrollment through non-traditional enrollment (AAMPLE) from 11% in 2005 to 80% in spring 2011.

131.   However, admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions.

132.   Reporting enrollment and success statistics based on 20% or less of the student population is grossly misleading to incoming students, and existing students.

133.   Bar passage rates are advertised as 68.85% for first time takers.

134.   Bar exam results sent in misleading emails to faculty, staff, and student purport bar exam passage rates at 87%, when actual rates are approximately 47%.

135.   Recent graduates, after spending hundreds of thousands of dollars in tax payer backed loans were informed via email that their anticipated bar passage rate for the February 2015 Arizona Bar exam were 45%, in stark comparison to the rosy projections presented before and at the time of enrollment.

136.   ASLS deceptively represented that its Legal Education Program provided "We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers."**

137.   ASLS misrepresented the existence of success of past, present, and future graduate's ability to meet job qualification requirements, including but not limited to: graduation; bar passage; character and fitness; and other job requirements.

138.   ASLS misleads students by enrolling students ineligible for federal financial aid based on credit by "giving students time to fix their credit to receive loans" knowing with certainty that Department of Education does not lend to students for specified time periods with specific credit blemishes include foreclosures, and bankruptcies.

139.   The school provided institutional loans causing students to incur debt, without the means to repay such debt in an effort to deceive the students and investors that students would somehow be able to continue at ASLS without funding.

140.   As alleged above, Defendants published misleading representations about school success and bar passage rates of its students.

141.   But for Defendant's misrepresentations, Plaintiff would not have enrolled in ASLS.

142.   Plaintiff has suffered damages, including student loan debt that includes accruing interest and fees throughout its term.

## Count Four – Family Caregiver And Family Responsibilities Discrimination Association Discrimination The Americans With Disabilities Act.
### (All Defendants)

143.   Plaintiff minor children (B.L. and C.L.) are disabled person(s) within the meaning of the ADA.

144.   Plaintiff is in a protected category under the ADA because she is associated with her minor children that have disabilities that are recognized under the ADA.

145.   Plaintiff is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the Defendant, the employer.

146.   Defendants discriminated against Plaintiff and her minor children by failing and refusing to engage in interactive conversations with Plaintiff to determine her job accommodation needs to care for her ill, disabled children.

147.   Defendants discriminated against Plaintiff and her minor daughter by failing to provide Plaintiff with reasonable job accommodations to care for her disabled children.

148.   Defendant's employees that have no families, no children and who are parents of non-disabled children and family members are given special consideration and more favorable treatment by the defendant.

149.   Employees that are primary caregivers of either children or adult family members are required to take paid time off and not advised of their FMLA rights while performing caregiver duties while non-caregiver employees are permitted to work remotely and not blocked from promotions.

150.   ASLS turnover rates, both voluntary and involuntary, for employee caregivers are higher than non-caregiver employees, and the executive staff is primarily made up of employees with non-caregiving duties.

151.   While employees that are not disabled and/or do not have caregiving responsibilities are permitted to work remotely at will, those with disabilities and caring for family members with disabilities are not permitted the same accommodations.

152.   Plaintiff was denied interview for promotions, and promotions based on recommendations by three previous supervisors.

153.   During the first week of April 2012, Plaintiff was advised by Lee, she would not be getting an interview for the promotion for which she applied.  When asked if it was because she complained about being charged paid time off to care for her disabled children, Lee responded that Plaintiff would just not be receiving an interview.

154.   ASLS advised the EEOC that Plaintiff did not qualify for positions she applied for.

155.   EEOC requested copy of the job description during investigation.

156.   ASLS provided a job description different from the position Plaintiff applied for.

157.   When the EEOC Investigator inquired as to why the school provided a misleading job posting, with an incorrect date, ASLS told EEOC Investigator that they did not provide the correct posting requested because they were moving in a different direction with the posting.

- 19 -

158.    Plaintiff acquired posting requirements of the "new position" and they appear to be identical to the job duties of the prior posting with the exception of the CPA required that was not included on the posting Plaintiff applied for.

159.    The individual "filling in" for the position Plaintiff applied for is a male without a disability and without caregiving responsibilities.

### Count Five – FMLA Denial and FMLA Interference
(All Defendants)

160.    Plaintiff's minor children B.L. and C.L., suffered from a "serious health condition" at all times relevant herein.

161.    While working under the supervision of Alicia Togno and Jim Lemire, Plaintiff was permitted accommodations such as working remotely for partial or full days in order to care for her disabled children.

162.    Plaintiff was permitted to work from home and required to work weekends from home to complete her workload.  Plaintiff was the only employee in the Student Accounts department while sister schools had 2-4 employees completing the same amount of work.

163.    Plaintiff was also required to cover certain activities in the absence of a Finance Director.  Plaintiff received assistance from the Information Technology Department on weekends while working remotely.

164.    While Plaintiff's daughter was hospitalized for her disability, Lee brought Plaintiff her work computer so she could work remotely.

165.    Lee and Thompson were notified via email, phone, and in person of Plaintiff's need to work remotely to care of her disabled children yet at no point did Lee offer FMLA protection to Plaintiff.

166.   Male employees without disabilities or caregiving responsibilities were placed on "FMLA leave" by Lee without documentation from a doctor or request from the employee to be placed on FMLA.

167.   In the case of one male employee, Lee stated she needed to place him on FMLA to protect herself and the male employee by indicating he was on FMLA leave as opposed to just taking vacation time for the birth of his child.

168.   Lee did not request documentation of the wife's pregnancy.  When the male employee advised Lee that he did not want to deal with the paperwork and that he would just use vacation time, Lee assured him she would not require standard FMLA paperwork from the male employee.

**Count Six – Gender Discrimination – Disparate Treatment Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 200e et seq.**
(All Defendants)

169.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq. for relief based upon the unlawful employment practices of Defendant.  Specifically, Plaintiff complains of Defendant's violation of Title VII's prohibition in employment based, in whole or in part, upon an employee's gender.

170.   During her employment with Defendant, Plaintiff was a member of a protected class under Title VII against gender based discrimination by her employer, Defendant, or by its managers and supervisory personnel.

171.   After a senior management meeting a manager approached Plaintiff and advised her that Lee and Dean Mays had discussed the attractiveness of her butt in the meeting that had just ended.  The manager stated that she felt uncomfortable with the discussion.

172.   Plaintiff met with Lee to discuss what occurred during the meeting.  Lee stated that since they said good things about Plaintiff's butt she should be flattered.

173.   Lee also stated, as she had in previous Emotional Intelligence Training, that sexual harassment is only harassment if it is unwanted.

174.   Plaintiff advised Lee that she was embarrassed that they had discussed her in a senior management meeting.

175.   Lee brushed Plaintiff off and did not further discuss the matter.

176.   Subsequently, Plaintiff's supervisor compared Plaintiff's body and face to that of a Barbie Doll.

177.   Plaintiff responded that she did not feel she resembled a Barbie Doll.  In response Plaintiff's supervisor drew a naked female body and commented that is what a Barbie looks like and that is what your body looks like as well.

178.   Plaintiff did not address the discussion with Human Resources because Lee had failed to address her prior complaint and further was personally involved in the inappropriate discussion in the presence of the entire senior management staff.

179.   Plaintiff scheduled a meeting with Lee to discuss disparate treatment and whether Plaintiff's job was in jeopardy for some reason.  Plaintiff asked whether there were concerns with performance that she should correct.  Lee advised that Thompson had never expressed any concern with her performance and Lee did not have any concerns with Plaintiff's performance or employment in general.

180.   Plaintiff was terminated without cause through a "mutual separation" because Lee stated "We feel you would be happier somewhere else".

181.   During the "mutual separation" meeting Plaintiff asked Lee why she was being terminated because she had never been advised of any behavior or performance issues.  Further, Lee had informed Plaintiff in a meeting merely weeks prior that her employment was not in jeopardy and neither Lee nor Thompson had concerns with employee's performance.

182. Lee stated that Plaintiff was "not being terminated for cause and had done nothing wrong. They just felt Plaintiff would be happier somewhere else".

183. ASLS later informed the EEOC that Plaintiff was terminated for cause because she talked about students and had performance issues, such as poor 360 results.

184. This again demonstrates a shifting in reason for termination by the Defendants in attempt to mislead as to the true reason for the "mutual separation".

185. Vanessa Ethier and Gail Sauers were also present in the "mutual separation" meeting.

186. Plaintiff had recently discussed via email and in person concerns regarding paid time off being deducted while Plaintiff was working from home caring for her children.

187. Lee stated there is a not a telecommuting policy. However, Plaintiff had copy of company telecommuting policy.

188. Most members of the management staff routinely worked remotely including Lee and Thompson without a deduction in their paid time off.

189. When Plaintiff discussed concerns regarding Lee's response and deduction of paid time off with colleagues at Infilaw they advised Plaintiff that employees at all Campuses and Infilaw routinely were permitted to telecommute based on necessity. Colleagues also advised Plaintiff they would speak with Lee regarding policy.

190. Plaintiff was also denied opportunities for promotion on multiple occasions. Whereas, ASLS hired male executives without posting positions or interviewing potential candidates, female candidates were forced to follow standard hiring procedures.

191. Plaintiff was replaced by a male employee with fewer qualifications whom also was not required to follow standard hiring procedures.

192. The Director of Admissions, a male, is frequently permitted to leave work early during key times for admissions to attend children's sporting events and other activities.

193.    In addition, Director of Admissions was berated openly in management meeting regarding performance, and inability to meet performance goals.

194.    Director of Admissions resigned to take a Professor Position as Arizona State University. Upon non-renewal of that contract, Director returned to ASLS as the Director of Admissions despite the severe drop in admissions numbers, and an apparent inability to adapt to enrollment challenges prior to his initial departure.

195.    Plaintiff was required to work until at least 5PM daily to accommodate night students.

196.    Plaintiff's male replacement routinely works no later than 4PM.  Male employee states he needs to leave early so that he can take public transportation although public transportation runs much later than 4PM on a daily basis.

**Count Six – Gender Discrimination – Disparate Treatment Arizona Civil Rights Act of 1974, A.R.S §§ 41-1463, -1464.**
(All Defendants)

197.    This claim is authorized and instituted pursuant to the provisions of ACRA for relief based upon the unlawful employment practices of Defendant.  Specifically, Plaintiff complains of Defendant's violation of the ACRA's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender.

198.    During her employment with Defendants, Plaintiff was a member of a protected class under ACRA against gender based discrimination by her employer, Defendant, or by its managers and supervisory personnel.

199.    Plaintiff's complaint(s) and her opposition to Defendant's discrimination were reasonable and made by her in good faith.

200.    After plaintiff engaged in the fundamental public policies and protected employment activities/speech as alleged heroin, Plaintiff was retaliated against by exclusion from management

- 24 -

meetings, taking Plaintiff's corporate credit card, being ignored by Lee and other supervisors, and eventually termination of her employment without cause.

201.    There exists a causal link between Plaintiff's complaint(s) and Defendant's decision to retaliate and take adverse employment actions against Plaintiff, including termination of her employment.

202.    As a direct and proximate result of Defendant's unlawful employment, retaliation, adverse employment actions and wrongful termination, Plaintiff suffered damages including loss of income, loss of employment entitlements, the loss of her personal dignity, inconveniences, costs, expenses and other consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court to enter judgment in favor of Plaintiff and against Defendants as follows:

A.    An award of actual, consequential, statutory, and incidental damages in an amount to be proven at trial; and

B.    Awarding to Plaintiff her costs, expenses, and attorneys' fees incurred herein pursuant to A.R.S. §§ 23-1501 and other applicable law; and

C.    Other relief as the court deems just and proper.


Dated this 22nd day of April, 2015

_____
Paula C. Lorona, Plaintiff


Original filed this 2nd day of March, 2015:

MARICOPA COUNTY SUPERIOR COURT
14264 W. Tierra Buena Lane
Surprise, AZ 85374

- 25 -

Michael K. Jeanes, Clerk of Court
*** Electronically Filed ***
04/28/2015 8:00 AM

SUPERIOR COURT OF ARIZONA
MARICOPA COUNTY

CV 2015-000681                                    04/27/2015

                                          CLERK OF THE COURT
HON. DAWN M. BERGIN                             C. Watling
                                                 Deputy


PAULA C LORONA                            PAULA C LORONA
                                          12705 W SIERRA CIR
                                          EL MIRAGE AZ  85335

v.

ARIZONA SUMMIT LAW SCHOOL L L C, et       ARIZONA SUMMIT LAW SCHOOL L L C
al.                                       NO ADDRESS ON RECORD



**MINUTE ENTRY**


       The Court has reviewed Plaintiff's Motion to Amend Complaint, filed on April 22, 2015.
As Plaintiff has not yet served any Defendant, she is entitled to amend the Complaint as a matter
of right under Rule 15(a). Plaintiff is therefore free to file her Amended Complaint.  However,
she must file the Amended Complaint no later than twenty-one days after serving it; otherwise,
she must obtain leave of court to do so.

Michael K Jeanes, Clerk of Court
*** Electronically Filed ***
K. Dyer, Deputy
5/1/2015 4:30:00 PM
Filing ID 6574469

Paula Mrs. Lorona
12705 W. Sierra Cir.
El Mirage, AZ 85335
(623) 875-9543
plorona@cox.net
*Plaintiff Pro Se*

## IN THE SUPERIOR COURT OF THE STATE OF ARIZONA

## IN AND FOR THE COUNTY OF MARICOPA

| | |
|---|---|
| PAULA C. LORONA, pro se | **CV2015-000681** |
| Plaintiff, | |
| vs. | |
| ARIZONA SUMMIT LAW SCHOOL LLC, a Delaware limited liability company; INFILAW CORPORATION, a Delaware corporation; STEPHANIE and JASON LEE, husband and wife, SCOTT and JANE DOE THOMPSON, husband and wife; JOHN AND JANE DOES 1-100; BLACK CORPORATIONS 1-100; WHITE PARTNERSHIPS 1-100; | **FIRST AMENDED COMPLAINT** |
| Defendants. | |

Plaintiff Paula C. Lorona, for her Complaint against the above-named Defendants, alleges as follows:

### PARTIES, VENUE, AND JURISDICTION

1.      Plaintiff Paula Mrs. Lorona ("Lorona") is a resident of Maricopa County, Arizona, and all times pertinent to this Complaint, Lorona was employed by Arizona Summit Law School, formerly known as Phoenix School of Law, in Phoenix, Arizona.

2.      Defendant Arizona Summit Law School ("ASLS" or "the School") is a for-profit Arizona limited liability company and was Lorona's employer.

- 1 -

3.      Defendant Scott Thompson ("Thompson") is the President of ASLS and a resident of Maricopa County, Arizona.

4.      Defendant Stephanie Lee ("Lee") was the Director of Human Resources for ASLS and a resident of Maricopa County, Arizona.

5.      Defendant Infilaw Corporation is a Delaware corporation with a primary place of business in Naples, Florida, and is the parent company of ASLS.

6.      At all times pertinent to this Complaint, Thompson and Lee were officials representing ASLS and Infilaw Corp., and in doing the acts complained of herein, were acting under the color and pretense of statutes, ordinances, regulations, customs of the State of Arizona, and Department of Education, ABA and any other pertinent accrediting agencies.

7.      At all times pertinent to this Complaint, Thompson and Lee were acting within the course and scope of employment with ASLS, and as a result thereof, ASLS and Infilaw are liable for the acts of Thompson and Lee under the principle of *respondeat superior*.

8.      Defendants Jason Lee and Jane Doe Thompson are named as defendants because at all times, Defendants Stephanie Lee and Scott Thompson were acting on behalf of their marital community and the marital community is liable for the actions of Stephanie Lee and Scott Thompson.

9.      Defendants Jane Does and 1-100, Black Corporations 1-100, and White Partnerships 1-100 are certain unknown individuals or entities who through their own actions or inactions have caused or assisted others in causing the incidents and resulting harms set forth below.  Despite diligent efforts by Plaintiff, the identity of these individuals has not yet been ascertained but they are well known by the Defendants. Plaintiffs will amend their complaint to allege the true names and capacities of the various Doe Defendants when they are learned.

10.     This court has jurisdiction because the amount in question exceeds the jurisdictional limits of all inferior courts.

11.     This Court is the appropriate venue because the actions giving rise to this Complaint occurred in Maricopa County, Arizona.

## DEFENDANTS DISCHARGE PLAINTIFF OUT OF RETALIATION
## FOR REFUSING TO FILE FRAUDLENT TAX FORMS

12.     Lorona was hired in November 2009 as an administrative assistant and received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

13.     One benefit given to employees of ASLS is a full tuition waiver to attend law school, beginning 12 months after full-time employment and continuing throughout employment.

14.     One of the factors Lorona considered when accepting employment with ASLS was the full tuition waiver described above, and if fact based on her job performance was permitted a pro rata early tuition waiver starting at 9 months.

15.     Before her employment, Lorona reviewed the evening school plan, statistics of school completion, and bar passage rates, among other factors, and decided that ASLS would be a good place for her to work and attend school.

16.     In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

17.     Throughout her employment, Lorona has received excellent employee reviews and as alleged above, has been offered the opportunity for advancement commensurate with her skills and experience.

18.     In 2012 Judy Smith ("Smith") Director of Finance, presented Mrs. Lorona with Arizona Department of Revenue ("ADOR") documents, including ADOR 10194 (7/11) (the "Tax Form"). *See Tax Form* as Exhibit 1-9.

19.     Smith ordered that Lorona review and upload the Tax Form to the ADOR's website.

20.     The reason that Lorona was ordered to review and upload the Tax Form was because ASLS had failed to register with ADOR or pay state sales tax since beginning operations in 2005.

21.     Before presenting the Tax Form to Lorona, Smith had knowingly filled in the Tax Form with false and incorrect information by listing in Section B 1 that the date business started in Arizona as 7/1/2008 and B 2, Date Sales began as 8/1/2010. *See Tax Form* Exhibit 1.

22.     After seeing the Tax Form that Smith had provided to her, Lorona advised Smith that the information was grossly inaccurate.

23.     Further, Lorona stated that she would not file false documents with the ADOR.

24.     Lorona then advised Smith that the school began doing business for purposes of the Tax Form in 2005.

25.     After learning this, Smith crossed out the date 7/1/2008 and wrote to the right of the incorrect date, in her own handwriting, 7/1/2011. *See Tax Form* Exhibit 1.

26.     Further, Smith crossed out "2011" changed box B 2 to read "8/1/2012." *See Tax Form* Exhibit 1.

27.     Smith then asked Lorona if she felt better about those dates.

28.     Lorona responded that she did not feel better about those dates because the altered dates were still false and inaccurate and reasonably believed that doing so would be considered a fraudulent filing with ADOR and would violate the law, including but not limited to A.R.S. § 42-1109.

29.     Accordingly, Lorona told Smith that she would not file the Tax Form documents with incorrect dates.

30.     Thereafter, Lorona was pressured and harassed daily by Smith to complete and file the Tax Form.

- 4 -

31.     For example, Smith visited Lorona's office multiple times daily for updates on the status of the tax documents.  Smith also stated that Lorona's previous supervisor was fired for failure to terminate Lorona's employment and she would not be terminated for that reason.

32.     These pressures led Lorona to fear that she would lose her job.

33.     In response, Lorona sought advice from ASLS General Counsel, Alicia Togno.

34.     Ms. Togno advised Lorona that under no circumstances should she file the fraudulent Tax Form, even if the failure to do so resulted in the termination of her employment.

35.     Lorona then met with Defendant Lee, the Human Resources Manager, to discuss the Tax Form and the pressures that Smith was putting on her.

36.     Incredibly, Lee advised Lorona that she would not do anything to resolve the harassment to complete the Tax Form using false and inaccurate information, and perhaps she could try the whistleblower hotline.

37.     Lee advised Lorona that she was not in a position to offer assistance.  Lorona was told to speak with Thompson for relief of harassment.

38.     Lee further stated if Thompson would not stop the harassment to contact the whistleblower hotline, and under no circumstances should Lorona mention Lee's name in the complaint.

39.     Thompson refused to become involved by speaking with Smith about the Tax Form.

40.     Via email, Plaintiff sent requests for meetings with Thompson and Lee to discuss Smith and her demand for Lorona to complete the Tax Form using false and incorrect data.

41.     However, Thompson and Lee failed to respond to Lorona's requests.

42.     After several weeks without response, and feeling daily pressure to complete the Tax Form using false and incomplete data, Lorona faxed a complaint to Infilaw's corporate whistle-blower hotline explaining the harassment occurring in at ASLS.

43.     In the fax, Lorona also complained about the failure of management, including Thompson's and Lee's, to address the harassment.

44.     The fax also notified Infilaw of management's failure to address demands that employee's work on Sunday is violating their religious beliefs, and daily threats of termination.

45.     Tellingly, Smith was terminated within days of Lorona's complaint to Infilaw's whistle-blower hotline.

46.     However, Defendants Thompson and Lee continued harassing Lorona.

47.     For example, when Lorona inquired about promotion for Director of Finance or Assistant Controller, she was denied the opportunity to interview for the position without consideration.

48.     Without reviewing Lorona's qualifications for Director of Finance or Controller, Lee told Lorona that she was not qualified to interview for the position.

49.     However, had Lee actually looked, she would have found that Lorona met or exceeded the minimum qualifications for the position.  See Controller Posting Exhibit

50.     When Lorona met with Lee in person in Lee's office, Lorona informed Lee that she was indeed qualified, Lee curtly told Lorona that would not be getting an interview either way in the presence of Angelique Artigua, Lee's Administrative Assistant.

51.     Ultimately, ASLS filled the position with a candidate that did not meet the minimum qualifications for the position.

52.     Lee and Thompson continued to harass Lorona in all facets of her employment, including excluding her completely from departmental meetings, excluding her while in meetings, taking Mrs. Lorona's corporate credit card while other employees in similar positions retained theirs, gossiping about Lorona, and ignoring her throughout the workday.

53.     ASLS has a written telecommuting policy that allows employees to occasionally work remotely while caring for sick or disabled family members.

54.     After Lorona refused to complete the Tax Forms with false and inaccurate information, Defendants inexplicably treated Lorona differently than every other employee at ASLS.

55.     During the course of Lorona's employment, she was forced to work away from the office, due to lack of cross training of employees.

56.     After refusing to complete the Tax Forms, Lee knew that Lorona was caring for her disabled daughter and son, yet Lee unilaterally charged Lorona PTO hours without discussing such with Lorona.

57.     ASLS employee Viki Coen spoke with Thompson notifying him that Lorona was working and corresponding with her while Lorona was working away from the office.  However, Lee did not change the record and still charged Lorona PTO.

58.     Lee was aware that Lorona had disabled children because she had many discussions regarding her children's health.

59.     In fact, on at least one occasion, Lee delivered Lorona's work laptop to Lorona at the Thunderbird Banner Hospital so she could work remotely while caring for her child and not being forced to use PTO because Lorona was actually working.

60.     Other similarly situated employees were, and still to this day are, permitted to work remotely for myriad reasons, including reasons less meritorious than caring for a disabled child.

61.     In early 2011, Lorona also had expressed concerns in meetings with Dean Shirley Mays, Thompson, the admissions staff, and financial aid staff that the school was being deceptive in marketing to incoming students, in violation of 34 C.F.R. § 668.6.  Lorona also expressed concern that the School was also providing misleading data to investors and incoming students regarding how successful those students were likely to be, as well as which students were actually paying students as opposed to "trying law school" or being funded by ASLS.

62.     For example, Dean Mays stated during a meeting including Admissions, Finance, Financial Aid staff, Dean Mays, and Scott Thompson that students coming in through the Alternative Admissions Model for Legal Education ("AAMPLE") program, rather than traditional means of admission were just as successful in the classroom.

63.     Lorona told Dean Mays and others in the meeting that her statements were not true and that the AAMPLE students are not as likely to pass classes, graduate, pass the bar exam, and obtain gainful employment.

64.     Students entering law school through AAMPLE may appear to be successful when the class is largely made up of AAMPLE students because law school grades are curved, resulting in some students being successful despite lack of ability.

65.     Lorona's concerns were based on the School's cumulative data as well as her own personal observations from the classroom, meeting with AAMPLE students, meeting with traditionally admitted students, downward trending bar passage rates, and discussions with the career placement department regarding placement of AAMPLE students in internship/externship programs as well as final placements.

66.     In response to Lorona's statements, Dean Mays became upset and had the Registrar's Office create reports showing the grade point average of student admitted through alternative admissions programs versus traditional admissions.

67.     Such reports were intended to mislead prospective students in violation of A.R.S. § 44-1521 *et seq.*

68.     On April 13, 2013, Lorona was called to a conference room under the pretense that Gail Sauers and Vanessa Etheir needed assistance with a report.

69.     Upon arrival in the conference room Mrs. Lorona was met by Sauers, and Ethier, and Defendant Lee.

70.     Lorona was advised by Lee that Lorona and the School were going to be "mutually separating" and that if she signed a waiver of rights and confidentiality agreement she would receive three weeks of pay.

71.     Lorona did not agree to "mutually separate" her employment.

72.     Mrs. Lorona asked Lee why she was being terminated because in multiple meetings just weeks prior Lee had assured Lorona that her job was not in jeopardy and she had no performance concerns.

73.     Lee replied that Lorona was not being fired for cause, that Lorona had not done anything wrong, and that the company just felt she would be happier somewhere else.

74.     Lorona refused to sign the waiver of rights and/or confidentiality agreement.

75.     In response, Lorona filed appropriate complaints with the Arizona Attorney General's Office for whistleblower protection and the EEOC for discrimination.

76.     Unsurprisingly, ASLS responded to the EEOC with a number of made up and unsupported reasons for Lorona's termination.

77.     For example, ASLS replied to the EEOC that the reasons for Lorona's termination were recognized and documented in disciplinary forms. *See ASLS's Response to EEOC* Exhibit 2.

78.     However this is patently false because Lorona had never had a disciplinary report at ASLS.

79.     Further, as Lee acknowledged at the time when Lorona was fired, Lorona was told she was not being fired for cause and had done nothing wrong to warrant termination.

## DEFENDANTS MISLEAD AND FRAUDULENTLY INDUCE STUDENTS TO ENROLL IN ASLS

80.     Infilaw has studied bar passage rates for its students and based on its findings, Infilaw and ASLS have developed a bar exam failure predictor formula.

81.     The failure predictor formula includes LSAT scores, undergraduate gpa, and law school gpa, among the factors.

82.     Beginning in May 2014, ASLS along with its sister schools Florida Coastal School of Law, and Charlotte School of Law began paying students not to take the bar exam upon graduation based on these calculated failure predictors.

83.     This is an attempt to deceive the ABA accrediting board, and Department of Education, incoming students, existing students, and graduating students by attempting to increase bar passage percentages.

84.     ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

85.     In addition, ASLS students who were unable to afford bar prep courses that requested financial assistance, but did not fall within Infilaw's Failure Predictor Formula criteria, were denied financial assistance to prepare for the February 2015 bar exam.

86.     The effect of Infilaw's and ASLS's actions was to prevent students who ASLS predicted would fail the bar exam from taking the bar exam and thereby gaming the bar test passage rates in order to retain accreditation and receive other benefits, such as retain Title IV eligibility from the Department of Education.

87.     This position is a direct contradiction to the public marketing intended to induce students, including those who enroll via non-traditional methods, to enroll at ASLS and take institutional and federally-backed student loans in order to pay tuition.

88.     Further, this is evidence of Defendants' attempts to deceive and misrepresent actual data concerning bar passage rates, a vital measurement of success of law schools, in violation of A.R.S. § 44-1421 *et seq.*

89.     As alleged above, Plaintiff informed ASLS through its Dean, Shirley Mays, President, Scott Thompson, and Assistant Dean of Admissions, Glen Fogerty that students who were admitted through non-traditional means, such as AAMPLE, had lower success rates on the bar exam.

90.     However, ASLS continued its marketing by creating deceptive documents and statistics designed to increase non-traditional enrollment and publicly stating the same, thereby violating A.R.S. § 44-1521.

91.     ASLS overall bar passage rate in July 2014 was approximately 48%. This number represents a significant decline in passage rate, due in part to students enrolling at ASLS via nontraditional methods, including AAMPLE, were graduating from ASLS and began taking the bar exam.

92.     Dean Mays attempted to mislead current students, faculty, staff, and alumni by sending out an email documenting the bar passage percentage in a combined calculation representing a bar passage rate of over 80%.

93.     As a recent graduate of ASLS by traditional application, Lorona received an email from ASLS on 12/23/2014 indicating the anticipated bar passage rate for ASLS students on the February 2015 bar exam was 47% compared with a state average of 70%.

94.     This number includes predicted bar passage rates for all students graduating in August 2014 and January 2015, including those who participated in AAMPLE.

95.     On February 11, 2015 Mrs. Lorona received a phone call stating she was on a list of students not likely to pass the February bar exam based on lack of participation in on-campus optional simulated bar exams other predictors.

96.     Lorona's school assigned bar coach told Lorona that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

97.     The School then offered to pay Lorona monthly to defer the bar exam until July 2015, as explained above, in an attempt to inflate the passage numbers.

98.     Lorona was informed that many students have already taken advantage of the "incentives" meant to deceive regulatory agencies, previous, current, and potential new students.

99.     Lorona declined to participate in program and did not take the $5,000 to defer taking the bar exam.

100.    ASLS possesses cumulative data demonstrating that its students do not pass the bar exam at the rate that it publicly states on its websites, in brochures, and in its face-to-face marketing and enrollment counseling.

101.    The omission of data is a material misrepresentation designed to mislead prospective students, including Lorona, to enroll and pay tuition and other expenses to the School.

102.    After her termination, Lorona was expected to pay lump sum taxes on previous tuition waiver benefits that she received when she was a full-time employee as well as finance the final trimesters of school.

103.    Lorona has obtained a Right to Sue Letter from the Arizona Attorney General's Office.

104.    Likewise, Lorona has also requested, and is awaiting the Right to Sue from the EEOC.

105.    Lorona will amend her initial pleading upon receipt of the Right to Sue Letter from the EEOC to encompass violations of federal employment law.

**CLAIMS FOR RELIEF**
**Count One – Retaliatory Discharge in violation of ADA, Title VII, ACRA: A.R.S. § 23-1501 *et seq.* and FMLA**
(All Defendants)

106.    Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

107.    As alleged above, Plaintiff was an employee of Defendant ASLS and responsible for managing and reporting various financial data of the School, including the completion of the Tax Form that is reported the Arizona Department of Revenue.

108.    As alleged above, Plaintiff was approached by Smith of ASLS, and was told by that employee to use false and incorrect information on the Tax Form that would be reported to the Arizona Department of Revenue.

109.    As alleged above, the effect of using false and incorrect information would constitute a violation of a known statute, specifically A.R.S. § 42-1109.

110.    As alleged above, another effect of using false and incorrect information is that Plaintiff would jeopardize her potential status as an attorney, and her Arizona Department of Insurance licenses because an attorney violating A.R.S. § 42-1109, even at the behest of an employer, would violate the Arizona Ethical Rules for Attorneys.

111.    As alleged above, Plaintiff refused to complete the Tax Form using false and incorrect information.

112.    As alleged above, Plaintiff spoke with General Counsel for ASLS and was told not to use false and incorrect information on the Tax Form even if such would result in the termination of her employment.

113.    As alleged above, after Plaintiff refused to complete the Tax Form with false and incorrect information, Defendants began a coordinated, intentional, and unlawful plan designed to deny Plaintiff opportunities for promotion within ASLS and color Plaintiff's employee record with unfavorable, unfounded, and undeserved employee evaluation system that they alone controlled.

114.    As alleged above, Plaintiff told ASLS management, including Shirley Mays, that the enrollment and bar passage data were incorrect and therefore misleading to students and prospective students.

115.   As alleged above, Plaintiff told Shirley Mays, the Dean of the School, that these statistics and statements were false and misleading.

116.   Plaintiff reasonably believed that these misrepresentations were fraudulent and in violation of statute, including A.R.S. § 44-1521 *et seq.*

117.   As a result of Defendants' coordinated, intentional, and unlawful plan to punish Plaintiff for not completing the Tax Form with false and incorrect information and for speaking out about the misleading bar passage statistics, Defendants unilaterally terminated Plaintiff's employment from ASLS, thereby violating A.R.S. § 23-1501(A)(3)(c)(i)-(ii).

118.   Defendants Lee and Thompson were acting in the scope and course of their employment with ASLS and Infilaw, accordingly ASLS and Infilaw are liable for the actions of Thompson and Lee under the theory of *respondeat superior*.

119.   As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistleblower and will be forever publicly linked to a whistleblower complaint.

120.   Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result.  As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

### Count Two - Violation of 34 CFR Parts 600, *et seq.*
(Defendants Infilaw and ASLS)

121.   Plaintiff re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

122.   Mrs. Lorona expressed that ASLS was in violation of Program Integrity Regulations under 34 C.F.R. Parts 600, 602, 603, *et seq.* requiring accurate reporting as required for eligibility of Title IV HEA funding.

123.   Mrs. Lorona expressed concerns that admissions marketing, policies of actively recruiting students unlikely to succeed in a law school program likely constituted fraud against the aforementioned students is also protected behavior pursuant to A.R.S. § 44-1531(A), and A.R.S. § 44-1521 *et seq.* As a result of her report, Lorona was fired by employees or agents of Defendants ASLS and Infilaw.

124.   As a result of Defendants' actions, Plaintiff has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and damage to her reputation because she will now be known as a whistle-blower and will be forever publicly linked to a whistleblower complaint.

125.   Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Plaintiff's rights and the damages that would plainly and obviously result.  As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

**Count Three – Consumer Fraud in violation of A.R.S. § 44-1521 *et seq.***
(Defendants Infilaw and ASLS)

126.   ASLS is a private, for-profit post-secondary school, owned and managed by Infilaw Corp. that offers Legal Education Programs in Phoenix, Arizona. ASLS is licensed by the Arizona State Board for Private Post-Secondary Education and is accredited by the American Bar Association (ABA).

127.   In 2012, the school began marketing the MyBar Program in an effort to comply with the Department of Education 90/10 requirements.

128.   On 12/12/2013 ASLS sent an email advising students not to sign up for Kaplan bar review, and touting higher bar passage rates for students taking MyBar as opposed to Barbri or Kaplan.

- 15 -

129.    Advertisements on the ASLS website; https://www.azsummitlaw.edu/student-resources/student-success-programs/mybar/mybar-faqs include statements such as:

Why is myBAR the best?

The myBAR Program has been specially designed to offer you the best of everything—including live lectures and practice tests by the two nationally-known bar prep companies (BarBri and Kaplan) and personalized assistance from the myBAR team of experts and fellow bar-takers.

With myBAR you are able to get a jump start on your bar review.  You can request materials before the lectures start and get access to BarBri AMP.

BarBri AMP combines brain science techniques with cutting-edge game studies research to fully engage and teach you in the most effective way possible. Its unique functionality – a multiple-choice testing format like no other – and proven memory-recall devices help you grasp the law faster and retain it longer. Exactly what you need to reinforce all the material you'll cover during the myBAR program.

According to LSAC, ASLS reports an average bar pass rate, LSAT scores, and average admissions grade point average intentionally disregarding students not admitted through traditional enrollment.

130.    ASLS reports on the school website at increase in enrollment through non-traditional enrollment (AAMPLE) from 11% in 2005 to 80% in spring 2011.

131.    However, admission and enrollment through AAMPLE does not require grade point average or LSAT scores within the range of traditional admissions.

132.    Reporting enrollment and success statistics based on 20% or less of the student population is grossly misleading to incoming students, and existing students.

133.    Bar passage rates are advertised as 68.85% for first time takers.

134.   Bar exam results sent in misleading emails to faculty, staff, and student purport bar exam passage rates at 87%, when actual rates are approximately 47%.

135.   Recent graduates, after spending hundreds of thousands of dollars in tax payer backed loans were informed via email that their anticipated bar passage rate for the February 2015 Arizona Bar exam were 45%, in stark comparison to the rosy projections presented before and at the time of enrollment.

136.   ASLS deceptively represented that its Legal Education Program provided "We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers**."

137.   ASLS misrepresented the existence of success of past, present, and future graduate's ability to meet job qualification requirements, including but not limited to: graduation; bar passage; character and fitness; and other job requirements.

138.   ASLS misleads students by enrolling students ineligible for federal financial aid based on credit by "giving students time to fix their credit to receive loans" knowing with certainty that Department of Education does not lend to students for specified time periods with specific credit blemishes include foreclosures, and bankruptcies.

139.   The school provided institutional loans causing students to incur debt, without the means to repay such debt in an effort to deceive the students and investors that students would somehow be able to continue at ASLS without funding.

140.    As alleged above, Defendants published misleading representations about school success and bar passage rates of its students.

141.    But for Defendant's misrepresentations, Plaintiff would not have enrolled in ASLS.

142.    Plaintiff has suffered damages, including student loan debt that includes accruing interest and fees throughout its term.

**Count Four – Family Caregiver And Family Responsibilities Discrimination Association Discrimination The Americans With Disabilities Act.**
(All Defendants)

143.    Plaintiff minor children (B.L. and C.L.) are disabled person(s) within the meaning of the ADA.

144.    Plaintiff is in a protected category under the ADA because she is associated with her minor children that have disabilities that are recognized under the ADA.

145.    Plaintiff is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the Defendant, the employer.

146.    Defendants discriminated against Plaintiff and her minor children by failing and refusing to engage in interactive conversations with Plaintiff to determine her job accommodation needs to care for her ill, disabled children.

147.    Defendants discriminated against Plaintiff and her minor daughter by failing to provide Plaintiff with reasonable job accommodations to care for her disabled children.

148.    Defendant's employees that have no families, no children and who are parents of non-disabled children and family members are given special consideration and more favorable treatment by the defendant.

149.    Employees that are primary caregivers of either children or adult family members are required to take paid time off and not advised of their FMLA rights while performing caregiver duties while non-caregiver employees are permitted to work remotely and not blocked from promotions.

150.    ASLS turnover rates, both voluntary and involuntary, for employee caregivers are higher than non-caregiver employees, and the executive staff is primarily made up of employees with non-caregiving duties.

151.    While employees that are not disabled and/or do not have caregiving responsibilities are permitted to work remotely at will, those with disabilities and caring for family members with disabilities are not permitted the same accommodations.

152.    Plaintiff was denied interview for promotions, and promotions based on recommendations by three previous supervisors.

153.    During the first week of April 2012, Plaintiff was advised by Lee, she would not be getting an interview for the promotion for which she applied.  When asked if it was because she complained about being charged paid time off to care for her disabled children, Lee responded that Plaintiff would just not be receiving an interview.

154.    ASLS advised the EEOC that Plaintiff did not qualify for positions she applied for.

155.    EEOC requested copy of the job description during investigation.

156.    ASLS provided a job description different from the position Plaintiff applied for.

157.    When the EEOC Investigator inquired as to why the school provided a misleading job posting, with an incorrect date, ASLS told EEOC Investigator that they did not provide the correct posting requested because they were moving in a different direction with the posting.

158.    Plaintiff acquired posting requirements of the "new position" and they appear to be identical to the job duties of the prior posting with the exception of the CPA required that was not included on the posting Plaintiff applied for.

159.    The individual "filling in" for the position Plaintiff applied for is a male without a disability and without caregiving responsibilities.

### Count Five – FMLA Denial and FMLA Interference
(All Defendants)

160.    Plaintiff's minor children B.L. and C.L., suffered from a "serious health condition" at all times relevant herein.

161.    While working under the supervision of Alicia Togno and Jim Lemire, Plaintiff was permitted accommodations such as working remotely for partial or full days in order to care for her disabled children.

162.    Plaintiff was permitted to work from home and required to work weekends from home to complete her workload.  Plaintiff was the only employee in the Student Accounts department while sister schools had 2-4 employees completing the same amount of work.

163.    Plaintiff was also required to cover certain activities in the absence of a Finance Director. Plaintiff received assistance from the Information Technology Department on weekends while working remotely.

164.    While Plaintiff's daughter was hospitalized for her disability, Lee brought Plaintiff her work computer so she could work remotely.

165.    Lee and Thompson were notified via email, phone, and in person of Plaintiff's need to work remotely to care of her disabled children yet at no point did Lee offer FMLA protection to Plaintiff.

166.    Male employees without disabilities or caregiving responsibilities were placed on "FMLA leave" by Lee without documentation from a doctor or request from the employee to be placed on FMLA.

167.    In the case of one male employee, Lee stated she needed to place him on FMLA to protect herself and the male employee by indicating he was on FMLA leave as opposed to just taking vacation time for the birth of his child.

168.    Lee did not request documentation of the wife's pregnancy.  When the male employee advised Lee that he did not want to deal with the paperwork and that he would just use vacation time, Lee assured him she would not require standard FMLA paperwork from the male employee.

**Count Six – Gender Discrimination – Disparate Treatment Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 200e et seq.**
(All Defendants)

169.    This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq. for relief based upon the unlawful employment practices of Defendant.  Specifically, Plaintiff complains of Defendant's violation of Title VII's prohibition in employment based, in whole or in part, upon an employee's gender.

170.    During her employment with Defendant, Plaintiff was a member of a protected class under Title VII against gender based discrimination by her employer, Defendant, or by its managers and supervisory personnel.

171.    After a senior management meeting a manager approached Plaintiff and advised her that Lee and Dean Mays had discussed the attractiveness of her butt in the meeting that had just ended.  The manager stated that she felt uncomfortable with the discussion.

172.    Plaintiff met with Lee to discuss what occurred during the meeting.  Lee stated that since they said good things about Plaintiff's butt she should be flattered.

173.    Lee also stated, as she had in previous Emotional Intelligence Training, that sexual harassment is only harassment if it is unwanted.

174.    Plaintiff advised Lee that she was embarrassed that they had discussed her in a senior management meeting.

175.    Lee brushed Plaintiff off and did not further discuss the matter.

176.    Subsequently, Plaintiff's supervisor compared Plaintiff's body and face to that of a Barbie Doll.

177.    Plaintiff responded that she did not feel she resembled a Barbie Doll.  In response Plaintiff's supervisor drew a naked female body and commented that is what a Barbie looks like and that is what your body looks like as well.

178.    Plaintiff did not address the discussion with Human Resources because Lee had failed to address her prior complaint and further was personally involved in the inappropriate discussion in the presence of the entire senior management staff.

179.    Plaintiff scheduled a meeting with Lee to discuss disparate treatment and whether Plaintiff's job was in jeopardy for some reason.  Plaintiff asked whether there were concerns with performance that she should correct.  Lee advised that Thompson had never expressed any concern with her performance and Lee did not have any concerns with Plaintiff's performance or employment in general.

180.    Plaintiff was terminated without cause through a "mutual separation" because Lee stated "We feel you would be happier somewhere else".

181.    During the "mutual separation" meeting Plaintiff asked Lee why she was being terminated because she had never been advised of any behavior or performance issues.  Further, Lee had informed Plaintiff in a meeting merely weeks prior that her employment was not in jeopardy and neither Lee nor Thompson had concerns with employee's performance.

- 22 -

182.   Lee stated that Plaintiff was "not being terminated for cause and had done nothing wrong. They just felt Plaintiff would be happier somewhere else".

183.   ASLS later informed the EEOC that Plaintiff was terminated for cause because she talked about students and had performance issues, such as poor 360 results.

184.   This again demonstrates a shifting in reason for termination by the Defendants in attempt to mislead as to the true reason for the "mutual separation".

185.   Vanessa Ethier and Gail Sauers were also present in the "mutual separation" meeting.

186.   Plaintiff had recently discussed via email and in person concerns regarding paid time off being deducted while Plaintiff was working from home caring for her children.

187.   Lee stated there is a not a telecommuting policy.  However, Plaintiff had copy of company telecommuting policy.

188.   Most members of the management staff routinely worked remotely including Lee and Thompson without a deduction in their paid time off.

189.   When Plaintiff discussed concerns regarding Lee's response and deduction of paid time off with colleagues at Infilaw they advised Plaintiff that employees at all Campuses and Infilaw routinely were permitted to telecommute based on necessity. Colleagues also advised Plaintiff they would speak with Lee regarding policy.

190.   Plaintiff was also denied opportunities for promotion on multiple occasions.  Whereas, ASLS hired male executives without posting positions or interviewing potential candidates, female candidates were forced to follow standard hiring procedures.

191.   Plaintiff was replaced by a male employee with fewer qualifications whom also was not required to follow standard hiring procedures.

192.   The Director of Admissions, a male, is frequently permitted to leave work early during key times for admissions to attend children's sporting events and other activities.

193.    In addition, Director of Admissions was berated openly in management meeting regarding performance, and inability to meet performance goals.

194.    Director of Admissions resigned to take a Professor Position as Arizona State University. Upon non-renewal of that contract, Director returned to ASLS as the Director of Admissions despite the severe drop in admissions numbers, and an apparent inability to adapt to enrollment challenges prior to his initial departure.

195.    Plaintiff was required to work until at least 5PM daily to accommodate night students.

196.    Plaintiff's male replacement routinely works no later than 4PM.  Male employee states he needs to leave early so that he can take public transportation although public transportation runs much later than 4PM on a daily basis.

**Count Six – Gender Discrimination – Disparate Treatment Arizona Civil Rights Act of 1974, A.R.S §§ 41-1463, -1464.**
(All Defendants)

197.    This claim is authorized and instituted pursuant to the provisions of ACRA for relief based upon the unlawful employment practices of Defendant.  Specifically, Plaintiff complains of Defendant's violation of the ACRA's prohibition against discrimination in employment based, in whole or in part, upon an employee's gender.

198.    During her employment with Defendants, Plaintiff was a member of a protected class under ACRA against gender based discrimination by her employer, Defendant, or by its managers and supervisory personnel.

199.    Plaintiff's complaint(s) and her opposition to Defendant's discrimination were reasonable and made by her in good faith.

200.    After plaintiff engaged in the fundamental public policies and protected employment activities/speech as alleged heroin, Plaintiff was retaliated against by exclusion from management

meetings, taking Plaintiff's corporate credit card, being ignored by Lee and other supervisors, and eventually termination of her employment without cause.

201.    There exists a causal link between Plaintiff's complaint(s) and Defendant's decision to retaliate and take adverse employment actions against Plaintiff, including termination of her employment.

202.    As a direct and proximate result of Defendant's unlawful employment, retaliation, adverse employment actions and wrongful termination, Plaintiff suffered damages including loss of income, loss of employment entitlements, the loss of her personal dignity, inconveniences, costs, expenses and other consequential damages.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests the Court to enter judgment in favor of Plaintiff and against Defendants as follows:

A.    An award of actual, consequential, statutory, and incidental damages in an amount to be proven at trial; and

B.    Awarding to Plaintiff her costs, expenses, and attorneys' fees incurred herein pursuant to A.R.S. §§ 23-1501 and other applicable law; and

C.    Other relief as the court deems just and proper.

Dated this 22nd day of April, 2015

_____
Paula C. Lorona, Plaintiff

Original filed this 2nd day of March, 2015:

MARICOPA COUNTY SUPERIOR COURT
14264 W. Tierra Buena Lane
Surprise, AZ 85374

Lorona-00000001

JT-1/UC-001 (7/11)



# ARIZONA JOINT TAX APPLICATION

**IMPORTANT:** *Incomplete applications WILL NOT BE PROCESSED. All required information is designated with asterisk *
To complete this application see attached instructions. Please return Complete application with appropriate license fee(s) to: **License & Registration Section, Department of Revenue, PO BOX 29032, Phoenix AZ 85038-9032.**

| To complete this online, go to www.aztaxes.gov ✓ |

---

## Section A: Taxpayer Information (Print legibly or type the information on this application.)

**1. License Type (Check all that apply) ***
- ☐ Transaction Privilege Tax (TPT)
- ☐ Withholding/Unemployment Tax (*if hiring employees*)
- ☒ Use Tax
- ☐ TPT For Cities ONLY

**2. Type of Ownership ***
- ☐ Individual / Sole Proprietorship
- ☐ Partnership
- ☐ Professional Limited Liability
- ☒ Limited Liability Company
- ☐ Limited Liability Partnership
- ☐ Corporation
   State of Inc _____
   Date of Inc. _____
- ☐ Sub-Chapter S Corporation
- ☐ Association
- ☐ Trust
- ☐ Government
- ☐ Estate
- ☐ Joint Venture
- ☐ Receivership

*Tax exempt organizations must attach a copy of the Internal Revenue Service letter of determination.*

**3. Federal Employer Identification Number (Required for Employers and Entities other than Sole Proprietors) or Social Security Number ***
14 ▓▓▓▓

**4. Legal Business Name / Owner / Employing Unit ***
Phoenix School of Law, LLC

**5. Business or "Doing Business As" Name ***
Phoenix School of Law

**6. Business Phone Number ***
602.682.6815

**7. Fax Number**
602.682.6998

**8. Mailing Address (Street, City, State, ZIP code) ***
ONE NORTH CENTRAL AVE   Suite 1400   PHOENIX AZ, 85004

**9. Country**
U.S.A.

**10. Email Address**
jsmith @ Phoenixlaw.edu

**11. Is your business located on an Indian Reservation?**
- ☐ Yes   If yes, _____ (See Section G for listing of Reservations)
- ☒ No

**13. County**
MARICOPA

**12. Physical Location of Business (Street, City, State, ZIP code) Do not use PO Box or Route No. ***
USA

---

### For additional business locations, complete Section B-12

**14. Are you a construction contractor?**
- ☐ Yes   (See Bonding Requirements below)
- ☒ No

**15. Did you acquire, or change the legal form of business of, all or part of an existing business? ***
- ☐ Yes   If yes, you must complete the Unemployment Tax Information (Section D)
- ☒ No

**Bonding Requirements:** Prior to the issuance of a Transaction Privilege Tax license, new or out-of-state contractors are required to post a Taxpayer Bond for Contractors, unless the Contractor qualifies for an exemption from the bonding requirement. The primary type of contracting being performed determines the amount of bond to be posted. Bonds may also be required from applicants who are delinquent in paying Arizona taxes or have a history of delinquencies. For more information on bonding, please see the "Taxpayer Bonds" publication, which is available online or at the Department of Revenue offices.

**16. Description of Business (Must include type of merchandise sold or taxable activity; for employers, the type of employment) ***
LAW SCHOOL, LEGAL EDUCATION

**17. NAICS Code: (Select at least one. Go to www.aztaxes.gov for a listing of codes) ***
611310   Account

**18. Identification of Owner, Partners, Corporate Officers, Members / Managing Members or Officials of this employing unit**

| A. Name (Last, First, MI) * | B. Soc. Sec. No. * | C. Title * | D. % Owned * | E. Complete Residence Address * | F. Phone Number * |
|---|---|---|---|---|---|
| Scott Thompson | ▓▓-▓▓▓ | DIRECTOR OF FIN | 0 | ONE N. CENTRAL AVE, STE 1400, PHX, AZ 85004 | 602-682-6815 |
| Judy Smith | | | | | |
| | | | | | |
| | | | | | |

If the owner, partners, corporate officers or combination of partners or corporate officers, members and/or managing members own more than 50% of or control another business in Arizona, attach a list of the businesses, percentages owned and unemployment insurance account numbers.

### THIS BOX FOR AGENCY USE ONLY

| | | |
|---|---|---|
| ☐ New | Acct. No. _____   LIAB _____ | DLN _____ |
| ☐ Change | Start _____   LIAB Est _____ | TPT _____ |
| ☐ Revise | | WH _____ |
| ☐ Reopen | S/E Date _____ | |

ADOR 10194 (7/11)

Lorona-00000002

# APPLICATION FOR TRANSACTION
# PRIVILEGE (SALES) TAX LICENSE

ACCOUNT NO.



**City of Phoenix**
**Finance Department**
Tel:  602-262-6785,
       press 4,1
TTY: 602-534-5500


FEE MUST BE MAILED WITH APPLICATION (see page 3)

PAT0711

---

| Check one: ☒ Permanent ☐ Temporary | Check one: ☒ New Business ☐ New Owner of Existing Business | Previous City License # | Former Owner (if applicable) |
|---|---|---|---|

**Section I. Business Information**
Verify if your business is in Phoenix www.phoenix.gov/webpmo.html

| Business Name (Individual, Company or "DBA" first name first): | Owning Entity Name (Corp, LLC etc.) |
|---|---|
| PHOENIX SCHOOL OF LAW, LLC | ☒ LLC |

Physical Business Street Address of retail store, rental property, etc (NOT a P.O. Box Number, a PMB, or single family home rentals)
ONE N CENTRAL AVE, STE 1400

| City, State, Country, Zip Code +4: PHOENIX, AZ 85004-4460 | Business Phone (Including Area Code) 602-682-6815 |
|---|---|

| When did your tax liability start in Phoenix? | E-Mail address: |
|---|---|

| | State License #: | Federal ID #: ▓▓▓▓▓▓▓ |
|---|---|---|

**Section II.  Mailing Address & Phone Number**
Enter Name if Different from Section I (above) or Enter Care-of Name:

Mailing Address:

| City, State, Country, Zip Code +4: | Phone (Including Area Code) |
|---|---|

**Section III.  Business Ownership** ⬩ Sole and Husband/Wife must submit a photo ID with application. See instructions for more info.

| Ownership | ☐ *Sole ☐ *Husband/Wife ☒ LLC ☐ Corp –State Inc _____ ☐ Gen. Partnership ☐ Ltd. Partnership |
|---|---|
| | ☐ Revocable Trust ☐ Irrevocable Trust ☐ Other explain |

| List of officers attached? ☐ Yes ☐ No | 1) Name | Title |
| | Home Address | SSN # |
| | City, State, Country, Zip Code +4: | Phone No. |
| | 2) Name | Title |
| | Home Address | SSN # |
| | City, State, Country, Zip Code +4: | Phone No. |

**Section IV. Business Type** (Check all that apply) Provide a detailed description of your business.

| Do you sell Liquor? ☐ Yes ☒ No | ☐ Retail ☐ Restaurant/Bar ☐ Hotel/Motel | NAICS Code: (6 digit) |
|---|---|---|
| **Accounting Method** | ☐ Commercial Rental Property ☐ Residential Rental Property–# of Units ____ | 6 1 1 3 1 0 |
| ☐ Cash | ☐ Advertising ☐ Job Printing ☐ Personal Property Rental | Principal business codes available at: |
| ☒ Accrual | ☐ Short Term Motor Vehicle Rental ☐ Telecommunications ☐ Amusement | www.naics.com/search.htm |
| | ☐ Construction Contracting  AROC# _____ ☐ Home Builder/Spec. Sale | |
| | ☒ Use Tax (Phoenix Business) ☐ Use Tax (Out of State Business with no AZ Nexus) | |

Describe Nature of Business:  PRIVATE UNIVERSITY

**Section V  Business Premises Status**

| Do you own your business location? ☐ Yes ☒ No | If yes, is this your residence? ☐ Yes ☒ No    If yes, skip to Signature |
|---|---|
| Do you rent a portion of the business premises to another entity or business? ☐ Yes ☒ No   If yes, see instructions for more info. |

| Landlord/Property Manager RYAN | Mailing Address  One N. Central - Phoenix AZ | Phone Number |
|---|---|---|

I certify that the statements made in this application are true and complete to the best of my knowledge.  I accept the
permit authorized and issued in response to this application with the condition that I report timely and pay any and all
taxes due by me to the City of Phoenix.
*IF APPLICABLE, BE SURE ALL SALES TAX HAS BEEN PAID BY FORMER OWNER.*
*BY LAW YOU MAY BE LIABLE FOR ANY UNPAID TAX.*

**FOR CITY USE ONLY BELOW**

*Applications received incomplete or without payment may not be processed.*

| Print Name | Title |
|---|---|
| Signature | Date |

Checks Payable to Phoenix City Treasurer, P.O. Box 2005 , Phoenix, AZ 85001-2005

---

**OFFICE USE ONLY**

| NOV Date or DISV # |
|---|
| ST Code |
| / |
| / |
| / |
| NAICS Code |
| Rental Units |
| Owner Type |
| Report Method  C A |
| Liability Date |
| Entered by |
| I Edited by |
| Approved by |

Office Location: 3rd Floor, 251 W. Washington St. Lorona-00000003
Mailing Address: P.O. Box 2005, Phoenix, AZ 85001-2005
Telephone: (602) 262-6785, press 4
   TDD (602)534-5500
www.phoenix.gov/plt          email  tax @phoenix.gov
This material is available in alternative formats.

## WHO IS REQUIRED TO HAVE A PRIVILEGE (SALES) LICENSE? (See Phoenix Tax Code Section 14-300)

1.   Every person desiring to engage or continue in business activities within the City upon which a Privilege Tax is imposed.
2.   Every person, engaging or continuing in business within the City, storing or using tangible personal property in this City upon which a Use Tax is imposed.
3.   Every person required to report and pay a tax upon Rental Occupancy, as imposed by Phoenix Tax Code Section 14-440.

A person engaged in more than one activity subject to City Privilege and Use Taxes at any one business location is not required to obtain a separate license for each activity provided that, at the time such person makes application for a license, he shall list on such application each category or activity in which he is engaged.  The licensee shall inform the Tax Collector of any changes in his business activities within thirty (30) days.

This license does not preclude the authority of other city agencies.  You should call the Planning and Zoning Department, (602) 262-7844, if you have any questions concerning land use or sign placement before engaging in business.

## GENERAL INSTRUCTIONS

*All information given on this application is public information (except Social Security number)*

The application is used for data entry and must be TYPED OR PRINTED IN BLACK INK.  Return the completed application to the City of Phoenix, enclosing the appropriate fee with a check payable to Phoenix City Treasurer.  There is also an annual license fee that must be paid prior to issuance of a license.

If you are a new owner of an existing business, please provide the name and Phoenix license number of the previous owner.  *Check to be sure that the person you are buying the business from owes no back taxes or fees to the City of Phoenix.  By law you may be responsible for all back taxes and fees.*

The Privilege License shall be nontransferable between owners and shall be on display to the public in the licensee's place of business. Except as provided in Phoenix Tax Code Section 14-320, the Privilege License shall be valid until request for cancellation and/or surrender of the license by the licensee of the business activity for which it was issued.

Application must be completed, signed and returned with fees to be processed.  **Incomplete applications or applications submitted without payment may not be processed and will delay your business activity.** Your license must be obtained and fees fully paid prior to engaging in business.

Permanent licenses are for an on-going year around business. Temporary licenses or Special Events licenses are issued only for periods of up to 30 consecutive days for a total fee of $25.00. Complete the following sections:

| Check one: O Permanent | Check one: O New Business | Previous City License # | Former Owner (if applicable) |
|---|---|---|---|
| O Temporary | O New Owner of Existing Business | | |

## Section I – Business Information *Verify if your business is in Phoenix www.phoenix.gov/webapps.html*

| | |
|---|---|
| Business Name: | Business name if using one. If not, list name of the business owner.  Property managers applying on behalf of a client should indicate the property owner's name in this section. |
| Owning Entity Name: | List the ownership name of the business if different from business name. |
| Business Address & Phone: | Physical address of your Phoenix business location, including suite, unit, or apartment number. A P.O. Box or PMB is not acceptable for a business location.  A separate license application must be completed for each multi-unit property and/or all commercial property. For single family residential rental property please use the owners home address. The phone number listed here should correspond to the Phoenix business location. (For further information regarding residential rentals see Quick Fact Sheet located in the Residential Rentals section) |
| Liability Start Date: | The date (month/day/year) in which you will begin taxable business activity in Phoenix. Licensing fees are based on this date. |
| E-mail address: | The email address for the person who should receive general Phoenix Privilege (Sales) and Use Tax information and updates |
| State Tax License #: | www.revenue.state.az.us |
| Federal ID #: | www.irs.gov |

## Section II – Mailing Address & Phone Number-Complete this area only if the information is different from Section I.

This area is for the name of the person and the address to which the business license and tax return mail will be sent. Please include suite, unit, or apartment numbers.

Lorona-00000004

Page 3

## Section III – Business Ownership (Please indicate the type of ownership. If you mark "Other" please describe.)

Ownership:
Sole or Husband/Wife ownerships must provide a color copy of their identification. See website for acceptable forms of identifications. All corporations must provide the State of incorporation and at least two officers information. A "LLC" must have at least the Managing Member. General Partnerships must provide the names of the general partner(s). You may attach a list to the application

Owners/Partners/Corporate Officers/LLC Members
List complete owner/officer/partner information as requested including names and titles. Please use the home (not business) address for each officer/partner.  P.O. Box numbers or PMB's are not acceptable for home addresses.

## Section IV – Business Type (Check all that apply)
Do you sell Liquor? If "Yes" contact License Services @ (602) 262-4638 Option #3 or email: clk.liquor.license@phoenix.gov.

Mark "Cash" if you recognize income based upon the date funds are received. Mark "Accrual" if you recognize income when earned regardless of when the cash is received.

Provide a detailed description of business activity. If retail sales, list type of items to be sold; if construction contracting, list type of contracting, etc.  Please indicate your Contractor's number with the Arizona Registrar of Contractors if you checked construction contracting.
NAICS Code: (6 digit)  Principal business codes available at: www.naics.com/search.htm

## Section V – Business Premises Status
Please indicate whether or not you own your business location. If you answer "No", please provide the name of the legal owner or property manager along with their mailing address and phone number. If you lease or take considerations for use of property from a related entity you own, this is taxable as commercial rental and an additional license would be needed.

### FEE SCHEDULE

A NON-REFUNDABLE APPLICATION FEES MUST BE PAID AT THE TIME OF APPLICATION. Any combination of activities may result in additional fees. If license fees are not paid in full within 30 days of start date, a 50 percent late fee will be assessed.

| Commercial Rental or Use Tax Activity only. | For persons engaged exclusively in the rental and leasing of nonresidential real property or Use Tax a $20 application fee is charged | $20 total due |
|---|---|---|

| Residential Rental Activity | For persons engaged in the rental of residential real property a $50 pro-rated fee for the year is charged with an annual cost of City $50 dollars per license, based on the Phoenix Tax Liability Start Date, per the chart below: | $20 Application fee plus pro-rated Annual License Fee |
|---|---|---|

| | Start Date | Pro-Rated Annual Fee per City | 50% Late Fee per City |
|---|---|---|---|
| | January 1 – March 31 | $52.00 | $21.00 |
| | April 1 – June 30 | $37.50 | $7.75 |
| | July 1 – September 30 | $25.00 | $5.50 |
| | October 1 – December 31 | $5.50 | $5.50 |

| All other types of business excluding Residential Rental, Commercial Rental and Use Tax | For persons engaged in the activities listed, a $50 pro-rated fee is charged, based on the Phoenix Tax Liability Start Date, per the chart below: | $20 Application Fee plus pro-rated Annual License Fee |
|---|---|---|

| Start Date | Pro-Rated Annual Fee | 50% Late Fee |
|---|---|---|
| January 1 – March 31 | $50.00 | $25.00 |
| April 1 – June 30 | $37.50 | $18.75 |
| July 1 – September 30 | $25.00 | $12.50 |
| October 1 – December 31 | $12.50 | $ 6.25 |

Any licensee who permits his license to expire through cancellation as provided in Phoenix Tax Code Section 14-320, by his request for cancellation by surrender of the license, or by the cessation of the business activity for which the license was issued, and who thereafter applies for a license, shall be granted a new license as an original application and shall pay the current license fee. Any licensee who loses or misplaces his Privilege License that is still in effect shall be charged the current license fee for each reissuance of a license.

Rev. 10/20/09

Lorona-00000005

JT-1/UC-001 (7/11)                                                                                          Page 2

## Section B:   Transaction Privilege Tax (TPT)

| 1. Date Business Started in Arizona * | 2. Date Sales Began * | 3. What is your anticipated annual income for your first twelve months of business? |
|---|---|---|
| 3/6/05 | 8/1/12 | 3½ million |

4. Business Classes (Select at least one. See Section H for a listing of business classes on page 4) *

029   USE TAX PURCHASES

| 5. TPT Filing Method | 6. Does your business sell tobacco products? | 7. Does your business sell new motor vehicle tires or vehicles? |
|---|---|---|
| ☐ Cash Receipts | ☐ Yes    If yes,   ☐ Retailer | ☒ No |
| ☒ Accrual | ☒ No              OR   ☐ Distributor | ☐ Yes   (You will be required to file a TR-1.) |

| 8. Are you a seasonal filer? | If yes, please check the months in which you intend to do business: |
|---|---|

| | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ Yes  ☒ No | | | | | | | | | | | | |

9. Location of Tax Records (Street Address, City, State and ZIP code) Do not use PO Box or Route No. *

| 10. Name of Company or Person to Contact | 11. Phone Number |
|---|---|
| Judy Smith | 602-682-6815 |

For additional locations, complete the following:  (If more space is needed, please attach additional sheets)

| 12. "Doing Business As" Name for this Location | 13. Phone Number |
|---|---|

14. Physical Location Address (Do not use PO Box or Route No.)

| 15. City | 16. County | 17. State | 18. ZIP code |
|---|---|---|---|

| 19. "Doing Business As" Name for this Location | 20. Phone Number |
|---|---|

21. Physical Location Address (Do not use PO Box or Route No.)

| 22. City | 23. County | 24. State | 25. ZIP code |
|---|---|---|---|

## Section C:  Program Cities / License Fees  Below is a list of cities and towns licensed by the Arizona Department of Revenue.

| City/Town | Code | Fee | No. of Loc | Total | City/Town | Code | Fee | No. of Loc | Total | City/Town | Code | Fee | No. of Loc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Benson | BS | 5.00 | | | Hayden | HY | 5.00 | | | Show Low | SL | 2.00 | | |
| Bisbee | BB | 1.00 | | | Holbrook | HB | 1.00 | | | Sierra Vista | SR | 1.00 | | |
| Buckeye | BE | 2.00 | | | Huachuca City | HC | 2.00 | | | Snowflake | SN | 2.00 | | |
| Camp Verde | CE | 2.00 | | | Jerome | JO | 2.00 | | | South Tucson | ST | 2.00 | | |
| Carefree | CA | 10.00 | | | Kearny | KN | 2.00 | | | Springerville | SV | 5.00 | | |
| Casa Grande | CG | 2.00 | | | Kingman | KM | 2.00 | | | St. Johns | SJ | 2.00 | | |
| Cave Creek | CK | 20.00 | | | Lake Havasu | LH | 5.00 | | | Star Valley | SY | 2.00 | | |
| Chino Valley | CV | 2.00 | | | Litchfield Park | LP | 2.00 | | | Superior | SI | 2.00 | | |
| Clarkdale | CD | 2.00 | | | Mammoth | MH | 2.00 | | | Surprise | SP | 10.00 | | |
| Clifton | CF | 2.00 | | | Marana | MA | 5.00 | | | Taylor | TL | 2.00 | | |
| Colorado City | CC | 2.00 | | | Maricopa | MP | 2.00 | | | Thatcher | TC | 2.00 | | |
| Coolidge | CL | 2.00 | | | Miami | MM | 2.00 | | | Tolleson | TN | 2.00 | | |
| Cottonwood | CW | 2.00 | | | Oro Valley | OR | 12.00 | | | Tombstone | TS | 1.00 | | |
| Dewey/Humboldt | DH | 2.00 | | | Page | PG | 2.00 | | | Tusayan | TY | 2.00 | | |
| Duncan | DC | 2.00 | | | Paradise Valley | PV | 2.00 | | | Wellton | WT | 2.00 | | |
| Eagar | EG | 10.00 | | | Parker | PK | 2.00 | | | Wickenburg | WB | 2.00 | | |
| El Mirage | EM | 15.00 | | | Patagonia | PA | 25.00 | | | Williams | WL | 2.00 | | |
| Eloy | EL | 10.00 | | | Payson | PS | 2.00 | | | Winkelman | WM | 2.00 | | |
| Florence | FL | 2.00 | | | Pima | PM | 2.00 | | | Winslow | WS | 10.00 | | |
| Fountain Hills | FH | 2.00 | | | Pinetop/Lakeside | PP | 2.00 | | | Youngtown | YT | 10.00 | | |
| Fredonia | FD | 10.00 | | | Prescott Valley | PL | 2.00 | | | Yuma | YM | 2.00 | | |
| Gila Bend | GI | 2.00 | | | Quartzsite | QZ | 2.00 | | | | | | | |
| Gilbert | GB | 2.00 | | | Queen Creek | QC | 2.00 | | | | | | | |
| Globe | GL | 2.00 | | | Safford | SF | 2.00 | | | | | | | |
| Goodyear | GY | 5.00 | | | Sahuarita | SA | 5.00 | | | | | | | |
| Guadalupe | GU | 2.00 | | | San Luis | SU | 2.00 | | | | | | | |

▶ Please Note:  City fees are subject to change (go to our website for updates). For cities not listed above, please contact the cities directly. Your license will not be issued until all fees are paid.

| Total of City Fees: | |
|---|---|
| State Fees $12.00 X ____ Number of Locations: | |
| TOTAL Fees: | |

ADOR 10194 (7/11)

JT-1/UC-001 (7/11)         Lorona-00000006         Page 3

## Section D:   Withholding/Unemployment Tax Information

| 1. Date Employees First Hired in Arizona. * | 2. Are you liable for Federal Unemployment Tax? | 3. Are individuals performing services that are excluded from withholding or unemployment tax? |
|---|---|---|
| | ☐ Yes    If yes, what was the first year of liability? <br> ☐ No     Year _____ | ☐ Yes    If yes, describe the services: <br> ☐ No |

| 4. Do you have an IRS Ruling that grants an exclusion from Federal Unemployment Tax? <br><br> ☐ Yes    If yes, attach a copy of the Ruling Letter. <br> ☐ No | 5. Do you have or have you previously had an Arizona Unemployment Tax Number? <br><br> ☐ No <br> ☐ Yes    If yes, Business Name _____ <br><br> Unemployment Number _____ |
|---|---|

6. Record of Arizona wages paid by calendar quarter for current and preceding calendar year.

| YEAR | 1ST QUARTER | 2ND QUARTER | 3RD QUARTER | 4TH QUARTER |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |

7. Weekly record of number of persons performing services in Arizona for current and preceding calendar year.

| YEAR | JANUARY | FEBRUARY | MARCH | APRIL | MAY | JUNE |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

| YEAR | JULY | AUGUST | SEPTEMBER | OCTOBER | NOVEMBER | DECEMBER |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |
| | | | | | | |

Complete this section if you acquired, or changed the legal form of business of, all or part of an existing Arizona business.

| 8. Date Acquired or Date Legal Form of Business changed * | 9. Acquired, or Changed Legal Form of Business of, * <br> ☐ All <br> ☐ Part   If part, to obtain an unemployment tax rate based on the business's previous account you must request it no later than 180 days after the date entered in item 8 of this section.  See instructions. | 10 Acquired by * <br> ☐ Purchase <br> ☐ Lease <br> ☐ Other | If other, including change in legal form of business, explain: |
|---|---|---|---|

Previous Owner Information or Previous Legal Form of Business Information: (See instructions.)

| 11.  Name(s) of Previous Owner(s) * | 12   Business Name of Previous Owner(s) * |
|---|---|

13.  Current Mailing Address of Previous Owner(s) (Street, City, State, ZIP code)

| 14.  Current Telephone Number of Previous Owner(s) | 15.  Unemployment Account Number of Previous Owner(s) |
|---|---|

Voluntary Election of Unemployment Insurance Coverage (subject to Unemployment Tax Office approval)

16.  The applicant, on behalf of the employing unit, voluntarily elects beginning January 1 of the current calendar year or the date employment started, if later, and continuing for not less than two calendar years, to:

☐   A.  Be deemed an employer subject to Title 23, Chapter 4, Arizona Revised Statutes, to the same extent as all other such employers and provide unemployment insurance coverage to my workers performing services defined by law as employment, even though I have not met conditions requiring me to provide such coverage.

☐   B.  Extend unemployment insurance coverage to workers referred to in item 2, above, by having the services they perform be deemed to constitute. Employment by an employer subject to Title 23, Chapter 4, A.R.S.

Lorona-00000007

JT-1/UC-001 (7/11)                                                                                                          Page 4

## Section E: AZTaxes.gov Security Administrator (Authorized User)

By electing to register for www.aztaxes.gov you can have online access to account information, and file and pay Arizona transaction, use, and withholding taxes. You also designate authorized users to access these services.

[X] I Elect to Register to use aztaxes.gov to file and pay online.

[ ] I DO NOT Elect to Register to use aztaxes.gov to file and pay online.

| 1. Authorized Users Last Name | 2. Authorized Users First Name |
|---|---|
| *Smith* | *Judy* |

| 3. Authorized Users Title | 4. Authorized Users Social Security Number |
|---|---|
| *Director of Finance* | |

| 5. Authorized Users Email Address | 6. Authorized Users Phone Number |
|---|---|
| *JSMITH@PHOENIXLAW.EDU* | *602-682-6815* |

## Section F: Signature(s) by individuals legally responsible for the business (required)

This application must be signed by either a sole owner, partners, corporate officer, managing member, the trustee, receiver or personal representative of an estate.

Under penalty of perjury I (we), the applicant, declare that the information provided on this application is true and correct. I (we) hereby authorize the security administrator, if one is listed in Section E, to access the AZTaxes.gov site for the business identified in Section A. This authority is to remain in full force and effect until the Arizona Department of Revenue has received written termination notification from an authorized officer.

| Type or Print Name | Title | Signature | Date |
|---|---|---|---|
| *Judy Smith* | *Director* | /s/ *Judy Smith* | |
| Type or Print Name | Title | Signature | Date |
| *Scott Thompson* | *President* | /s/ *Scott Thompson* | |

**THIS APPLICATION MUST BE COMPLETED, SIGNED AND RETURNED AS PROVIDED BY ARS § 23-722**
Equal Opportunity Employer/Program • This document available in alternative formats by contacting the UI Tax Office.

## Section G: Indian Reservation Codes

| Indian Reservation (County) | Code | Indian Reservation (County) | Code | Indian Reservation (County) | Code | Indian Reservation (County) | Code |
|---|---|---|---|---|---|---|---|
| Ak-Chin (Pinal) | PNA | Hopi (Coconino) | COJ | Pascua-Yaqui (Maricopa) | MAN | Tohono O'dham (Pinal) | PNT |
| Cocopah (Yuma) | YMB | Hopi (Navajo) | NAJ | Pascua-Yaqui (Pima) | PMN | Tonto Apache (Gila) | GLU |
| Colorado River (La Paz) | LAC | Hualapai (Coconino) | COK | Salt River Pima-Maricopa (Mar.) | MAO | White Mtn Apache (Apache) | APD |
| Fort McDowell-Yavapai (Mar.) | MAE | Hualapai (Mohave) | MOK | San Carlos Apache (Gila) | GLP | White Mtn Apache (Gila) | GLD |
| Fort Mohave (Mohave) | MOF | Kaibab-Paiute (Coconino) | COL | San Carlos Apache (Graham) | GRP | White Mtn Apache (Graham) | GRD |
| Fort Yuma-Quechan (Yuma) | YMG | Kaibab-Paiute (Mohave) | MOL | San Carlos Apache (Pinal) | PNP | White Mtn Apache (Navajo) | NAD |
| Gila River (Maricopa) | MAH | Navajo (Apache) | APM | San Juan Southern Paiute (Coco.) | COQ | Yavapai Apache (Yavapai) | YAW |
| Gila River (Pinal) | PNH | Navajo (Coconino) | COM | Tohono O'Odham (Maricopa) | MAT | Yavapai Prescott (Yavapai) | YAX |
| Havasupai (Coconino) | COI | Navajo (Navajo) | NAM | Tohono O'Odham (Pima) | PMT | | |

## Section H: Business Classes

| Business Class | Code | Business Class | Code | Business Class | Code | Business Class | Code |
|---|---|---|---|---|---|---|---|
| Mining - Nonmetal | 002 | Commercial Lease | 013 | Use Tax - Utilities | 026 | Jet Fuel Tax | 049 |
| Utilities | 004 | Personal Property Rental | 014 | Rental Occupancy Tax | 028 | Jet Fuel Use Tax | 051 |
| Communications | 005 | Contracting - Prime | 015 | Use Tax Purchases | 029 | Rental Car Surcharge | 053/055 |
| Transporting | 006 | Retail | 017 | Use Tax from Inventory | 030 | Jet Fuel Tax > 10 million gallons | 056 |
| Private Car - Pipeline | 007/008 | Severance - Metalliferous Mining | 019 | Telecommunications Devices | 033 | Use Tax Direct Payments | 129 |
| Publication | 009 | Severance - Timbering Ponderosa | 021 | 911 Wireless Telecommunications | 036 | 911 Wireline Telecommunications | 131 |
| Job Printing | 010 | Severance - Timbering Other | 022 | Contracting - Owner Builder | 037 | Rental Car Surcharge - Stadium | 153 |
| Restaurants and Bars | 011 | Recreational Vehicle Surcharge | 023 | Municipal Water | 041 | | |
| Amusement | 012 | Transient Lodging | 025 | Membership Camping | 047 | | |

ADOR 10194 (7/11)

## INSTRUCTIONS FOR ARIZONA JOINT TAX APPLICATION

**IMPORTANT:** You must complete each of the following sections or your application will be returned

---

- For licensing questions on Transaction Privilege, Withholding or Use Tax (Department of Revenue) call (602) 542-4576 or 1-800-634-6494 (from area codes 520 and 928).
- For Unemployment Tax (Department of Economic Security) call (602) 771-6602 or e-mail uit.status@azdes.gov

---

**USE THIS APPLICATION TO:**

- **License New Business:** A new business with no previous owners.
- **Change Ownership:** If acquiring or succeeding to all or part of an existing business or changing the legal form of your business (sole proprietorship to corporation, etc.).

  If you need to update a license, add a business location, get a copy of your license or make other changes: Complete a Transaction Privilege Tax License Update form and include fees of $12 per location.

### Section A: TAXPAYER INFORMATION

**1. LICENSE TYPE**

Transaction Privilege Tax (TPT): Anyone involved in an activity taxable under the TPT statutes must apply for a TPT License before engaging in business.

For TPT, you are required to obtain and display a separate license certificate for each business or rental location. This may be accomplished in one of the following ways:

Each location may be licensed as a separate business with a separate license number for purposes of reporting transaction privilege and use taxes individually. Therefore a separate application is needed for each location.

Multiple locations may be licensed under a consolidated license number, provided the ownership is the same, to allow filing of a single tax return. If applying for a new license, list the various business locations as instructed below. If already licensed and you are adding locations, *do not use this application to consolidate an existing license. Please submit update form.*

Withholding & Unemployment Taxes: Employers paying wages or salaries to employees for services performed in the State must apply for a Withholding number & Unemployment number.

Use Tax: Out-of-state vendors (that is, vendors with no Arizona location) making direct sales into Arizona must obtain a Use Tax Registration Certificate. In-state vendors making out-of-state purchases for their own use (and not for resale) must also obtain the Use Tax Registration Certificate.

TPT for cities only: This type of license is needed if your business activity is subject to city TPT that is collected by the state, but the activity is not taxed at the state level. Many of the larger cities in Arizona administer and collect their own privilege taxes. Please contact those cities directly to obtain information regarding licensing requirements.

**2. TYPE OF OWNERSHIP**

Check as applicable. A corporation must provide the state and date of incorporation.

**3.** Enter your Federal Employer Identification number.

- Taxpayers are required to provide their taxpayer identification number (TIN) on all returns and documents. A TIN is defined as the federal employer identification number (EIN), or social security number (SSN) depending upon how income tax is reported. The EIN is required for all employers. A penalty of $5 will be assessed

by the Department of Revenue for each document filed without a TIN.

**4.** Enter the Legal Business Name of the Owner or Employing Unit (name of corporation as listed in its articles of incorporation, or individual & spouse, or partners, or organization owning or controlling the business).

**5.** Enter the name of the Business/DBA (doing business as) Name. If same as above, enter "same."

**6.** Enter the business telephone number including area code.

**7.** Enter the fax number including area code.

**8. and 9.** Enter mailing address where all correspondence is to be sent. You may use your home address, corporate headquarters, or accounting firm's address, etc. If mailing address differs for licenses (for instance withholding and unemployment insurance), please use cover letter to explain.

**10.** Enter the e-mail address (option) for the business or contact person.

**11.** See section G for listing of reservation codes if your business is located on an Indian Reservation.

**12. and 13.** Enter the physical location of business including county. This can not be a PO Box or Route Number.

**14.** If you are a construction contractor, read the bonding requirements carefully.

**15.** If you answered yes, you must complete Section D.

**16.** Describe the major business activity: principal product you manufacture, commodity sold, or services performed. Your description of the business is very important because it determines your transaction privilege tax rate and provides a basis for state economic forecasting.

**17.** Enter the North American Industries Classification System (NAICS) code identified for your business activity.

**18.** Identify the owners of the business. Enter as many as applicable; attach a separate sheet if additional space is needed.

### Section B: TRANSACTION PRIVILEGE TAX (TPT)

**1.** Enter the date the business started in Arizona.

**2.** Enter date sales began in Arizona, or estimate when you plan to begin selling in Arizona.

**3.** Enter the amount of Transaction Privilege Tax income you can reasonably expect to generate in your first twelve months of business. You will be set up for monthly filing unless your anticipated annual income will result in a tax liability of less than $1,250, which may qualify you for quarterly filing.

**4.** For businesses applying for Transaction Privilege and/or Use Tax, enter the applicable business classes based on your activity. See Section H for listing of business classes.

# TRANSACTION PRIVILEGE, USE, AND SEVERANCE TAX RETURN (TPT-1)

Corona-00000389

TPT-1 return is due the 20th day of the month following the reporting period.

**Arizona Department of Revenue**
PO BOX 29010 • PHOENIX, AZ 85038-9010
☎ For assistance out-of-state or in the Phoenix area: (602) 255-2060 or Statewide, toll free from area codes 520 and 928: (800) 843-7196

| STATE LICENSE NUMBER. | |
| --- | --- |
| **TAXPAYER IDENTIFICATION NUMBER** ☒ EIN  ☐ SSN   *14-1977610* | |
| PERIOD BEGINNING | PERIOD ENDING |

## I. TAXPAYER INFORMATION

☐ Amended Return  ☐ Multipage Return  ☐ One-Time Only Return  ☐ Final Return: *(CANCEL LICENSE)*

**DOR USE ONLY**    ☐ LABELED RETURN

BUSINESS NAME
*PHOENIX SCHOOL OF LAW, LLC*

C/O

ADDRESS
*ONE N CENTRAL AVE, STE 1400*

CITY
*PHOENIX*    STATE *AZ*   ZIP *85004*

☐ Address Changed

POSTMARK DATE

RECEIVED DATE

## II. TRANSACTION DETAIL (If more reporting lines are necessary, please attach continuation pages.)

| LINE | (A) BUSINESS DESCRIPTION | (B) REGION CODE | (C) BUSINESS CLASS | (D) GROSS AMOUNT | (E) DEDUCTION AMOUNT | (F) NET TAXABLE AMOUNT | (G) TAX RATE | (H) TOTAL TAX AMOUNT | (I) ACCOUNTING CREDIT RATE | J (F × I) ACCOUNTING CREDIT |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| 1 | *PRIVATE UNIVERSITY* | *MAR* | *229* | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| Subtotal................. | | | | | | | | | | |

## III. TAX COMPUTATION

| | |
| --- | --- |
| 1 Total deductions from Schedule A.................................................... | 1 |
| 2 Total Tax Amount (from column H) ................................................... | 2 |
| 3 State excess tax collected............................................................ + | 3 |
| 4 Other excess tax collected............................................................ + | 4 |
| 5 Total Tax Liability:  Add lines 2, 3, and 4........................................ = | 5 |
| 6 Accounting Credit (from column J).................................................. | 6 |
| 7 State excess tax accounting credit:  *Multiply line 3 by .01* ............. + | 7 |
| 8 Total Accounting Credit:  *Add lines 6 and 7* ................................ = | 8 |
| 9 Net tax due line:  *Subtract line 8 from line 5*.............................. | 9 |
| 10 Penalty and interest.................................................................... + | 10 |
| 11 TPT estimated payments to be used........................................... - | 11 |
| 12 Total amount due this period....................................................... = | 12 |
| 13 Additional payment to be applied (for other periods)................... + | 13 |
| 14 TOTAL AMOUNT REMITTED WITH THIS RETURN ........................ = | 14 |

AMENDED RETURN ONLY
ORIGINAL REMITTED AMOUNT
$

DOR USE
$

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct and complete. Declaration of preparer (other than taxpayer) is based on all information of which preparer has any knowledge.

▶ _____
TAXPAYER'S SIGNATURE          DATE

PAID PREPARER'S SIGNATURE (OTHER THAN TAXPAYER)

PAID PREPARER'S EIN OR SSN

ADOR 10872 (6/10)
Previous ADOR 90-1046

*Please make check payable to Arizona Department of Revenue.*

MICHAEL K. JEANES, CLERK
BY *A. Corona* DEP
FILED

15 MAY -6 PM 2: 44

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se
    Plaintiff

Case #CV2015-000681

    vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
    Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:03 AM on May 06, 2015 I personally served copies of the following documents, Summons (2), Complaint & Demand for Jury Trial, First Amended Complaint, upon Jason Lee for Susan Lee, at his place of business , 16841 N 31st Ave, Ste 102, Phoenix, AZ 85053

I have read the foregoing document and state under penalty of perjury that the facts herein are true and correct.

Signature    Date

_____  5/6/2015

MICHAEL K. JEANES, CLERK
BY
*A. Corona*
DEP
FILED

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
## IN AND FOR THE COUNTY OF MARICOPA 15 MAY -6 PH 2: 43

Paula C Lorona, pro se                         Case #CV2015-000681
    Plaintiff

      vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
    Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:06 AM on May 5, 2015 I personally served copies of the following documents, Summons (2),Complaint & Demand for Jury Trial, First Amended Complaint with Plaintiffs First Request to Defendants for Production of Documents, for **Arizona Summit Law School LLC, a Delaware limited liability company** upon Andrea Infante, Service of Process Coordinator at Corporation Service Company, 2338 W Royal Palm Rd. Ste J, Phoenix, AZ 85021

I have read the foregoing document and state under penalty of perjury that the facts herein are true and correct.

Signature    Date

MICHAEL K. JEANES, CLERK
BY                      DEP
*A. Corona*
FILED

**15 MAY -6  PM 2: 43**

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se                              Case #CV2015-000681
    Plaintiff

vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
    Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of
   Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or
   employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue
   in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:06 AM on May 5, 2015 I personally served copies of the following documents,
   Summons (2), Complaint & Demand for Jury Trial, First Amended Complaint with
   Plaintiffs First Request to Defendants for Production of Documents, for **Scott Thompson**
   upon Andrea Infante, Service of Process Coordinator at Corporation Service Company,
   2338 W Royal Palm Rd, Ste J, Phoenix, AZ 85021

I have read the foregoing document and state under penalty of perjury that the facts herein are
true and correct.

Signature        Date

*Lowell*  5/6/2015

MICHAEL K. JEANES. CLERK
BY                              DEP
*A. Corona*
FILED

15 MAY -6  PM 2: 43

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se                    Case #CV2015-000681
    Plaintiff

       vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
      Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:06 AM on May 5, 2015 I personally served copies of the following documents, Summons (2),Complaint & Demand for Jury Trial, First Amended Complaint with Plaintiffs First Request to Defendants for Production of Documents, for **Jane Doe Thompson** upon Andrea Infante, Service of Process Coordinator at Corporation Service Company, 2338 W Royal Palm Rd, Ste J, Phoenix, AZ 85021

I have read the foregoing document and state under penalty of perjury that the facts herein are true and correct.

Signature    Date

*Lowell*   5/6/2015

MICHAEL K. JEANES, CLERK
BY *A. Corona* DEP
FILED

**15 MAY -6 PM 2: 43**

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se                              Case #CV2015-000681
    Plaintiff

    vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
      Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of
   Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or
   employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue
   in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:03 AM on May 06, 2015 I personally served copies of the following
   documents, Summons (2), Complaint & Demand for Jury Trial, First Amended
   Complaint, upon Jason Lee, at his place of business , 16841 N 31st Ave, Ste 102,
   Phoenix, AZ 85053

I have read the foregoing document and state under penalty of perjury that the facts herein are
true and correct.

Signature     Date

*Lowell*     5/6/2015

MICHAEL K. JEANES, CLERK
BY _A. Corona_ DEP
FILED

15 MAY -6 PM 2: 43

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se
    Plaintiff

Case #CV2015-000681

    vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
    Defendant

## AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:06 AM on May 5, 2015 I personally served copies of the following documents, Summons (2), Complaint & Demand for Jury Trial, First Amended Complaint with Plaintiffs First Request to Defendants for Production of Documents, for **Infilaw Corporation, a Delaware Corporation** upon Andrea Infante, Service of Process Coordinator at Corporation Service Company, 2338 W Royal Palm Rd, Ste J, Phoenix, AZ 85021

I have read the foregoing document and state under penalty of perjury that the facts herein are true and correct.

Signature    Date

_Lowell_  5/6/2015



MICHAEL K. JEANES.CLERK
BY
E. Castello DEP
FILED

15 MAY 20 PM 2: 38

# IN THE SUPERIOR COURTS OF THE STATE OF ARIZONA
# IN AND FOR THE COUNTY OF MARICOPA

Paula C Lorona, pro se
Plaintiff

Case #CV2015-000681

vs

ARIZONA SUMMIT LAW SCHOOL, LLC, a
Delaware limited liability company; INFILAW
CORPORATION, a Delaware corporation; STEPHANIE
and JASON LEE, husband and wife; SCOTT and JANE
DOE THOMPSON, husband and wife; JOHN AND JANE
DOES 1-100; BLACK CORPORATIONS 1-100; WHITE
PARTNERSHIPS 1-100;
Defendant

## AMENDED AFFIDAVIT OF SERVICE BY PERSONAL SERVICE

I, Vanessa Lowell, do hereby declare:

1. That I am at least 18 years of age, a citizen of the United States, and a resident of Maricopa County;

2. That I am not related to the recipient(s) by way of blood, adoption, marriage or employment, but serve as a "disinterested third party" (herein server) and further;

3. That I am in no way connected to or involved in or with, the person and or matter at issue in this action;

4. I am an Arizona certified process server, Maricopa County License #MC-8501;

5. That at 10:03 AM on May 06, 2015 I personally served copies of the following documents, Summons (2),Complaint & Demand for Jury Trial, First Amended Complaint, upon Jason Lee for Stephanie Lee (not Susan Lee), at his place of business , 16841 N 31st Ave, Ste 102, Phoenix, AZ 85053

I have read the foregoing document and state under penalty of perjury that the facts herein are true and correct.

Signature   Date

Lowell   5/20/2015