**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paula C. Lorona, | No. CV-15-00972-PHX-NVW |
| Plaintiff, | |
| v. | **ORDER** |
| Arizona Summit Law School, LLC, et al., | |
| Defendants. | |

Before the Court is Defendants' Motion to Dismiss (Doc. 21) and the parties' accompanying briefs.  For the reasons that follow, the motion will be granted in part and denied in part.

## I.    BACKGROUND

On March 2, 2015, Paula Lorona filed a complaint *pro se* in state court against Arizona Summit Law School, LLC ("Arizona Summit Law School" or "the Law School"), Infilaw Corporation ("Infilaw"), and various individuals and entities.  (Doc. 1-1 at 1-18.)  Lorona then amended her complaint to include claims under federal statutes. (Doc. 1-1 at 56-80.)  On May 28, the defendants removed to federal court.  (Doc. 1.) Lorona then obtained counsel (Doc. 14) and amended her complaint again.  This Second Amended Complaint (Doc. 20) names only Arizona Summit Law School, Infilaw, and fictitious entities as defendants and alleges the following.

### A.      Arizona Summit Law School and Infilaw

Arizona Summit Law School is a for-profit Arizona limited liability company. (*Id.* at ¶ 4.)  Its parent company is Infilaw, a Delaware corporation whose primary place of business is in Florida.  (*Id.* at ¶ 7.)  Infilaw dominates the Law School's business operations and controls all its finances.  (*Id.* at ¶ 15.)  Specifically, Infilaw controls the Law School's budget, payroll, employee promotions, employee incentives, employee benefits, and certain employee requests for reimbursement.  (*Id.* at ¶¶ 16-19.)

### B.      Lorona's Employment at Arizona Summit Law School

In November 2009, the Law School hired Lorona as an administrative assistant. (*Id.* at ¶ 23.)  Lorona accepted the job in part because the Law School offered a tuition waiver to employees.  (*Id.* at ¶¶ 24-25.)  Lorona also reviewed statistics regarding the Law School's completion rates, the academic caliber of its students, and bar pass rates, and decided it would be a good place to work and attend school.  (*Id.* at ¶ 26.)

In her first two years of work, Lorona was promoted three times and received excellent employment reviews.  (*Id.* at ¶¶ 23, 28.)  Then problems arose.

#### 1.      Lorona's refusal to file an inaccurate tax form[1]

In 2012 the Law School's Director of Finance, Judy Smith, ordered Lorona to upload a tax form to the Arizona Department of Revenue's website.  (*Id.* at ¶¶ 29-30.) Lorona explained that the form contained inaccurate information and refused to file it, even after Smith made revisions.  (*Id.* at ¶¶ 33-40.)  Smith continued to pressure Lorona to file the form.  (*Id.* at ¶¶ 41-42.)

Concerned, Lorona sought advice from the Law School's General Counsel, who told her not to file the form.  (*Id.* at ¶¶ 43-45.)  Lorona also met with the Law School's Human Resources Manager, Stephanie Lee, who advised Lorona to speak with the Law School's President, Scott Thompson, or to contact Infilaw's whistleblower hotline.  (*Id.* at

---

[1] It is not clear how Lorona's refusal to file a tax form pertains to her stated causes of action, but it is chronicled in the Second Amended Complaint and therefore summarized here.

¶¶ 5-6, 46-49.)  Lee and Thompson declined Lorona's requests for follow-up meetings. (*Id.* at ¶¶ 50-52.)  Lorona then contacted Infilaw's whistleblower hotline.  (*Id.* at ¶¶ 53-55.)  Days later, Smith was fired.  (*Id.* at ¶ 56.)

## 2. Employment difficulties

Subsequently, Lorona was charged "paid time off" hours while working remotely and caring for her children, who had severe asthma.  (*Id.* at ¶¶ 67-70, 177, 204-07, 209.)  At times she was denied the opportunity to work remotely at all.  (*Id.* at ¶ 183.)  Lorona discussed her concerns regarding "paid time off" hours with Lee.  (*Id.* at ¶¶ 251-54.)  Lorona was not advised of her rights under the Family and Medical Leave Act ("FMLA").  (*Id.* at ¶¶ 181, 184, 208.)   At Lorona's request, Lee gave Lorona the paperwork necessary to seek FMLA leave, but her doctor misplaced the paperwork.  (*Id.* at ¶¶ 210-14.)    Other employees—males without disabilities or caregiving responsibilities—received FMLA leave without requesting it or submitting paperwork.  (*Id.* at ¶¶ 215-19.)

In addition, Lorona was denied an interview for a promotion for which she was qualified.  (*Id.* at ¶¶ 58-61, 185-87.)  The position was given to a male without disabilities or caregiving responsibilities, who was less qualified than Lorona.  (*Id.* at ¶¶ 62, 193.)  Thompson and Lee excluded Lorona from department meetings and took away her corporate credit card.  (*Id.* at ¶ 63.)  Lorona complained to her superiors that she was being unfairly treated and discriminated against due to her need to care for her disabled children.  (*Id.* at ¶¶ 270-72.)

On one occasion, Lee commented in a meeting that Lorona (who was absent) had a "great butt."  (*Id.* at ¶¶ 231-32.)  Lee later told Lorona she should be flattered, not embarrassed.  (*Id.* at ¶¶ 235-38.)  On a separate occasion, Lorona's supervisor compared Lorona to a Barbie doll.  (*Id.* at ¶¶ 239-40.)  Lorona complained to her superiors that she was being discriminated against because she is a woman.  (*Id.* at ¶ 270.)

On April 13, 2013, Lorona was fired.  (*Id.* at ¶¶ 90-93.)  Lee had previously assured Lorona there were no concerns about her performance.  (*Id.* at ¶¶ 242-44.)  When Lorona was fired, Lee confirmed she was not being fired for cause.  (*Id.* at ¶¶ 94-95.)  Lorona was replaced by a male who did not follow standard hiring procedures, is less qualified than Lorona, and regularly leaves work earlier than Lorona was allowed to leave. (*Id.* at ¶¶ 256-58, 264-65.)

### 3. Lorona's claims arising from her employment

Lorona has filed complaints with the Arizona Attorney General's Office for whistleblower protection and the Equal Employment Opportunity Commission ("EEOC") for discrimination.  (*Id.* at ¶ 97.)

Here in federal court, Lorona claims: (1) Defendants discriminated against her because of her sex in violation of Title VII of the Civil Rights Act of 1964, as amended (*id.* at ¶¶ 227, 266); (2) Defendants discriminated against her because of her children's disability in violation of the Americans with Disabilities Act (*id.* at ¶¶ 171-72, 194); (3) Defendants denied her accommodations to care for her children in violation of the Family Medical Leave Act (*id.* at ¶¶ 202, 219); and (4) Defendants terminated her in retaliation for activity protected under these statutes (*id.* at ¶¶ 173, 228, 270-73).

### C. Lorona's Enrollment at Arizona Summit Law School

In August 2009, Lorona applied for traditional enrollment at the Law School and was accepted.  (*Id.* at ¶ 27.)  Traditional enrollment may be contrasted with "alternative" enrollment, whereby students with lower undergraduate grade point averages ("GPAs") and Law School Admission Test ("LSAT") scores are accepted to the Law School.  (*Id.* at ¶ 130.)  The Law School has increased its percentage of "alternative" enrollees over the years, from 11% in 2005 to 80% in 2011.  (*Id.* at ¶ 131.)

The Second Amended Complaint does not state whether Lorona was accepted to any other law schools, on what date she decided to attend Arizona Summit Law School, or on what date she began attending.  Lorona graduated at the end of 2014.  (*See id.* at

¶ 115.)   She incurred approximately $204,000 of student loan debt and cannot find employment with her degree.  (*Id.* at ¶¶ 143, 147.)  As conceded in oral argument, Lorona passed the Arizona Bar Exam in 2015 and is currently attempting to establish a solo practice.

### 1.      Representations by the Law School

Arizona Summit Law School made representations, to Lorona and others, about its students.   In 2009, bar exam pass rates among the Law School's graduates were reportedly over 80%.  (*Id.* at ¶ 26.)  But Law School emails from 2012 to 2014 disclosed plummeting pass rates, as low as 50%.  (*Id.* at ¶¶ 79-84.)  During that period the Law School continued to boast an "Ultimate" bar pass rate of over 80%, via brochures and email.   (*Id.* at ¶¶ 85-86.)   The "Ultimate" pass rate refers to the percentage of all graduates who have passed the bar exam "on the first or subsequent attempts," not the percentage of test-taking graduates who passed the exam on a particular date.  (*Id.* at ¶ 85.)   In addition, the Law School reported to third parties statistical data about its students, such as undergraduate GPAs, LSAT scores, and bar pass rates.  (*Id.* at ¶¶ 128, 130-31.)   But these data did not take into account students admitted via "alternative" enrollment, even though such students comprise up to 80% of the student population. (*Id.* at ¶¶ 128, 130-31, 133.)   In a staff meeting in 2011, the dean of the Law School stated that "alternative" enrollees were just as successful in the classroom as traditional enrollees.   (*Id.* at ¶¶ 72-74.)   In May 2014, the Law School began paying students it deemed likely to fail the bar exam not to take the exam, in order to inflate bar pass rates. (*Id.* at ¶¶ 102-104, 106, 117-20.)   Despite struggling bar pass rates, the Law School projected confidence: "We believe by graduation, lawyers should enter the workforce professionally prepared to practice law . . . .   Summit Law . . . creat[es] well-rounded lawyers who add immediate value to their firms and employers."  (*Id.* at ¶ 138.)

The Law School also made representations about its affordability.   Its website stated that tuition, fees, and supplies for its three-year program beginning in 2010 would

total approximately $103,000 and that median student loan debt for recent graduates was approximately $98,000.  (*Id.* at ¶ 142.)  Further, the Law School enrolled students ineligible for federal financial aid and gave them "time to fix their credit to receive loans," despite knowing the Department of Education does not lend to students with certain credit deficiencies.  (*Id.* at ¶ 140.)

In addition, the Law School made representations about its bar exam preparation program, myBAR.  A 2013 Law School email advised students to sign up for myBAR instead of a competitor's bar review course, citing higher bar pass rates with myBAR.  (*Id.* at ¶ 126.)  The Law School's website also promotes myBAR with statements such as the following: "The myBAR program has been specially designed to offer you the best of everything."  (*Id.* at ¶ 127.)

**2.      Lorona's claims arising from her enrollment**

Lorona claims Defendants defrauded her in violation of A.R.S. § 44-1521 *et seq.* and Arizona common law because the above-mentioned representations were false and she detrimentally relied on these representations in deciding to enroll at the Law School and in deciding to remain there.  (*Id.* at ¶¶ 143-147, 150-58.)  She also claims Defendants negligently misrepresented information to her because they failed to exercise reasonable care in communicating.  (*Id.* at ¶ 163.)

## II.      LEGAL STANDARD

Defendants move to dismiss the Second Amended Complaint in its entirety for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  (Doc. 21 at 1.)

When considering a motion to dismiss, a court evaluates the legal sufficiency of the plaintiff's pleadings.  Dismissal under Rule 12(b)(6) can be based on "the lack of  a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory."  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990).  To

avoid dismissal, a complaint need include "only enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On a motion to dismiss under Rule 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, the principle that a court accepts as true all of the allegations in a complaint does not apply to legal conclusions or conclusory factual allegations. *Ashcroft v. Iqbal*, 566 U.S. 662, 678 (2009). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To show that the plaintiff is entitled to relief, the complaint must permit the court to infer more than the mere possibility of misconduct. *Id.* If the plaintiff's pleadings fall short of this standard, dismissal is appropriate.

Generally, material beyond the pleadings may not be considered in deciding a Rule 12(b)(6) motion. However, a court may consider evidence on which the complaint necessarily relies if (1) the complaint refers to the document, (2) the document is central to the plaintiff's claim, and (3) no party questions the authenticity of the copy of the document submitted to the court. *Marder v. Lopez*, 450 F.3d 445, 448 (9th Cir. 2006). The Second Amended Complaint refers to a Charge of Discrimination that Lorona filed with the EEOC. (Doc. 20 at ¶ 13.) The charge is central to Lorona's employment discrimination claims because the Court's jurisdiction to hear such claims depends on whether Lorona has exhausted her administrative remedies. *See Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990). Defendants have submitted a copy of the charge. (Doc. 28-1.) Lorona does not question its authenticity. (Doc. 30.) Therefore the Court considers the charge as well as the pleadings in deciding the present motion.

- 7 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## III.   ANALYSIS

### A.   Employment-Related Claims

Lorona claims Defendants violated her employee rights under Title VII of the Civil Rights Act of 1964 as amended ("Title VII"), the Americans with Disabilities Act ("ADA"), and the Family Medical Leave Act ("FMLA").  Defendants contend Lorona fails to state a claim under any of these statutes.

#### 1.   Infilaw's liability as Lorona's employer

As a threshold matter, Defendants contend Lorona does not adequately allege Infilaw was her "employer" for purposes of Title VII, the ADA, or the FMLA. Defendants do not dispute that the Law School was her employer; the issue is whether Infilaw, the parent company, was her employer as well.

The Ninth Circuit has held that "[i]n the absence of special circumstances, a parent corporation is not liable for the Title VII violations of its wholly owned subsidiary." *Watson v. Gulf & W. Indus.*, 650 F.2d 990, 993 (9th Cir. 1981).  However, the court noted that this general rule may not apply if the parent company "participated in or influenced the employment policies" of its subsidiary.  *Id.*  In a subsequent case, the Ninth Circuit invoked this exception by extending Title VII liability to a "parent" (the State of California) that "participated extensively in, and influenced, the employment policies and practices" of its "subsidiary" (local school districts).  *Ass'n of Mexican-Am. Educators v. State of California*, 231 F.3d 572, 582 (9th Cir. 2000).  These cases provide guidance in interpreting not only Title VII but also similar statutes.  *See, e.g.*, *E.E.O.C. v. Con-Way, Inc.*, No. CV 06-1337-MO, 2007 WL 2610367, at *2 (D. Or. Sept. 4, 2007) (citing *Watson* in interpreting Age Discrimination in Employment Act).  Similarly, although these cases were on appeal from summary judgment, they provide guidance as to what must be alleged at the motion to dismiss stage.  *See, e.g.*, *Nowick v. Gammell*, 351 F.

Supp. 2d 1025, 1034 n.28 (D. Haw. 2004) (citing *Watson* and *Mexican-Am. Educators* in considering motion to dismiss).

The issue is therefore whether Lorona's allegations permit a reasonable inference that Infilaw "participated in or influenced" the Law School's employment policies.[2] Most of Lorona's allegations on this subject miss the mark. For example, Infilaw's control over the Law School's "business operations," "finances," "budget," and "payroll" does not bear on employment policy. (Doc. 20 at ¶¶ 15-17.) Similarly, Infilaw's control over Law School employees' 401k and corporate credit cards has little to do with any employment policy related to Lorona's suit. (*Id.* at ¶¶ 18-19.)

Only one allegation is on point: "All promotions [of Law School employees] had to be approved by Infilaw." (*Id.* at ¶ 16.) That allegation suffices to plead Infilaw's liability as Lorona's employer, with respect to her claims involving denial of a promotion. If Infilaw had to approve all promotions of Law School employees, one could infer that Infilaw "participated in or influenced" the Law School's decision not to promote Lorona. Although this inference is weak, it is enough at the pleading stage because whether a parent company is an "employer" of its subsidiary's employees "is generally a question of fact not suitable to resolution on a motion to dismiss." *Brown v. Daikin Am. Inc.*, 756 F.3d 219, 226 (2d Cir. 2014).

### 2.     Title VII substantive claims

Lorona claims Defendants discriminated against her because of her sex in violation of Title VII, 42 U.S.C. §§ 2000e *et seq.* Defendants argue this claim is deficient in the following ways.

---

[2] Lorona also claims Infilaw is liable under the "integrated enterprise" test. *See Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 815 (9th Cir. 2002). That test is inapplicable. It governs whether an entity has enough employees to be considered an "employer," not joint liability. *See Anderson v. Pac. Mar. Ass'n*, 336 F.3d 924, 928 (9th Cir. 2003).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### a.     Administrative exhaustion as to claim against Infilaw

First, Defendants contend Lorona failed to exhaust administrative remedies against Infilaw because she did not name Infilaw as her employer in the discrimination charge she filed with the EEOC.[3]

As a general rule, "Title VII claimants may sue only those named in the EEOC charge because only they had an opportunity to respond to charges during the administrative proceeding." *Sosa v. Hiraoka*, 920 F.2d 1451, 1458 (9th Cir. 1990). But there are exceptions to this rule. For example, a plaintiff may sue a party unnamed in the EEOC charge if the party "had notice of the EEOC conciliation efforts and participated in the EEOC proceedings." *Id.* at 1459. In addition, a plaintiff may sue a party that is "a principal or agent" of, or "substantially identical" to, the party named in the EEOC charge. *Id.* Courts are particularly likely to invoke these exceptions when the EEOC charge was filed without the assistance of counsel, since the charging party may not understand the need to name all parties in the charge or may be unable to appreciate parties' separate legal identities. *Id.*

Lorona's failure to name Infilaw in her EEOC charge does not bar her Title VII claim against Infilaw. She was not represented by counsel when she filed the EEOC charge, so her omission should be viewed with leniency. She alleges that Infilaw had actual notice of the EEOC proceedings. (Doc. 20 at ¶ 21.) Thus, the "notice and participation" exception may apply. *Sosa*, 920 F.2d at 1459. She also alleges that Infilaw dominated the Law School's business operations and shared the Law School's interests regarding the EEOC charge. (Doc. 20 at ¶¶ 15, 22.) Thus, the "substantially identical parties" exception may apply. *Sosa*, 920 F.2d at 1460. It would therefore be premature to dismiss Lorona's claim at this stage of proceedings merely on the ground that she did not name Infilaw in her EEOC charge. *Id.* at 1459-60, 1462 (reversing

---

[3] Defendants' exhaustion arguments, though made in a Rule 12(b)(6) motion, go to whether the Court has jurisdiction, not whether Lorona states a claim. *See Sosa v. Hiraoka*, 920 F.2d 1451, 1456 (9th Cir. 1990).

dismissal of Title VII claims against parties unnamed in an EEOC charge because the "notice and participation" and "substantially identical parties" exceptions could apply).

        **b.**     **Administrative exhaustion as to sexual harassment claim**

Second, Defendants contend Lorona failed to exhaust administrative remedies for her sexual harassment claim because she did not include this claim, or any allegation giving rise to this claim, in her EEOC charge. In particular, Lorona did not mention in her charge two incidents alleged in her Second Amended Complaint: (1) that the Law School's Human Resources Director, Stephanie Lee, commented in a meeting that Lorona had a "great butt," and (2) that Lorona's supervisor compared Lorona's body and face to that of a Barbie doll.

"Incidents of discrimination not included in an EEOC charge may not be considered by a federal court unless the new claims are like or reasonably related to the allegations contained in the EEOC charge. In determining whether an allegation under Title VII is like or reasonably related to allegations contained in a previous EEOC charge, the court inquires whether the original EEOC investigation would have encompassed the additional charges. Finally, the remedial purpose of Title VII and the paucity of legal training among those whom it is designed to protect require charges filed before the EEOC to be construed liberally." *Green v. Los Angeles Cty. Superintendent of Sch.*, 883 F.2d 1472, 1475-76 (9th Cir. 1989) (citations and alterations omitted).

The allegations in Lorona's EEOC charge, even when construed liberally, are not "like or reasonably related" to the sexual harassment incidents alleged in the Second Amended Complaint. The EEOC charge alleges three ways in which Lorona was mistreated: (1) she was charged paid time off for working at home, (2) she did not receive an interview for a promotion, and (3) she was terminated. (Doc. 28-1 at 3-4.) The charge then concludes that Lorona was discriminated against because of her sex and her association with her children. (*Id.* at 4.) Nowhere is sexual harassment alleged.

That the charge contains a conclusory allegation of sex discrimination is not enough.  "In determining whether claims are reasonably related, the focus should be on the factual allegations made in the [EEOC] charge itself, describing the discriminatory conduct about which a plaintiff is grieving.  It is the substance of the charge and not its label that controls."  *Mathirampuzha v. Potter*, 548 F.3d 70, 76-77 (2d Cir. 2008).  Although sexual harassment is one form of sex discrimination, the substance of Lorona's charge shows it is not what she complained of to the EEOC.  Because Lorona failed to exhaust administrative remedies for her sexual harassment claim, the Court lacks jurisdiction to hear such a claim.  *Sosa*, 920 F.2d at 1456.

### c. Failure to state a hostile work environment claim

Third, Defendants contend that even if Lorona exhausted administrative remedies for her sexual harassment claim, the Second Amended Complaint does not allege facts supporting a hostile work environment claim.

As explained above, the Court lacks jurisdiction to hear Lorona's sexual harassment claims.  But even assuming jurisdiction *arguendo*, Lorona has not stated a hostile work environment claim.  Lorona alleges two instances of harassment: (1) Stephanie Lee's comment that Lorona had a "great butt" and (2) a supervisor's comparison of Lorona to a Barbie doll.  (Doc. 20 at ¶¶ 231-32, 239-40.)  These instances are not "sufficiently severe or pervasive to alter the conditions of [Lorona's] employment and create an abusive working environment."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993).

### d. Failure to state a disparate treatment claim

Fourth, Defendants contend Lorona does not adequately allege a disparate treatment claim because her allegations do not permit a reasonable inference that she was subject to any adverse employment action because of her sex.

In the part of her complaint entitled "Gender Discrimination," Lorona identifies five ways the Law School treated her differently: (1) she was denied opportunities for

promotion (Doc. 20 at ¶¶ 255, 263), (2) she was charged "paid time off" when she worked from home (*id.* at ¶ 253), (3) she was required to work later than male employees (*id.* at ¶¶ 260, 264-65), (4) she was not offered FMLA leave in the same manner as male employees (*id.* at ¶ 266), and (5) she was terminated (*id.* at ¶¶ 245-49).

The fourth of these actions—the manner in which the Law School offered FMLA leave—is not an "adverse employment action" for purposes of Title VII because, even if Lorona's allegations are true, this action did not "materially affect the compensation, terms, conditions, or privileges" of her employment. *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008) (alteration omitted). The other actions, however, are adverse employment actions under Title VII. *See, e.g.*, *Kang v. U. Lim Am., Inc.*, 296 F.3d 810, 818-19 (discriminatory overtime is adverse employment condition).

The question then becomes whether Lorona has sufficiently alleged that these actions were "because of" her sex. 42 U.S.C. § 2000e-2(a)(1). For one of these actions, the answer is no: Nowhere does Lorona allege that she was charged paid time off because she was female. If anything, she suggests the opposite by identifying another female employee who was not charged paid time off. (Doc. 20 at ¶ 253.) As to the Law School's other actions, however, Lorona adequately alleges causation. She claims the Law School promoted male employees more readily (*id.* at ¶¶ 255-57), allowed male employees to leave earlier (*id.* at ¶¶ 260, 264-65), and replaced her with a male employee less qualified than she was (*id.* at ¶¶ 256-58). These allegations permit the reasonable inference that three of the Law School's actions—denying her an opportunity for promotion, requiring her to work late, and terminating her—were "because of" her sex. Lorona need not say more at this preliminary stage of litigation.[4]

---

[4] Defendants' argument that Lorona has not established a prima facie case of sex discrimination is misplaced. The prima facie case is an evidentiary standard, not a pleading requirement. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002); *see also U.S. E.E.O.C. v. Farmers Ins. Co.*, 24 F. Supp. 3d 956, 957 (E.D. Cal. 2014).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### 3. ADA substantive claims

Lorona also claims Defendants discriminated against her on the basis of her relationship with her disabled children in violation of the ADA, 42 U.S.C. § 12112(a). Defendants urge dismissal of this claim for several reasons, but none is persuasive.

#### a. Administrative exhaustion as to claim against Infilaw

First, Defendants contend Lorona failed to exhaust administrative remedies against Infilaw because she did not name Infilaw as her employer in the discrimination charge she filed with the EEOC.

This contention fails because, as explained above, Lorona was not represented by counsel when she filed the EEOC charge, Infilaw had actual notice of the EEOC proceedings, and Infilaw dominated the Law School's business operations and shared the Law School's interests regarding the EEOC charge. *See supra* Part III.A.2.a; *see also Kennedy v. Kings Mosquito Abatement Dist.*, No. 1:12-CV-1458 AWI MJS, 2013 WL 1129202, at *4 (E.D. Cal. Mar. 18, 2013) (noting Title VII and the ADA have the same exhaustion requirements).

#### b. Entitlement to reasonable accommodation

Second, Defendants contend the ADA did not entitle Lorona, a non-disabled employee, to a reasonable accommodation allowing her to work from home and care for her disabled children.

This argument misunderstands the nature of Lorona's ADA claim. Lorona does not claim she was deprived of an accommodation to which she was entitled. Rather, she claims she was deprived of customary job benefits because of her relation to her disabled children. The crux of her claim is unequal treatment, not inadequate treatment.

Lorona relies on 42 U.S.C. §§ 12112(a) and 12112(b)(4). (Doc. 20 at ¶¶ 171-72.) Section 12112(a) prohibits "discriminat[ion] against a qualified individual on the basis of disability" with respect to terms, conditions, and privileges of employment. Section 12112(b)(4) specifies that such discrimination includes "denying equal jobs or benefits . . . because of the known disability of an individual with whom the qualified individual

- 14 -

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

is known to have a relationship."  Lorona alleges Defendants knew her children had a disability and, as a result, denied her benefits usually offered to employees, such as the ability to work remotely at will.  (Doc. 20 at ¶¶ 177, 183-86.)  Whether Defendants discriminated in this manner does not depend on whether Lorona was entitled to those benefits as a reasonable accommodation.  *See Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 573 (2d Cir. 2003) (distinguishing between "disparate treatment" and "failure to make a reasonable accommodation").

Still, to whatever extent Lorona intended to sue for failure to provide a reasonable accommodation as opposed to discrimination, Defendants are correct in pointing out that such a claim is not cognizable under the ADA because Lorona is not disabled.  *Larimer v. Int'l Bus. Machines Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

c.      **Failure to allege causation**

Third, Defendants contend Lorona has not adequately alleged that the discrimination she experienced was "because of" her relation to her disabled children.  42 U.S.C. § 12112(b)(4).  Defendants argue that, because Lorona does not identify the particular person who denied her benefits, she cannot identify anyone with discriminatory intent.  Defendants also argue that according to Lorona's own allegations, any unequal treatment was caused by her refusal to file an inaccurate tax form and subsequent whistleblowing, not by discriminatory intent.

These arguments fail.  Lorona alleges that her supervisors and two other Law School employees knew of her children's disability, and she ascribes that same knowledge to Defendants generally.  (Doc. 20 at ¶¶ 46, 177.)  She also alleges that employees unrelated to disabled persons were treated more favorably, and she ascribes discriminatory intent to Defendants generally.  (*Id.* at ¶¶ 179-84.)  These allegations permit a reasonable inference that Lorona was denied equal benefits "because of" her relation to her disabled children.  Contrary to Defendants' suggestion, this is not a case where the plaintiff "does not even attempt to articulate a causal link."  *Cheeks v. Gen.*

*Dynamics*, 22 F. Supp. 3d 1015, 1039 (D. Ariz. 2014).   At the pleading stage, it is unrealistic to expect Lorona to identify precisely who made the decision resulting in her unequal treatment.   And it does not matter that Lorona alleges multiple, conflicting accounts of what caused the unequal treatment she experienced, since a "party may state as many separate claims . . . as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(3).

### 4.      FMLA substantive claims

Lorona also claims Defendants denied her accommodations to care for her children in violation of the FMLA, 29 U.S.C. §§ 2611 *et seq*.   Defendants argue this claim is time-barred and otherwise deficient.   Lorona did not defend her FMLA claims in her Response or at oral argument and has therefore abandoned them.   Moreover, Defendants' arguments are meritorious.

#### a.      Statute of limitations

First, Lorona's substantive FMLA claims are time-barred.   The statute requires that such claims be brought no later than two years after "the date of the last event constituting the alleged violation."   29 U.S.C. § 2617(c)(1).   Although Lorona does not specify when the most recent FMLA violation occurred, it must have been sometime before she was fired on April 13, 2013.   She brought her FMLA claim more than two years after that date.   (Doc. 1-1 at 56, 75-76, 80.)

#### b.      Entitlement to requested accommodations

Second, the FMLA did not entitle Lorona to any of the accommodations that were denied to her.   At the outset, it is not clear exactly what Lorona's legal theory under the FMLA is.   The Second Amended Complaint cites 29 U.S.C. § 2612(a)(1)(C), which entitles eligible employees to twelve weeks of annual leave to care for a sick family member.   (Doc. 20 at ¶ 202.)   A reader might then expect to see allegations that Lorona requested such leave and Defendants denied her request.

But that is not how the story goes.   Instead Lorona says Defendants *permitted* her to work remotely to care for her children.   (*Id.* at ¶¶ 204-07.)   She complains she was charged "paid time off" hours for this arrangement and was not offered FMLA

protection.  (*Id.* at ¶¶ 208-09.)  At her request, Defendants gave her paperwork with which to seek FMLA leave, but her doctor misplaced it.  (*Id.* at ¶¶ 210-14.)  Other employees—males without disabilities or caregiving responsibilities—received FMLA leave without requesting it or submitting paperwork.  (*Id.* at ¶¶ 215-19.)

None of these allegations advances a cognizable legal theory under the FMLA. First, Lorona's complaint that she was charged "paid time off" hours for working remotely is a nonstarter because an "employer may require the employee to substitute accrued paid leave for unpaid FMLA leave."  29 C.F.R. § 825.207(a).  Indeed, Lorona cites nothing in the FMLA entitling her to work remotely at all, much less to do so without using paid leave.  Second, Lorona's complaint that she was not affirmatively offered FMLA protection seems to be a claim that she was not notified of her FMLA rights.  But the Second Amended Complaint says nothing about whether Defendants violated the relevant notice requirements.  29 C.F.R. § 825.300.  Finally, Lorona's complaint that other employees were treated more favorably with respect to FMLA leave is a discrimination claim, not a FMLA claim.

### 5.      Title VII retaliation claim

Lorona also claims Defendants fired her in retaliation for activity protected under Title VII, 42 U.S.C. § 2000e-3(a).  Defendants contend this claim is deficient in two respects.

### a.      Administrative exhaustion

First, Defendants contend Lorona failed to exhaust administrative remedies for her retaliation claim because she did not include this claim, or any allegation giving rise to this claim, in her EEOC charge.

The Ninth Circuit rejected a similar argument in *Vasquez v. County of Los Angeles*, 349 F.3d 634, *as amended* (Jan. 2, 2004).  There, an employee claimed he had been transferred and harassed in retaliation for protected activity, but he had not alleged retaliation in his EEOC charge.  *Id.* at 645.  Nevertheless, the Ninth Circuit noted that

"[w]hile the EEOC charge does not contain the relevant legal theory of retaliation, it does contain the relevant factual allegations." *Id.* Specifically, the charge contained allegations of the employee's transfer and harassment, "the same acts specified as retaliation in his claim." *Id.* at 645-46. Accordingly, the Ninth Circuit held the employee had exhausted his administrative remedies as to the retaliation claim. *Id.* at 646.

So too here. Although Lorona's EEOC charge does not specifically allege retaliation, it alleges that Defendants terminated her, which is "the same act[] specified as retaliation" in her Second Amended Complaint. Thus, Lorona exhausted her administrative remedies.

### b.     Failure to allege protected activity and causation

Second, Defendants contend Lorona has not adequately alleged retaliation because she does not claim her termination resulted from any protected activity. This is incorrect.

Lorona alleges she complained to her superiors that Defendants discriminated against her because she is a woman. (Doc. 20 at ¶ 270.) This is protected activity because it opposes a practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). Lorona also alleges she was terminated as a result of her complaining. (Doc. 20 at ¶ 274.) These allegations state a Title VII retaliation claim.

### 6.     ADA retaliation claim

Lorona also claims Defendants fired her in retaliation for activity protected under the ADA, 42 U.S.C. § 12203(a). But the Second Amended Complaint presents this claim in a misleading way, because the heading of the "retaliation" count does not mention the ADA. Instead, the heading reads: "Retaliatory Discharge in violation of Title VII and FMLA." (*Id.* at ¶ 269.) This omission might explain why Defendants do not address Lorona's ADA retaliation claim in their motion to dismiss.

Because of this omission, the Second Amended Complaint does not contain a "short and *plain* statement" of Lorona's ADA retaliation claim. Fed. R. Civ. P. 8(a)(2) (emphasis added); *accord* Fed. R. Civ. P. 10(b) ("If doing so would promote clarity, each

claim founded on a separate transaction or occurrence . . . must be stated in a separate count . . . .").  Thus, the claim will be dismissed without prejudice to renewal in a further amended complaint.

### 7. FMLA retaliation claim

Lorona also claims Defendants fired her in retaliation for action protected under the FMLA.  Defendants argue this claim is time-barred and otherwise deficient. Although this claim may not actually be time-barred, *compare* 29 U.S.C. § 2617(c)(1) *with* 29 U.S.C. § 2617(c)(2), Lorona did not defend the claim in her Response or at oral argument and has therefore abandoned it.

Moreover, the Second Amended Complaint does not clearly specify the protected activity in which Lorona engaged or the FMLA provision underlying her retaliation claim.  *See Bachelder v. Am. W. Airlines, Inc.*, 259 F.3d 1112, 1122-25 (9th Cir. 2001) (distinguishing among FMLA retaliation provisions).  Because of these omissions, the Second Amended Complaint does not contain a "short and plain statement" of Lorona's FMLA retaliation claim.  Fed. R. Civ. P. 8(a)(2).  Thus, the claim will be dismissed without prejudice to renewal in a further amended complaint.

### B. Enrollment-Related Claims

Lorona also claims she detrimentally relied on various misrepresentations made by the Law School and therefore claims consumer fraud under A.R.S. § 44-1521 *et seq.*, common law fraud, and negligent misrepresentation (collectively, "fraud claims").[5] Defendants contend Lorona has not stated any such claim.

---

[5] The only difference among these claims, for present purposes, is that Defendants argue Lorona has not pleaded negligent misrepresentation because she has not alleged a breach of duty.  This argument is unconvincing.  Lorona alleges Defendants "failed to exercise reasonable care" in communicating.  (Doc. 20 at ¶ 163.)  That is an allegation of breach of duty.  *See St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987) (defining negligent misrepresentation).

1

### 1.    Infilaw's liability as the Law School's parent company

2      As a threshold matter, Defendants contend Lorona has not stated any fraud claim

3  against Infilaw.  This is true.  Lorona's theory of Infilaw's fraud liability is predicated not

4  on Infilaw's representations but on its corporate relationship with the Law School.  The

5  theory is that Infilaw controlled the Law School to such an extent that it is liable for the

6  Law School's misrepresentations.  On this view, the Law School is Infilaw's alter ego:

7  "the individuality or separateness of the subsidiary corporation has ceased."  *Gatecliff v.*

8  *Great Republic Life Ins. Co.*, 170 Ariz. 34, 37, 821 P.2d 725, 728 (1991).

9      *Gatecliff* lists factors that may be considered in determining whether a parent

10  corporation exercises enough control over its subsidiary to support an "alter ego" theory:

11  "[1] stock ownership by the parent; [2] common officers or directors; [3] financing of

12  subsidiary by the parent; [4] payment of salaries and other expenses of subsidiary by the

13  parent; [5] failure of subsidiary to maintain formalities of separate corporate existence;

14  [6] similarity of logo; and [7] plaintiff's lack of knowledge of subsidiary's separate

15  corporate existence."  170 Ariz. at 37; 821 P.2d at 728.  Lorona simply alleges that

16  Infilaw dominated the Law School's business operations and controlled its finances.  (*See*

17  Doc. 20 at ¶¶ 15-19.)

18      These allegations are not enough.  At best, they permit an inference only as to the

19  third and fourth *Gatecliff* factors.  Were such allegations sufficient to plead a parent

20  corporation's liability, corporations would routinely be dragged into litigation over their

21  subsidiaries' statements, and the "alter ego" exception would swallow the general rule of

22  corporate separateness.  This result is unacceptable, especially where, as here, there is no

23  reason to think suing the parent company is necessary for the plaintiff's full recovery.

24

### 2.    Whether fraud may be inferred from any of the Law School's representations

25

26      Defendants also contend that none of the representations attributed to the Law

27  School in the Second Amended Complaint supports a reasonable inference of fraud.  This

28

1
2

is correct.  Each representation is discussed below.  That the Law School made these representations is presumed at this stage of litigation.

3

### a.     "Ultimate" bar pass rate

4
5
6
7
8
9
10

According to the Second Amended Complaint, in 2013 and 2014 the Law School reported to its students an "Ultimate" bar pass rate of over 80%.  (Doc. 20 at ¶¶ 85-86.) But in May 2013, the Law School reported that only 73% of its graduates passed the most recent bar exam.  (*Id.* at ¶ 84.)  And in October 2014, the Law School reported that only 50% of its graduates passed the most recent bar exam.  (*Id.* at ¶ 79.)  Lorona claims the disparity between the "Ultimate" bar pass rate and the other reported pass rates amounts to fraud.

11
12
13
14
15
16
17
18
19
20

But this disparity is easily explained: the pass rates measure different things.  The "Ultimate" bar pass rate is based on *all* Law School graduates who passed the bar exam on first or subsequent attempts.  (*Id.* at ¶ 85.)  The other reported pass rates are based only on graduates who took a specific version of the bar exam—like the February 2013 exam or the July 2014 exam.  (*Id.* at ¶¶ 79, 84.)  Thus, one would expect the "Ultimate" pass rate to be higher, since students who fail a specific version of the exam (thereby lowering the rate for that exam) might pass a subsequent version (thereby raising the "Ultimate" rate).  This difference would be particularly pronounced when recent pass rates are unusually low, since the "Ultimate" pass rate would be somewhat anchored by earlier, higher pass rates.[6]

21
22
23
24

In sum, Lorona does not plausibly allege that the Law School's statements about an "Ultimate" bar pass rate are false or misleading.  Therefore fraud cannot be reasonably inferred.  *See Correa v. Pecos Valley Dev. Corp.*, 126 Ariz. 601, 605, 617 P.2d 767, 771 (Ct. App. 1980) (defining consumer fraud); *Enyart v. Transamerica Ins. Co.*, 195 Ariz.

25

26
27
28

[6] For example, if 70% of 100 graduates passed in 2013 but 50% of 100 different graduates passed in 2014, the "Ultimate" pass rate would be 60% even though the 2014 pass rate would be 50%.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

71, 77, 985 P.2d 556, 562 (Ct. App. 1998) (defining common law fraud); *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987) (defining negligent misrepresentation).

### b.    Reporting statistical data to third parties

According to the Second Amended Complaint, the Law School reports statistical data about its students' undergraduate GPAs, LSAT scores, and bar pass rates to third parties such as the Law School Admission Council.  (Doc. 20 at ¶ 128.)  However, this data does not take into account students admitted via "alternative" enrollment, even though such students comprise up to 80% of the student population.  (*Id.* at ¶¶ 128, 130-31, 133).  Moreover, in May 2014 the Law School began paying students it deemed likely to fail the bar exam not to take the exam, in order to inflate bar pass rates.  (*Id.* at ¶¶ 104, 117-20.)  Lorona claims this deceptive reporting amounts to fraud.

But Lorona fails to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1106 (9th Cir. 2003).  Specifically, she does not state when the Law School made these reports or whether the Law School complied with the relevant third-party reporting requirements. Both omissions matter.  The timing is necessary to know whether Lorona detrimentally relied on these reports in deciding to stay at the Law School, and the third-party reporting requirements are necessary to know whether the Law School is the proper target of blame for any misleading reported data.

Because Lorona does not plead these circumstances with sufficient particularity, fraud cannot be reasonably inferred.  Upon amending her complaint, if she cannot supply more details on this subject, she should say so.

### c.    Classroom success of "alternative" enrollees

According to the Second Amended Complaint, in 2011 the dean of the Law School stated that "alternative" enrollees were just as successful in the classroom as

traditional enrollees.  (Doc. 20 at ¶¶ 72-74.)  The dean made this remark during a staff meeting in response to concerns voiced by Lorona in her capacity as an employee.  (*Id.*)

The dean's statement is too vague to constitute a misrepresentation.  Although Lorona identifies ways in which alternative enrollees perform worse than traditional enrollees during and after law school (*id.* at ¶¶ 75-77), these shortcomings are consistent with an abstract statement about success in the classroom.  And even if the dean's statement referred to something more concrete such as grades, Lorona does not squarely allege such a statement is false.  In fact, Lorona points out that Law School grades are curved, such that alternative enrollees "may appear to be successful" despite "lack of ability."  (*Id.* at ¶ 76.)

Moreover, the dean made this remark offhandedly during a staff meeting.  In this context, the dean could hardly have intended that Lorona would rely on this remark in her capacity as a student in deciding whether to continue attending the Law School.  Fraud cannot be reasonably inferred.

### d. Creating "well-rounded lawyers"

According to the Second Amended Complaint, the Law School made the following statement about its graduates:

> We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries.  Summit Law partners with local law firms, courts, municipalities, business and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers.**

(Doc. 20 at ¶ 138 (emphasis in original).)  Lorona claims this statement exaggerated the value of the Law School's legal education program and amounts to fraud.

But Lorona again fails to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  A plaintiff claiming fraud must allege "the who, what, when, where, and how" of the misconduct charged.  *Vess*, 317 F.3d at 1106.  Lorona does

not specify when, where, how, or whom the Law School made this statement. These omissions are fatal to her claim.

Further, it is difficult to pinpoint any misrepresentation in the statement. The statement begins with the words "We believe" and appears to be aspirational, not factual. Mere expressions of opinion are not fraud. *Law v. Sidney*, 47 Ariz. 1, 4, 53 P.2d 64, 66 (1936). To the extent the statement implicitly asserts that Law School graduates find jobs as lawyers, Lorona does not allege facts contradicting this assertion. She does not say, for example, how many Law School graduates are lawyers. That *she* has not found such a job is of little consequence, since the Law School did not guarantee *all* of its graduates will find such jobs.

Because Lorona neither pleads these circumstances with sufficient particularity nor identifies any misrepresentation, fraud cannot be reasonably inferred.

### e.    Affordability

According to the Second Amended Complaint, the Law School's website stated that tuition, fees, and supplies for its three-year program beginning in 2010 would total approximately $103,000 and that median student loan debt for recent graduates was approximately $98,000. (Doc. 20 at ¶ 142.) Further, the Law School enrolled students ineligible for federal financial aid and gave them "time to fix their credit to receive loans," despite knowing the Department of Education does not lend to students with certain credit deficiencies. (*Id.* at ¶ 140.) Lorona claims these representations were deceptive and amount to fraud.

Nothing in the Second Amended Complaint suggests the Law School's statements about its costs and median student loan debt were false or misleading. On this subject, Lorona simply alleges she incurred $204,000 of student loan debt. (*Id.* at ¶ 143.) But she graduated in 2014, whereas the Law School's figures pertained to 2010. (*Id.* at ¶¶ 115, 142.) And she does not specify whether her debt is comparable to the debt of other

graduates or how much she spent on tuition, fees, and supplies. Thus, her debt is not a reason to think the Law School's 2010 statements were fraudulent.

In addition, nothing in the Second Amended Complaint suggests the Law School's statements about students' credit affected Lorona in any way. She does not, for example, claim to have had credit problems. Further, Lorona does not plead the surrounding circumstances with particularity because she does not specify when, where, or how these statements were made. *Vess*, 317 F.3d at 1106. Fraud cannot be reasonably inferred.

###### f.      myBAR

According to the Second Amended Complaint, the Law School encouraged students to use its own bar exam preparation program, myBAR. In 2013, a Law School email stated that students who used myBAR were more likely to pass the bar exam than students who used competitors' programs. (Doc. 20 at ¶ 126.) The Law School's website also promotes myBAR with statements such as the following: "The myBAR program has been specially designed to offer you the best of everything." (*Id.* at ¶ 127.)

Nothing in the Second Amended Complaint suggests these statements affected Lorona in any way. She does not allege that she used the myBAR program, and she passed the bar exam. Fraud cannot be reasonably inferred.

###### 3.      Detrimental reliance

Defendants also contend Lorona has not adequately alleged that she detrimentally relied on the Law School's misrepresentations. *See Correa*, 126 Ariz. at 605, 617 P.2d at 771 (defining consumer fraud); *Enyart*, 195 Ariz. at 77, 985 P.2d at 562 (defining common law fraud); *St. Joseph's*, 154 Ariz. at 312, 742 P.2d at 813 (defining negligent misrepresentation). This argument is superfluous because, as explained above, none of the representations identified in the Second Amended Complaint supports a fraud claim. Nevertheless, the Court briefly addresses this argument to guide Lorona in amending her complaint, should she choose to do so.

1
2
3
4
5
6

Lorona has not adequately alleged that she relied on the Law School's misrepresentations in deciding to *enroll* in the school. She does not specify when she decided to enroll, nor does she claim that any of the above-mentioned representations were made before she decided to enroll. (*See* Doc. 20 at ¶¶ 72-74, 79-86, 104, 126-27, 128, 138, 140, 142.) Thus, Lorona does not allege that she enrolled in the Law School *after* the misrepresentations, much less in reliance on them.

7
8
9
10
11

The harder question is whether Lorona has adequately alleged that she relied on the misrepresentations in deciding to *remain* at the school. On one hand, this reliance theory is more consistent with the timeline in the Second Amended Complaint, since many of the alleged misrepresentations occurred while Lorona was a student. (*See id.* at ¶¶ 79-86, 104, 115, 126.)

12
13
14
15
16
17
18
19
20

On the other hand, this reliance theory is less plausible. It seems to imply that if the Law School had been more accurate—in reporting bar pass rates, for example— Lorona would have dropped out. But questions immediately arise. Where would she have gone instead? Did she have any realistic alternatives, academic or otherwise? Hadn't she already invested significant money and time in the Law School, such that she would have preferred to finish? It is not clear whether Lorona can offer plausible answers to these questions. But the point is that she currently offers no answers to these questions. Any further amended complaint that proceeds on this reliance theory should include corresponding factual allegations.

21
22
23
24
25
26
27
28

### C.    Claims for Declaratory and Injunctive Relief

The Second Amended Complaint lists declaratory and injunctive relief as separate counts. (Doc. 20 at ¶¶ 278-85.) These are remedies, not independent causes of action. *See, e.g.*, *Colonial Sav., FA v. Gulino*, No. CV-09-1635-PHX-GMS, 2010 WL 1996608, at *8-9 (D. Ariz. May 19, 2010). Lorona may pursue these remedies only to the extent they are proper forms of relief for claims that survive the motion to dismiss.

- 26 -

**IV.     CONCLUSION**

Only a few of Lorona's claims survive this motion to dismiss: (1) Title VII sex discrimination arising from the Law School denying opportunities for promotion, requiring her to work late, and terminating her; (2) ADA discrimination on the basis of her association with her disabled children; and (3) retaliation for activity protected under Title VII.  Infilaw will remain a defendant, but only with respect to Lorona's Title VII and ADA discrimination claims arising from denied opportunities for promotion.  All other claims will be dismissed.

Leave to amend should be freely given "when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Courts should consider five factors: bad faith, undue delay, prejudice to the opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint.  *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir 2004).  "Futility alone can justify the denial of a motion to amend."  *Id.*

Here, amending the complaint would not reward bad faith, produce undue delay, or unfairly prejudice Defendants.  Although Lorona has amended her complaint twice already, neither amendment was in response to the challenges raised in Defendants' motion to dismiss.  However, it would be futile for Lorona to amend the Title VII sexual harassment claims because the Court lacks jurisdiction to hear them, and it would be futile for her to amend the substantive FMLA claims because they are time-barred. Therefore Lorona will have leave to amend her complaint with respect to any dismissed claims except her Title VII sexual harassment claims and substantive FMLA claims.

If Lorona chooses to amend her complaint, she should bear in mind that the complaint must contain a "short and plain statement" of her claims, Fed. R. Civ. P. 8(a)(2), and that each allegation must be "simple, concise, and direct," Fed. R. Civ. P. 8(d)(1).  The Second Amended Complaint, which sprawls across more than fifty pages and contains paragraphs of irrelevant information, is not the ideal blueprint.  If Lorona

declines to amend her complaint, she may proceed only with the surviving claims enumerated above.

IT IS THEREFORE ORDERED that Defendants' Motion to Dismiss (Doc. 21) is granted with respect to every claim in the Second Amended Complaint (Doc. 20) except (1) Title VII sex discrimination arising from the Law School denying Lorona opportunities for promotion, requiring her to work late, and terminating her; (2) ADA discrimination on the basis of her association with her disabled children; and (3) retaliation for activity protected under Title VII. Infilaw remains a defendant only with respect to Lorona's Title VII and ADA discrimination claims arising from denied opportunities for promotion.

IT IS FURTHER ORDERED that Lorona may file a further amended complaint by January 15, 2016. If Lorona does not file a further amended complaint by that date, she will be held to the position that no amendment could be made that would revive the claims dismissed in this order and may proceed only with her surviving claims, and the time for Defendants to file a responsive pleading will begin to run on the next business day.

Dated this 16th day of December, 2015.

_____
Neil V. Wake
United States District Judge

- 28 -