**MILLS + WOODS LAW PLLC**
5055 North 12th Street
SUITE 101
PHOENIX, ARIZONA  85014
TELEPHONE (480) 999-4556
docket@millsandwoods.com
Robert T Mills (Arizona Bar #018853)
Sean A Woods (Arizona Bar #028930)
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paula C. Lorona,<br><br>          Plaintiff,<br><br>     vs.<br><br>Arizona Summit Law School LLC, a Delaware limited liability company; Infilaw Corporation, a Delaware corporation; Jane and Johns Doe 1-100; Black Corporation 1-100; White Partnership 1-100,<br><br>          Defendants, | Case No.:  2:15-cv-00972-NVW<br><br>**THIRD AMENDED COMPLAINT**<br>-and-<br>DEMAND FOR JURY TRIAL |

Plaintiff Paula C. Lorona, for her Complaint against the above-named Defendants, alleges as follows:

1.    This is an action for relief from Defendants' violations of Plaintiff's civil rights. These violations include: wrongful and willful discrimination and retaliation in violation of the Americans with Disabilities Act, 42 U.S.C. § 12111 *et seq*., and wrongful and willful gender discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* Plaintiff also brings claims for fraud and negligent misrepresentation under Arizona state law.

2.     Plaintiff seeks damages, including lost wages and benefits, compensatory, general punitive and liquidated damages, plus interest and reasonable attorneys' fees and costs.

## PARTIES, VENUE, AND JURISDICTION

3.     Plaintiff Paula Lorona ("Lorona") is a resident of Maricopa County, Arizona.

4.     Defendant Arizona Summit Law School ("ASLS") formerly known as Phoenix School of Law, is a for-profit Arizona limited liability company. ASLS is a private, for-profit post-secondary school, owned and managed by Infilaw Corp. that offers Legal Education Programs in Phoenix, Arizona. ASLS is licensed by the Arizona State Board for Private Post-Secondary Education and is accredited by the American Bar Association (ABA).

5.     Defendant Infilaw Corporation ("Infilaw") is a Delaware corporation with a primary place of business in Naples, Florida, and is the parent company of ASLS. In addition to ASLS, Infilaw owns and operates two other private, for-profit law schools – Florida Coastal School of Law in Jacksonville, Florida, and Charlotte School of Law in Charlotte, North Carolina.

6.     Defendants Jane Does and 1-100, Black Corporations 1-100, and White Partnerships 1-100 are certain unknown individuals or entities who through their own actions or inactions have caused or assisted others in causing the incidents and resulting harms set forth below.  Despite diligent efforts by Lorona, the identity of these individuals has not yet been ascertained but they are well known by the Defendants. Lorona will amend their complaint to allege the true names and capacities of the various Doe Defendants when they are learned.

7.     This court has jurisdiction over the subject matter and the parties pursuant to 28 U.S.C. §1331 because this is an action under Title VII of the Civil Rights Act of 1964, as amended 42 U.S.C. § 2000e et seq. (Title VII) and § 102 of the Civil Rights Act of 1991, 42 U.S.C. § 1981A, and pursuant to the ADA, 42 U.S.C. § 12111, *et seq.*.

8.      Venue is proper in the District of Arizona pursuant to 28 U.S.C § 1391 (b), because the events giving rise to Lorona's claims occurred in this District.

9.      Lorona timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and this Complaint is timely filed.

10.      All administrative prerequisites have been met.

<b>GENERAL ALLEGATIONS</b>

**A.      Liability of Infilaw on Plaintiff's Civil Rights Claims.**

11.      At all relevant times, Infilaw participated in or influenced the employment policies and practices of ASLS.

12.      Infilaw controlled and managed the budget and budgeting process of ASLS. All promotions, raises for performance reviews and any other incentives had to be approved by Infilaw. Infilaw also had to approve ASLS's annual budget.

13.      Infilaw prepared and distributed to ASLS and its sister schools all employee handbooks, and required the use of those handbooks in the operation of the schools.

14.      Infilaw promulgated and imposed on ASLS all hiring policies and Infilaw made all benefits decisions applicable to ASLS employees. Infilaw determined the insurance carriers and plans that were available to ASLS employees under ASLS health insurance benefits.

15.      Infilaw transferred employees of the three law schools it owns, including ASLS, between the three law school campuses. For example, Don Lively, a founder of Infilaw, has rotated and served at various points in time as the President and Dean of all three Infilaw campuses.

16.      Infilaw processed and maintained control of ASLS's payroll.

17.      401-K and all other benefits of ASLS employees, including tuition waivers for ASLS students who also were also, were controlled and managed by Infilaw.

18.     Reimbursement for corporate credit cards and expenses paid by individual employees while traveling for ASLS were made by Infilaw, which also had to review and approve such reimbursements.

19.      Infilaw is accordingly liable for the violations of the ADA and Title VII alleged herein.

20.     On information and belief, Defendant Infilaw was given actual notice of the EEOC proceedings alleged above during the time that the EEOC's investigation of Lorona's Charge of Discrimination was still pending.

21.     As alleged herein, at all relevant times Defendant Infilaw had an identity of interest with Defendant ASLS with respect to the matters alleged in Lorona's Charge of Discrimination filed with the EEOC.

**B.      Lorona's Employment With  ASLS.**

22.     ASLS hired Lorona to work as an administrative assistant in November 2009. While employed by ASLS Lorona received promotions to financial aid representative in 2010, assistant director of financial aid in 2011, and student accounts/accounting manager in 2011.

23.     Throughout her employment, Lorona received excellent employee reviews and was assured by her superiors at ASLS that she would have the opportunity for advancement commensurate with her skills and experience.

24.     However, after Lorona began working for ASLS, she was subjected to a pattern of discrimination because of her gender and because she was known to have minor children with disabilities, for whom Lorona was the primary caregiver. For example, unlike her male colleagues and other employees who were not caregivers of disabled family members, Lorona was denied promotions or even the opportunity to interview for positions for which she was qualified. She was also denied the opportunity to work remotely, and was charged "paid time off" when she did work remotely. Further, Defendants did not offer her

FMLA leave under the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, in the same manner it offered such leave to other employees.

25.    Lorona complained to her superiors, including ASLS President Scott Thompson ("Thompson") and  ASLS Director of Human Resources Stephanie Lee ("Lee") that she was being treated worse than her male colleagues and colleagues who were not caregivers of disabled family members.

26.    Defendants took no corrective action on Lorona's complaints, and instead continued their pattern of discrimination.

27.    On April 13, 2013, Lee informed Lorona that Lorona and the School were going to be "mutually separating," and that if Lorona signed a waiver of rights and confidentiality agreement she would receive three weeks of pay.

28.    Lorona did not agree to "mutually separate" her employment.

29.    Lorona asked Lee why she was being terminated, because in multiple meetings just weeks prior Lee had assured Lorona that her job was not in jeopardy and she had no performance concerns.

30.    Lee replied that Lorona was not being fired for cause, that Lorona had not done anything wrong, and that the company just felt she would be happier somewhere else.

31.    Lorona refused to sign the waiver of rights and/or confidentiality agreement.

32.    In response, Lorona filed appropriate complaints with the Arizona Attorney General's Office for whistleblower protection and the EEOC for discrimination.

33.    Despite ASLS's assurances to Lorona that her termination was without cause, ASLS represented to the EEOC during the course of its investigation of Lorona's charge of discrimination that Lorona had in fact been terminated for cause because she talked about students and had performance issues, such as poor 360 results.

34.    In fact**,** Lorona had never had a disciplinary report filed against her at ASLS.

**C.     Lorona's Enrollment at ASLS.**

**1.     Lorona Relied On Defendants' Representations In Deciding to Enroll as a Student at ASLS.**

35.     One benefit given to employees of ASLS is a full tuition waiver to attend law school, beginning 12 months after full-time employment and continuing throughout employment. Also, based upon the employee's job performance, the employee could be granted a pro rata early tuition waiver starting at 9 months

36.     This tuition waiver was one of the factors Lorona considered when accepting employment with ASLS.

37.     Before her employment and before enrolling at ASLS, Lorona reviewed statistics set forth in marketing materials physically placed throughout the admissions area of the ASLS facility. This marketing material included the annual "Viewbook" which contained favorable statements from previous students about the caliber of the students attending ASLS and the quality of the education they received from ASLS. The "Viewbook" was also available online on ASLS' website.

38.     ASLS posted on its website and in its "Viewbook" enrollment statistics, including LSAT scores and undergraduate GPAs, of its students. ASLS updated this information at least annually on its website and in the "Viewbook." ASLS also provided this information to the Law School Admission Council ("LSAC"), which similarly posted it on its website for review by students and potential students of ASLS. Lorona reviewed these statistics both online and in the paper copy marketing materials and "Viewbooks" available in the admissions area of ASLS facilities.

39.     Lorona also reviewed additional information on ASLS' graduates provided by ASLS in its student application packet. From this information, Lorona was impressed to learn that only two out of 70 students that were actively seeking employment were unemployed. She also learned from the application packet that the median salary for ASLS graduates was $60,000, with a median student loan debt of $101,310.

40.     ASLS' law school application instructions that ASLS provided to Lorona online contained in its Section 10 explicit assurance that:

> Phoenix School of Law's [ASLS's] admissions process is governed by the American Bar Association Standards for Approval of Law Schools and Interpretations. In particular, Standard 501 provides that:
> (a) A law school's admission policies shall be consistent with the objectives of its educational program and the resources available for implementing those objectives.
> (b) A law school shall not admit applicants who do not appear capable of satisfactorily completing its educational program and being admitted to the bar.

Lorona read and relied upon these assurances in deciding to enroll at ASLS as a law student. ASLS repeated these assurances in its online application page through at least 2012.

41.     Lorona also read on ASLS' website prior to enrolling at ASLS as a student that ASLS' graduates had bar passage rates exceeding 80%.

42.     Based upon all the foregoing information, which ASLS provided to Lorona prior to her enrollment, Lorona decided that ASLS would be a good place for her to work and attend law school.

43.     Specifically, Lorona reasonably believed based upon this information that if she completed ASLS' law school program she had a very good chance of passing the bar examination and would easily be able to find employment at a law firm or even in the public sector making approximately $60,000 per year.

44.     In August 2009, Lorona applied for traditional enrollment at ASLS and was accepted as a traditional evening student.

45.     Throughout the time she was a law student of ASLS, ASLS continued to post on its website and in its "Viewbook" statistics including LSAT scores and grade point averages of ASLS students. ASLS updated the reported statistics at least annually. ASLS also continued to provide those statistics to LSAC, which with ASLS' knowledge and

permission, continued to post them on LSAC's website for review by students and potential students of ASLS.

46.     LSAT scores and undergraduate GPAs are commonly accepted indicators of the likelihood of a student's success in law school and ability to pass the bar examination.

47.     Throughout the time Lorona was a student at ASLS she continued to read and rely upon the admission statistics, including LSAT scores and undergraduate GPAs of ASLS students as reported on ASLS' website and marketing materials, including the "Viewbook" and on LSAC's website.

48.     Lorona took comfort in the fact that the reported statistics regarding LSAT scores and undergraduate GPAs of ASLS students remained stable throughout this time, and compared favorably to comparable statistics regarding students enrolled at other law schools.

49.     For example, median LSAT scores and undergraduate GPAs for ASLS students as reported on ASLS website in the "Viewbook" as of Spring 2008 were 153 and 3.18 respectively.

**2.     Admission of Large Numbers of Students Through the AAMPLE Program Materially Decreased the Median and Average LSAT Scores and Undergraduate GPAs of ASLS' Student Body.**

50.     By 2005, ASLS was admitting certain students to its law school through a program known as Alternative Admissions Model for Legal Education ("AAMPLE").

51.     Admission and enrollment through AAMPLE does not require grade point average nor LSAT scores within the range of traditional admissions.

52.     AAMPLE students are admitted through alternative means. As such, and unbeknownst to Lorona, LSAT and undergraduate GPA statistics were not included in the admissions statistics ASLS posted on its website, published in its marketing materials, including the "Viewbook" and provided to the LSAC for review by potential and existing ASLS students.

53.     The percentage of AAMPLE applicants who were admitted to ASLS increased from 11% in 2005 to 80% in Spring 2011. The number and percentage of AAMPLE students included in ASLS' student body likewise increased substantially and materially during that time period.

54.     However, ASLS did not disclose on its website nor in marketing materials nor the "Viewbook," nor in the information it provided to LSAC for posting on its website that the reported admissions statistics, including LSAT scores and undergraduate GPAs, did not include the LSAT scores or undergraduate GPAs of AAMPLE students. As such, the statistics ASLS reported were materially false and misleading.

55.     Lorona did not know that the reported LSAT scores and undergraduate grade point averages of ASLS students that she reviewed on ASLS website and marketing materials, including the "Viewbook," excluded AAMPLE students. This omission was material, and rendered the reported statistics materially false and misleading.

56.     Defendants thus misrepresented their admission requirements and the caliber of students being admitted to ASLS.

57.     Reporting enrollment and success statistics based on 20% or less of the student population is grossly misleading to incoming and existing students.

58.     The actual impact of the admission of ever-increasing numbers of AAMPLE students was not known to Lorona until ASLS' recent disclosure of abysmal and progressively lower bar examination passage rates, culminating in the July 2015 bar passage rate of 26.4% for first-time and repeat takers.

59.     Actual bar pass rates (combined first time and repeat takers) of ASLS graduates during Lorona's tenure as a student of ASLS were as follows:

| February 2012 | 63.8% |
| July 2012 | 73.1% |
| February 2013 | 72.9% |
| July 2013 | 63.3% |

| February 2014 | 48.8% |
| July 2014 | 49.5% |
| February 2015 | 52.6% |

Lorona took the February 2015 bar examination.

60.     The actual bar pass rate of ASLS graduates taking the July 2015 bar examination was 26.4%. The bar pass rate for Arizona State University Sandra Day O'Connor College of law and University of Arizona James E. Rogers College of Law graduates taking the July 2015 bar examination were 81.8% and 77%, respectively.

61.     However, prior to and continuing through the time that Lorona was a student of ASLS, ASLS continued to tout "Ultimate Bar Pass Rate[s]" exceeding 80%. For example, ASLS' "Viewbook" marketing brochure which was used to market to and attract student to ASLS in at least the years 2013 and 2014 prominently touts an "Ultimate Bar Pass Rate" of 86% for ASLS graduates, and in fine-print purportedly bases this on "[g]raduates who passed the Arizona Bar Exam on the first or subsequent attempts."

62.     In an October 16, 2014 email to ASLS students, including Lorona, Dean Mays reported an "Ultimate pass rate" of 80.8%.

63.     Throughout her tenure as a law student of ASLS Lorona read and relied upon and continued to read and rely upon ASLS's representations of an "Ultimate Bar Pass Rate" exceeding 80%.

64.     Moreover, as the bar pass rate of ASLS graduates continued to decline, enrollment at ASLS appeared to increase substantially during Lorona's tenure.

65.     Thus, the "Ultimate" bar pass rates touted by ASLS were extremely misleading at best.

66.     The Bar Examination statistics and pass rates maintained by the Arizona Supreme Court indicate that the passage rate for individuals taking the Arizona Bar Examination for a second time or subsequent times is substantially lower than the passage rate for individuals taking the Arizona Bar Examination for the first time.

67.     Throughout the time Lorona was a law student of ASLS, Lorona continued to rely on ASLS' representations regarding the success of its graduates in finding employment in in average salary of its graduates. This information could be found in ASLS' marketing materials and website.

68.     ASLS stated on its website from at least 2010 through 2013 that:

> PSL's [ASLS's] Bar Exam passage rates are high, and the school places 97% of its graduates into jobs within nine months of graduation.

69.     Lorona read and took continuing comfort in this representation, and it gave her assurance and confidence that she would be able to obtain employment with her ASLS degree.

### 3.     Defendants Knew But Failed to Reveal That the Percentage of Its Students Likely to Pass the Bar Exam Was Declining Rapidly and Materially.

70.     Infilaw has studied bar passage rates for its students and based on its findings, Infilaw and ASLS have developed a bar exam failure predictor formula.

71.     The failure predictor formula includes LSAT scores, undergraduate grade point average, and law school grade point average, among other factors.

72.     Both ASLS and Infilaw thus knew, but failed to disclose, that the percentage of its students who were likely to ever pass the bar examination was declining substantially and rapidly throughout the time of Lorona's legal education at ASLS. This omission was material. For example, in an email dated December 23, 2014 from Ann Woodley, ASLS's Associate Dean for Bar Pass and Student Success to certain ASLS students and graduates stated that, "[t]he ASLS grads planning to take the bar exam in February have a predicted pass rate of 47%, compared to an expected state average of greater than 70%. This is based on our statistical analysis of how our students have performed on the last few bar exams (and is primarily focused on law school grade point averages and LSAT scores)."

73.     Defendants also knew, but failed to disclose, that the substantial decline in likely bar pass rates was due to the admission of ever-increasing numbers of students through the AAMPLE program. This omission was likewise material.

74.     Rather than disclosing this substantial and material decline in their students' abilities to pass the bar exam and in expected bar passage rates, Defendants have attempted to manipulate reported bar pass rates.

75.     Beginning in May 2014, ASLS along with its Infilaw sister schools Florida Coastal School of Law and Charlotte School of Law actually began to pay substantial and material numbers of their graduates to defer or forego taking the bar exam upon graduation based on these calculated failure predictors.

76.     This is an attempt to deceive the ABA accrediting board, and Department of Education, potential and existing students, and the general public by artificially increasing bar passage percentages.

77.     ASLS students who were predicted to fail the February 2015 bar exam according to Infilaw's failure predictor formula were offered $5,000 and other benefits such as bi-weekly payments, to defer taking the bar exam.

78.     The effect of Infilaw's and ASLS's actions was to skew reported bar exam results by eliminating from the pool of ASLS bar exam takers those who ASLS and Infilaw believed would not pass. This enabled ASLS to maintain its reputation as a competent law school producing well educated graduates capable of passing the bar and actually practicing law at a law firm or in public employment by "cherry-picking" the students who would attempt the bar exam in order to inflate their first-time test taker's passing percentage.

79.     The deception also enabled ASLS to retain accreditation and receive other benefits, such as eligibility for Title IV funding from the Department of Education.

80.     The ASLS bar examination preparation coach to whom Lorona was assigned told Lorona frankly that the School is concerned that it may lose accreditation and access to Title IV Federal Funding due to drastically low performance numbers.

**4.** **Lorona Reasonably Relied To Her Detriment Upon ASLS' Misrepresentations and Omissions of Material Facts.**

81.     Lorona incurred well over $200,000 in student loan debt while attending ASLS.

82.     Based upon ASLS' misrepresentation and omissions of material facts regarding the caliber of students attending ASLS and bar pass rates, Lorona was confident and reasonably believed that if she completed law school at ASLS she would be able to find gainful employment at a law firm or in the public sector that would pay a salary sufficient to justify the incursion and continuing incursion of debt in order to attend ASLS.

83.     As revealed by the disastrous recent bar exam pass rates of ASLS graduates, the quality and value of Lorona's law degree from ASLS is materially less than what she was led to believe by virtue of ASLS' misrepresentations and omissions of material facts.

84.     As a result, Lorona is unable to obtain employment as a lawyer.

85.     While she was waiting for her bar exam results, she had applied for positions such as bailiff, clerk and paralegal, which did not even require a law license. She did not even receive an interview for any of those positions.

86.     After being admitted to the bar, Lorona applied for numerous positions at private law firms, positions as public prosecutor and public juvenile law positions. She also enlisted the services of employment placement firms including Robert Half and Associates and Kelly Career Placement.  From all this effort, she received one interview, which did not even result in a callback.

87.     Lorona's inability to find employment is the result of the abysmal reputation of ASLS, prompted largely by the inability of even a third of its graduates to pass the bar exam.

88.     The only use Lorona can make of her license to practice law is as a sole practitioner, without the support or client base she would expect to access at a private firm or through employment as a lawyer in the public sector.

89.     Had she known that her ASLS law degree would be useless, and indeed an impediment, in obtaining employment as a lawyer and that she would have no other option other than to attempt to practice as a sole practitioner, struggling to make anything close to $60,000, she would not have enrolled at ASLS and incurred the enormous debt to attend that school.

90.     Had she discovered the truth about ASLS' misrepresentations and omissions of material fact while she was attending ASLS, she would have withdrawn from the law school and avoided the further incursion of debt. She could have then taken an entirely different career path, if necessary, to obtain gainful employment. Although Lorona may have already incurred substantial debt in attending the law school, she would have seen little if any point in continuing to incur massive debt for a degree that would not enable her to obtain employment as a lawyer, and would in fact hinder her ability to do so.

## CLAIMS FOR RELIEF

### Count One – Consumer Fraud in violation of A.R.S. § 44-1521 *et seq.*
(Defendant ASLS)

91.     Lorona restates and re-alleges the allegations of the previous paragraphs as if fully set forth herein.

92.     Pursuant to A.R.S. § 44-1522. A.:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice.

93.     A.R.S. § 44-1521. 5. Provides in pertinent part that ""Merchandise" means," among other things, "intangibles" or "services." As alleged above, ASLS, in connection with the sale or advertisement of the services it provided and the value of an ASLS education, made material misrepresentations regarding bar passage rates and the caliber of

students it was admitting to its law school, including the ability of its students to actually pass the bar examination and obtain employment as lawyers. ASLS omitted material facts, including the LSAT scores and undergraduate GPAs of AAMPLE students despite the fact that the percentage of AAMPLE students was increasing substantially and materially from year to year. ASLS also omitted the material fact that it knew by application of Infilaw's own bar exam failure predictor formula that few, and increasingly fewer, of its students were ever going to pass the bar exam, let alone find employment as lawyers. ASLS deceptively represented its Legal Education Program as follows:

> We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers**.

94.     ASLS used deception, used a deceptive act or practice, used fraud, used false pretense, made false promises, made misrepresentations, and concealed, suppressed and omitted material facts in connection with the sale or advertisement of merchandise.

95.     ASLS intended that others rely upon these misrepresentations.

96.     Lorona in fact relied upon ASLS' misrepresentations in deciding to enroll in law school at ASLS, and to continue to enroll in and remain a student at ASLS, and to incur debt in connection therewith. But for ASLS' misrepresentations, Lorona would not have enrolled in ASLS, continued to enroll and remain a student at ASLS, and continued to incur substantial debt in connection therewith.

97.     As a direct and proximate result of Lorona's reliance on ASLS' misrepresentations, Lorona has suffered damages, including but not limited to student loan debt that includes accruing interest and fees throughout its term. In addition, Lorona is unable to obtain employment with her ASLS degree.

## Count Two – Common Law Fraud
### (Defendant ASLS)

98.     Lorona restates and re-alleges the allegations of the previous paragraphs as if fully set for the herein.

99.     As alleged herein ASLS made numerous representations to Lorona regarding the bar passage rate and expected bar passage rates of ASLS graduates, admission requirements and the caliber of students being admitted to ASLS, and qualifications of ASLS graduates to actually practice law.

100.     These representations were false. As alleged herein, the actual bar passage rates and expected bar passage rates of ASLS graduates was substantially and materially lower than those represented by ASLS. Admission requirements and the academic caliber of students being admitted to ASLS, including their ability to actually pass the bar exam and find employment as lawyers, was also materially lower than that being represented by ASLS.

101.     ASLS knew these representations were false. ASLS had possession of the true statistics that were substantially and materially different from those represented by Defendants.

102.     ASLS' representations were material in that they were sufficiently important to influence Lorona's actions and the actions of a reasonable person.

103.     ASLS intended that Lorona rely upon these representations in deciding to enroll and to remain enrolled at ASLS and to pay Defendants very substantial amounts of money for tuition and fees.

104.     Lorona in fact relied upon the truth of these representations in deciding to enroll and to continue to enroll and remain a student at ASLS, and in deciding to incur substantial debt in the form of loans to pay for attendance at ASLS.

105.     Lorona's reliance on ASLS' representations was reasonable and justified under the circumstances.

106.     Lorona was unaware that ASLS' representations were false.

107.   As a direct and proximate result of Lorona's reliance on ASLS' misrepresentations Lorona sustained damages in an amount to be proven at trial including but not limited to student loan debt that continues accruing interest and fees throughout its term. In addition, Lorona is unable to obtain employment with her ASLS degree.

108.   ASLS' conduct was willful and intentional, extreme and outrageous, thus entitling Lorona to an award of punitive damages.

### Count Three –Negligent Misrepresentation
### (Defendant ASLS)

109.   Lorona restates and re-alleges the previous paragraphs of this Complaint as if fully set forth herein.

110.   As alleged herein ASLS made numerous representations to Lorona regarding the bar passage rate and expected bar passage rates of ASLS graduates, admission requirements and the caliber of students being admitted to ASLS, and qualifications of ASLS graduates.

111.   These representations were false. As alleged herein, the actual bar passage rates and expected bar passage rates of ASLS graduates were substantially and materially lower than those represented by ASLS. Admission requirements and the academic caliber of students being admitted to ASLS, including their ability to actually pass the bar exam and find employment as lawyers, was also materially lower than that being represented by ASLS.

112.   ASLS intended that Lorona rely on these representations and ASLS made these representations for that purpose.

113.   ASLS failed to exercise reasonable care or competence in obtaining or communicating the information conveyed in these representations.

114.   Lorona relied on the information conveyed in these representations as alleged herein in deciding to enroll in and to continue to enroll and remain a student at ASLS, and to incur substantial debt in connection therewith.

115.   Lorona's reliance on these representations was justified.

116.   As a direct and proximate result of Lorona's reliance on ASLS' misrepresentations, Lorona sustained damages in an amount to be proven at trial including but not limited to student loan debt that continues accruing interest and fees throughout its term. In addition, Lorona is unable to obtain employment with her ASLS degree.

### Count Four – Family Caregiver And Family Responsibilities Discrimination Association Discrimination The Americans With Disabilities Act.
(All Defendants)

117.   Lorona restates and realleges the previous paragraphs of this Complaint as if fully set forth herein.

118.   ASLS and Infilaw are "covered entities" within the meaning of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12111 (2) in that each of them is an employer engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

119.   At all relevant times Lorona was an "employee" of ASLS and Infilaw within the meaning of the ADA, 42 U.S.C. § 12111 (4).

120.   At all relevant times Lorona was a "qualified individual" within the meaning of the ADA, 42 U.S.C. § 12111 (8) in that Lorona can, and at all relevant times could, perform the essential functions of her employment position and the employment position she sought with Defendants with or without reasonable accommodation.

121.   The ADA, 42 U.S.C.§ 12112 (a) specifically provides that:

> No covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

This provision of the ADA applied to ASLS and Infilaw at all relevant times.

122. The ADA, 42 U.S.C.§ 12112 (b) provides that:

> As used in subsection (a) of this section, the term 'discriminate against a qualified individual on the basis of disability' includes---
> ***
> (4) excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association.

123. The ADA, 42 U.S.C. § 12203 (a) further prohibits retaliation against any individual who opposes a violation of the ADA:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

124. Lorona's minor children (B.L. and C.L.) each have a "disability", specifically chronic severe asthma, within the meaning of the ADA 42, U.S.C. § 12102 (1).

125. Lorona is in a protected category under the ADA because she is associated with her minor children that have disabilities that are recognized under the ADA.

126. Defendants knowingly, intentionally, and with reckless disregard of Lorona's rights under the ADA discriminated against Lorona on the basis of disability in violation of the ADA as alleged herein.

127. Defendants ASLS and Infilaw, at all relevant times, knew that Lorona's minor children had a disability, and that Lorona was the primary caregiver to her minor children. Lorona specifically discussed with her first ASLS supervisors, Alicia Togno, and later Jim Lemire that Lorona's children suffered from chronic severe asthma. Lorona also informed Viki Coen from Infilaw about her children's chronic severe asthma. In addition, Lorona on numerous occasions informed Stephanie Lee of her children's health, including their severe asthma. In fact, Ms. Lee delivered Lorona's work laptop to Lorona at Banner Thunderbird Hospital while Lorona's daughter was hospitalized due to a severe asthma attack. Lee did

this so that Lorona could work remotely and not be required to be charged paid time off. Others at ASLS were also aware that Lorona's children suffered from a chronic severe illness.

128.   Lorona is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the Defendant, the employer.

129.   Defendants discriminated against Lorona because of the known disability of Lorona's minor children.

130.   ASLS has a written telecommuting policy that allows employees occasionally to work remotely while caring for sick or disabled family members.

131.   However, Lorona was frequently denied the opportunity to work remotely, or was criticized and harassed when she did work remotely

132.   In addition, on occasions when Lorona was working remotely so that she could be with her disabled children, ASLS routinely charged her paid time off and did not advise her of or offer her FMLA leave.

133.   Other employees who worked remotely and who did not have disabled family members were not charge paid time off.

134.   Indeed, ASLS employee Viki Coen spoke with Lorona's supervisor Thompson and informed him that Lorona was actually working and corresponding with her while Lorona was working away from the office.  However, even after being so informed, Lee did not change the record, and Lorona was charged PTO.

135.   Other similarly situated employees were, and still to this day are, permitted to work remotely for many reasons, including reasons less meritorious than caring for a disabled child.

136.   While employees that are not disabled and/or do not have caregiving responsibilities are permitted to work remotely at will, those with disabilities and caring for family members with disabilities are not permitted the same accommodations. For example, Stephanie Lee was allowed to "work" remotely while she shopped, attended appointments,

or just stayed at home. Other ASLS employees, including without limitation Glen Fogerty, Diane Alkais, Dave Bachechi, Nina Sergovia, Debbie Richards, Eric Border, and Reid White, who did not have disabled children or family members were allowed to work remotely as they desired. ASLS allowed Jennifer Hanny, who was single and without children, work accommodations in connection with an ongoing illness.

137.   Lorona was also denied promotions and even interviews for promotions despite recommendations by three previous supervisors that she be promoted.

138.   For example, in 2012, ASLS posted for application by potential candidates the position of Director of Finance or Assistant Controller.

139.   Lorona met or exceeded the minimum qualifications for the position as stated in the posting.

140.   Lorona applied for the position.

141.   During the first week of April 2012, and without reviewing Lorona's qualifications for Director of Finance or Controller, Lee told Lorona that she was not qualified to even interview for the position.

142.   Lorona then met with Lee in person in Lee's office, and explained that Lorona was indeed qualified.   Lee curtly told Lorona that she would not be getting an interview either way. Lee said this in the presence of Angelique Artigua, Lee's Administrative Assistant.

143.   Lorona asked whether the reason she was being denied the opportunity to even interview for the promotion was because she complained about being charged paid time off to care for her disabled children.   Lee responded that Lorona would just not be receiving an interview, "period."

144.   During this same time period, ASLS's Viki Coen recommended Lorona for promotions, raises and bonuses, and expressed to Lorona that she could not understand why Lorona was not being promoted.

145.    Ultimately, ASLS filled the position with a candidate that did not meet the minimum qualifications for the position.

146.    During the EEOC's investigation of Lorona's Charge of Discrimination, ASLS advised the EEOC that Lorona did not qualify for the position to which she applied.

147.    EEOC requested a copy of the job description during investigation.

148.    ASLS provided a job description different from the position for which Lorona applied. Specifically, the job description states that a CPA is required.

149.    When the EEOC Investigator inquired as to why the school provided a misleading job posting, with an incorrect date, ASLS told the EEOC Investigator that they did not provide the correct posting requested because they were moving in a different direction with the posting.

150.    Lorona acquired the posted job requirements of the "new position." They appear to be identical to the job duties of the prior posting, except that the "new position" requires a CPA.

151.    The individual currently holding the position Lorona applied for is a male without a disability and without caregiving responsibilities.

152.    Lee and Thompson continued to harass Lorona in all facets of her employment, including excluding her completely from departmental meetings, excluding her while in meetings, taking Mrs. Lorona's corporate credit card while other employees in similar positions retained theirs, gossiping about Lorona, and ignoring her throughout the workday.

153.    In contrast, Defendants' employees who do not have disabled children or close family members are given special consideration and more favorable treatment by Defendants.

154.    Employees who have disabled children or close family members for whom the employee is a caregiver, like Lorona, are required to take paid time off and not advised of

their FMLA rights while performing caregiver duties while non-caregiver employees are permitted to work remotely and not blocked from promotions.

155.   ASLS turnover rates, both voluntary and involuntary, for employee caregivers are higher than non-caregiver employees, and the executive staff is primarily made up of employees with non-caregiving duties.

156.   As described herein Defendants discriminated against Lorona because of the known disability of Lorona's minor children.

157.   As a direct and proximate result of Defendants violations of the ADA, Lorona sustained damages, including the loss of wages and benefits, and the loss of increased salary and benefits and the potential for increased salary and benefits, in an amount to be proven at trial.

158.   Defendants' conduct was willful, intentional and malicious, and was done in reckless disregard of Lorona's rights, thus entitling Lorona to an award of punitive damages.

**Count Five – Gender Discrimination – Disparate Treatment Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq.**
(All Defendants)

159.   Lorona restates and re-alleges the allegations of the previous paragraphs of this Complaint as if fully set forth herein.

160.   This claim is authorized and instituted pursuant to the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Section(s) 2000e et seq. for relief based upon the unlawful employment practices of Defendant.   Specifically, Lorona complains of Defendant's violation of Title VII's prohibition in employment based, in whole or in part, upon an employee's gender.

161.   Defendant ASLS is an "employer" within the meaning of 42 U.S.C. § 2000e (b) in that ASLS was engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

162.   Defendant Infilaw is an "employer" within the meaning of 42 U.S.C. § 2000e (b) in that Infilaw was engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year.

163.   At all relevant times, Lorona was an "employee" of ASLS and Infilaw within the meaning of 42 U.S.C. § 2000e (f) in that she was employed by ASLS and Infilaw.

164.   Title VII of the Civil Rights Act of 1964, as amended, provides in pertinent part:

It shall be an unlawful employment practice for an employer –

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e—2 (a). At all relevant times this provision was applicable to Defendants ASLS and Infilaw.

165.   Title VII of the Civil Rights Act of 1964, as amended, also provides in part:
It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment … because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e—3 (a).

166.   During her employment with Defendant, Lorona was a member of a protected class under Title VII against gender-based discrimination by her employer, Defendant, or by its managers and supervisory personnel.

167.  In 2013 Lorona scheduled a meeting with Lee to discuss disparate treatment and whether Lorona's job was in jeopardy for some reason.

168.  At that meeting, Lorona asked Lee whether there were concerns with performance that she should correct.  Lee told Lorona that she did not have any concerns with Lorona's performance or employment in general. Lee also told Lorona that she had never heard Thompson express any concern with Lorona's job performance.

169.  In fact in at least three meetings with Stephanie Lee, at least one of which was also attended by Scott Thompson, Lorona expressed concern that she was being treated differently from other employees and excluded from work related meetings and discussions. Lorona specifically asked whether her job was in jeopardy.  Lee and Thompson stated that they did not have any concerns with Lorona's work. Lee assured Lorona that her job was not in jeopardy. Lee told Lorona that if Lorona were to be terminated she would first receive counseling and several write-ups to provide an opportunity to improve where needed.

170.  Lorona was also denied opportunities for promotion on multiple occasions. Whereas, ASLS hired male executives without posting positions or interviewing potential candidates, female candidates were forced to follow standard hiring procedures.

171.  Shortly after being terminated, Lorona was replaced by a male employee, Eric Border, with fewer qualifications who was not required to follow standard hiring procedures.

172.  Unlike Lorona, Mr. Border had never worked in Student Accounts and did not have any experience managing student accounts. He had never worked in Financial Aid until he started working at ASLS.  He was also promoted to Lorona's position without the job being posted to the public, and without the interview and screening process that others, like Lorona, were required to complete.

173.  In fact, after Mr. Border was promoted, Lorona received numerous calls and emails from individuals in ASLS's IT Department asking Lorona to help train Mr. Border because no one knew how to do Lorona's job.

174.    Defendants in fact have established a pattern and practice of discrimination against women in general and those with caregiving responsibilities.

175.    The Director of Admissions, a male, is frequently permitted to leave work early during key times for admissions to attend children's sporting events and other activities.

176.    In contrast, the Director of Admissions, a female, was berated openly in management meeting regarding performance, and inability to meet performance goals.

177.    A Director of Admissions resigned to take a Professor Position at Arizona State University.  Upon non-renewal of that contract, the Director returned to ASLS as the Director of Admissions despite the severe drop in admissions numbers, and an apparent inability to adapt to enrollment challenges prior to his initial departure.

178.    In addition, ASLS hired Kenneth Schnolobler as Director of Technology in 2014 without posting the position or interviewing alternative candidates.

179.    Lorona was required to work until at least 5:00 p.m. daily to accommodate night students.

180.    Lorona's male replacement routinely works no later than 4:00 p.m.  The male employee states he needs to leave early so that he can take public transportation although public transportation runs much later than 4:00 p.m. on a daily basis.

181.    As alleged above, Defendants also discriminated against Lorona on the basis of her gender in violation of Title VII by failing to promote Lorona or even to consider her for promotions due to her gender and the fact that she was the primary caregiver of her minor children.

182.    As a direct and proximate result of Defendants' violations of Title VII Lorona has sustained damages, including but not limited to lost wages and benefits, lost promotions and the opportunity for promotions, and the loss of increased wages and benefits through promotion or otherwise in an amount to be proven at trial.

183.   Defendants' violations of Title VII were willful, intentional and malicious, and were done in reckless disregard of Lorona's rights, thus entitling Lorona to an award of punitive damages.

### Count Six – Retaliatory Discharge in violation of Title VII and ADA
(All Defendants)

184.   Lorona re-alleges and incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint.

185.   On numerous occasions during the course of her employment at ASLS, Lorona complained to her supervisors and superiors that Defendants were treating her unfairly and discriminated against her because she: (a) has minor children with disabilities; (b) needs to work from home on occasions so that she can care for her minor children with severe and chronic asthma; and (c) is a woman in that, as described herein, Lorona's male coworkers were not subjected to harassment and denied promotions and the opportunities for promotion in the same or similar manner as Lorona, and male coworkers who were less qualified than Lorona were advanced and promoted in the company while Lorona was not.

186.   Defendants terminated Lorona's employment because she attempted to exercise her rights protected under the ADA and Title VII, and complained about unfair, unequal and disparate treatment in violation of the ADA and Title VII as alleged herein.

187.   But for Lorona's complaints about, and opposition to, unlawful and disparate treatment in violation of the ADA and Title VII and her attempts to exercise her rights thereunder, Defendants would not have terminated Lorona's employment.

188.    Lee and Thompson were acting in the scope and course of their employment with ASLS and Infilaw.   Accordingly, ASLS and Infilaw are liable for the actions of Thompson and Lee under the theory of *respondeat superior*.

189.   As a direct and proximate result of Defendants' actions, Lorona has suffered damages, including but not limited to, the loss of income, loss of employee benefits, and

damage to her reputation because she will now be known as a whistleblower and will be forever publicly linked to a whistleblower complaint.

190.    Further, Defendants actions were willful, wanton, intentional, malicious, and done with reckless and evil mind that consciously disregarded Lorona's rights and the damages that would plainly and obviously result.  As such, an assessment of exemplary and punitive damages in an amount to be determined at trial is warranted.

### DEMAND FOR JURY TRIAL

191.   Lorona demands trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Lorona requests the Court to enter judgment in favor of Lorona and against Defendants as follows:

A.    Ordering Defendants to pay Lorona for the wages, salary, employment benefits, and other compensation denied or lost to Lorona by reason of Defendants' violations of the ADA, FMLA and Title VII in an amount to be proven at trial; and

B.    Awarding Lorona actual, compensatory, consequential, statutory, and incidental damages in an amount to be proven at trial; and

C.    Awarding Lorona punitive damages; and

D.    Awarding Lorona her costs, expenses, and attorneys' fees incurred herein as allowed by law; and

E.    Ordering Defendants to pay Lorona interest on such damages as are appropriate, including pre- and post- judgment interest; and

F.    Granting such other and further relief as the court deems just and proper.

DATED this 14th day of January 2016.

**MILLS + WOODS LAW PLLC**


By   /s/ Sean A. Woods
Robert T. Mills
Sean A. Woods
5055 N 12th Street
Suite 101
Phoenix, AZ  85014
Attorneys for Plaintiff

# CERTIFICATE OF SERVICE

I hereby certify that on January 14, 2016, I electronically transmitted the foregoing document to the Clerk's Office using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:

Nicole France Stanton (#020452)
nicole.stanton@quarles.com
Eric B. Johnson (#020512)
eric.johnson@quarles.com
Michael S. Catlett (#025238)
Michael.catlett@quarles.com
Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391

Attorneys for Defendants

/s/Marci Perkins