Quarles & Brady LLP
Firm State Bar No. 00443100
Renaissance One
Two North Central Avenue
Phoenix, AZ  85004-2391
TELEPHONE 602.229.5200

Nicole France Stanton (#020452)
nicole.stanton@quarles.com
Eric B. Johnson (#020512)
eric.johnson@quarles.com
Michael S. Catlett (#025238)
michael.catlett@quarles.com

Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paula C. Lorona,<br><br>　　　　　　Plaintiff,<br><br>　　vs.<br><br>Arizona Summit Law School LLC, a Delaware limited liability company; Infilaw Corporation, a Delaware corporation; Jane and Johns Doe 1-100; Black Corporation 1-100; White Partnership 1-100,,<br><br>　　　　　　Defendants. | NO. 2:15-CV-00972-NVW<br><br>**DEFENDANT ARIZONA SUMMIT LAW SCHOOL, LLC'S MOTION TO DISMISS COUNTS ONE THROUGH THREE OF PLAINTIFF'S THIRD AMENDED COMPLAINT** |

　　　　Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, Defendant Arizona Summit Law School, LLC ("ASL") hereby moves to dismiss Counts One (Consumer Fraud), Two (Common Law Fraud), and Three (Negligent Misrepresentation) of Plaintiff Paula Lorona's ("Lorona") Third Amended Complaint ("TAC") for failure to state a claim.  This Motion is supported by the following Memorandum of Points and Authorities.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. <u>INTRODUCTION</u>

On December 16, 2015, this Court granted ASL's (and Infilaw Corporation's) Motion to Dismiss Lorona's claims for fraud, consumer fraud, and negligent misrepresentation, and provided Lorona with leave to amend her Complaint for the fourth time (the "Order"). Lorona has now filed her Third Amended Complaint ("TAC"), again bringing those same claims (this time against ASL only) arising out of various "representations" allegedly made by ASL in marketing materials, on its website, or to third parties, like the Law School Admissions Council. Unfortunately for Lorona, she has failed to correct the deficiencies the Court identified in its Order. Accordingly, ASL respectfully requests that the Court again dismiss those claims, this time with prejudice.

## II. <u>FACTUAL BACKGROUND.</u>[1]

Lorona is a former employee and student at ASL. (TAC at ¶ 44.) Lorona applied for enrollment in August of 2009, was accepted for traditional enrollment, and at some (unidentified) point thereafter began studying law at ASL. (Id.) Lorona graduated from ASL in December of 2014, passed the Arizona bar exam on her first attempt in February of 2015, and is now practicing law in Arizona "as a sole practitioner". (Id. ¶¶ 86, 88.)

### A. Lorona Alleges that She Relied on ASL's Employment and Bar Passage Statistics Prior to Her Enrollment at ASL.

The TAC alleges that at *some point* "before enrolling at ASL[]", Lorona reviewed certain statistics and other (unidentified) "favorable statements" contained in ASL "marketing materials" and ASL's "Viewbook", and that Lorona "relied upon" those statistics and statements" in deciding to enroll at ASL[] as a law student". (Id. ¶¶ 37, 38, 40.) While Lorona does not make clear which "favorable statements" she read, the "statistics" that Lorona purportedly relied upon when deciding to attend ASL were as follows: (1) that at some, unidentified point in time, ASL was enrolling students with certain, unidentified undergraduate GPA and LSAT scores; (2) that at some, unidentified

---

[1] For purposes of this Motion only, Defendants assume that the factual allegations contained in the TAC are true.

point in time, ASL graduates were expected to make a median salary of $60,000, (3) that at some, unidentified point in time those students could expect to amass a median student loan amount of $101,310, and (4) that at some, unidentified point in time those same ASL students had an 80% chance of ultimately passing the bar exam. (Id. ¶¶ 39, 40-42.) Lorona claims that based on these statistics and unidentified "favorable statements," she "reasonably believed" that she "would easily be able to find employment at a law firm or even in the public sector making approximately $60,000 per year". (Id. ¶ 43.)

      **B.**    **Lorona Alleges She Continued to Enroll Based on the Admission Statistics of Subsequent Students.**

After beginning her studies at ASL, Lorona alleges that she continued to read ASL's website and marketing materials regarding the "caliber" of students being admitted in the years following Lorona's admission, and that she continued to "t[ake] comfort in the fact that the reported statistics regarding LSAT scores and undergraduate GPAs of ASL[] students remained stable . . ." (Id. ¶ 48.) Lorona then claims that between 2005 and 2011, ASL started admitting "lower caliber" students (through ASL's Alternative Admissions Model for Legal Education) at a higher rate, and that ASL failed to disclose to the Law School Admissions Counsel, or in its marketing materials, that ASL was not including the grade point averages and LSAT scores of these alternative students in its statistical reporting. Lorona claims that ASL's failure to do so was fraudulent.

      **C.**    **Lorona Alleges that ASL's "Ultimate Bar Pass Rate" is Misleading.**

Lorona alleges that there was a disparity between the "actual bar passage rates" being reported by ASL and the "ultimate bar pass rates" being reported by ASL, and that such disparity is "misleading at best." (Id. ¶ 60-66.)

      **D.**    **Lorona Alleges She Continued To Take Comfort in ASL's Employment and Salary Statistics While Enrolled at ASL.**

Lorona claims that from 2010 through 2013, ASL stated that its "Bar Exam passage rates [were] high, and [that] the school places 97% of its graduates into jobs within nine months of graduation." (Id. at 67-68.) Lorona does not allege that this statement was false, or that she relied upon it, but she does allege that she "read [it] and

-3-

took continuing comfort [in it because] it gave her assurance and confidence that she would be able to obtain employment with her ASL[] degree." (Id. ¶ 69.)

### E. Lorona Claims that ASL Committed Fraud by Stating that it Produces "Well-Rounded Lawyers Who Add Immediate Value."

Lorona again alleges in the TAC that ASL committed fraud and negligent misrepresentation by stating in connection with its Legal Education Program materials (at some, unidentified point in time) that it *believes* it produces "well-rounded lawyers who add immediate value to their firms and employers." (Id. ¶ 93.) Lorona claims that this statement exaggerates the value of ASL's legal education and amounts to fraud.

## III. LEGAL ARGUMENT.

### A. Standard for Dismissal.

To survive a motion to dismiss for failure to state a claim, the plaintiff must allege "enough facts to state a claim for relief that is plausible on its face." Fed. R. Civ. P. 12(b)(6); *Bell Atl. Corp. v. Twombly*, 556 U.S. 544, 570 (2007); *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008) (applying *Twombly* standard). The allegations in the complaint are generally accepted as true and construed in the light most favorable to the plaintiff. *Id.* (*citing Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)). The Court is not "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *Sprewell*, 266 F.3d at 988, *amended on other grounds*, 275 F.3d 1187 (9th Cir. 2001).

### B. Plaintiff Has Failed to Plead Plausible Claims for Fraud or Negligent Misrepresentation (Counts 1-3).

Counts 1 through 3 of the TAC should be dismissed. To establish a consumer fraud claim under Arizona law, a plaintiff must plead facts, with particularity, plausibly establishing that the defendant used deception, used a deceptive act or practice, used fraud, used false pretense, made a false promise, made a misrepresentation, or concealed, suppressed or omitted a material fact in connection with the sale or advertisement of merchandise with the intent that the plaintiff rely on the unlawful practice, and that the plaintiff suffers damage as a consequent and proximate result. *See Dunlap v. Jimmy GMC*

*of Tucson, Inc.*, 666 P.2d 83, 87, 89 (Ariz. App. 1983).

The elements of common law fraud are similar, and require a specific showing that the defendant knowingly made a false, material misrepresentation with the intent that the plaintiff rely on that representation, and that the plaintiff did reasonably rely on that representation and suffered damage as a consequent and proximate result. *Peery v. Hansen*, 585 P.2d 574, 577 (Ariz. App. 1978). For fraud to be actionable, it "must be based upon a misrepresentation of material fact, and not upon an expression of opinion." *Poley v. Bender*, 347 P.2d 696 (Ariz. 1959). Lorona's fraud claims fail to satisfy these required elements in a number of respects.

The elements of negligent misrepresentation are similar to those of fraud, and must also be pled with particularity. *Gould v. M & I Marshall & Ilsley Bank*, 860 F. Supp. 2d 985, 988 (D. Ariz. 2012). Like claims for fraud, stating a claim for negligent misrepresentation requires, among other things, facts that plausibly establish the existence of a misrepresentation or omission of a material fact, the reasonable and detrimental reliance on that fact by the plaintiff, and actual and proximate damages. *Taeger v. Catholic Family & Cmty. Servs.*, 995 P.2d 721, 730 (Ariz. App. 1999); *McAlister v. Citibank*, 829 P.2d 1253, 1261 (Ariz. App. 1992).

**1.  Lorona Failed to Plead Facts that Plausibly Establish a "Misrepresentation" by ASL.**

The Court previously held that Lorona failed to plead in the Second Amended Complaint that ASL had made a misrepresentation sufficient to support a fraud or negligent misrepresentation claim. The TAC fares no better in that respect.

As to statements ASL purportedly made about the Legal Education Program (TAC ¶ 93) and ultimate bar passage rates (Id. ¶ 61), those statements do not support a fraud or negligent misrepresentation claim. As the Court noted in the Order, ASL's statement in support of the Legal Education Program that it "believes" it produces "well-rounded lawyers who add immediate value to their firms and employers" is aspirational, not factual. (The Order at 24.) And Lorona has again failed to specify the when, where, how,

1  or to whom ASL made this statement. (Id. at 23-24).

2  Regarding the statements that ASL purportedly made about "Ultimate Bar Passage
3  Rates," Lorona merely describes those statements as "misleading at best," but not as false.
4  Indeed, it would be impossible for her to allege that they were false, given that the very
5  marketing materials she relies upon explained to readers the differences between "bar
6  passage rates" and "ultimate bar passage rates." (TAC ¶ 61) (noting that the Viewbook
7  explicitly states that the Ultimate Bar Pass Rate is based on "[g]raduates who passed the
8  Arizona Bar Exam on the first *or subsequent attempts*") (emphasis added.) As the Court
9  noted in the Order, "this disparity [between the two pass rates] is easily explained: the
10 pass rates measure different things . . . [so] one would expect the "Ultimate" pass rate to
11 be higher . . ."[2] (The Order at 21.) "In sum, Lorona [has failed again to] plausibly allege
12 that [ASL's] statements about an "Ultimate" bar pass rate are false or misleading.
13 Therefore fraud cannot be reasonably inferred." (The Order at 21).

14 To the extent Counts 1 through 3 are based on the fact that ASL's website
15 purportedly indicated "from . . . 2010 through 2013 that . . . [its] bar exam passage rates
16 [were] high and [that] the school places 97% of its graduates into jobs within nine months
17 of graduation," those claims fail because Lorona never alleges in the TAC that those
18 statements were false when made, or that she relied upon them. For example, Lorona
19 does not plausibly establish that the percentage of ASL graduates employed after nine
20 months of graduation was actually less than 97%.[3] Instead, Lorona merely states that she
21 "took continuing comfort" in ASL's statements.

22 Counts 1 through 3 appear to be based, at least in part, on statements by ASL about
23 the theoretical "expected bar passage rates of ASL[] graduates." (TAC ¶¶ 93, 99, 110.)

---

[2] Not to mention that ASL's bar passage statistics are publicly-available through the Arizona Supreme Court. Thus, if Lorona wanted to know what the bar passage rate was for ASL students in any given year, all she had to do was look at the Arizona Judicial Branch's website. (*See* http://www.azcourts.gov/cld/Attorney-Admissions/Examination-Statistics.)

[3] As explained further below, the American Bar Association considers solo practitioners, such as Lorona, as being employed.

1  Those claims fail because fraud and negligent misrepresentation claims must be based on
2  a material *fact*, not mere subjective projections or estimations. *See Law v. Sidney*, 53 P.2d
3  64, 66 (Ariz. 1936) ("The general rule is that in order to constitute actionable fraud, the
4  false representation must be of a matter of fact which exists in the present, or has existed
5  in the past . . . ")

6  Finally, with respect to ASL's purported statements about the average G.P.A. and
7  LSAT scores of incoming students, Lorona claims those statistics were misleading
8  because they did not include the G.P.A.s and LSAT scores of students admitted through
9  alternative means. Because of that alleged omission, Lorona claims that, in reviewing
10 those statistics, she erroneously assumed that her peers at ASL were of a higher caliber
11 than she now believes them to have been. Even assuming that Lorona is correct that ASL
12 omitted the statistics of students admitted through alternative programs, she <u>assumes</u> (but
13 does not actually establish) that including those statistics would have resulted in
14 materially lower overall G.P.A. and LSAT statistics for the class as a whole, and further
15 takes the subjective view that G.P.A. and LSAT scores are the sole reflection of the
16 caliber of her fellow law students and sole determinates of future success on the Bar exam
17 and in law practice. ASL has never made any attempt to hide the fact that it admits
18 students through alternative means; in fact, it trumpets the existence (and successes) of the
19 AAMPLE program on its website. (https://www.azsummitlaw.edu/admissions/aample.)
20 The fact that Lorona has now concluded in her own mind that one's G.P.A. and LSAT
21 score are the sole determinate of one's caliber as a law student does not make ASL's
22 contrary belief fraudulent,[4] particularly in light of the fact that Lorona still has not alleged
23 that ASL's statistics were in violation of any third-party reporting requirement.

---

[4] Lorona's claim is also based on the faulty premise that prospective employers take the same view of undergraduate G.P.A.s and LSAT scores as she does, and therefore are less likely to hire ASL graduates because those students are of a lower "caliber" than students at other law schools whose incoming students have higher undergraduate G.P.A. and LSAT scores.

### 2. Lorona Failed to Plead Detrimental Reliance.

#### a. Statements Made Before Enrollment.

Lorona's fraud and negligent misrepresentation claims, based on statements allegedly made by ASL *prior* to Lorona's enrollment at ASL, fail for lack of particularity. As the Court noted in the Order, Lorona must allege "the who, *what*, *when*, where, and how" of the misconduct charged. (The Order at 23) (citing Vess v. Ciba-Geigy Corp. USA, 317 F.3d 1097, 1105 (9th Cir. 2003)) (emphasis added). Lorona has not alleged facts plausibly supporting the "when" or "what" of the purported misrepresentations that she purportedly relied upon before enrolling at ASL. Instead, Lorona has merely provided that at some, unidentified point in time "before enrolling" Lorona viewed certain "favorable statements" in ASL marketing materials, among which were the median salary of ASL graduates, the median debt load of ASL graduates, and the bar passage rate of ASL students. In fact, the Complaint does not even make clear *when* Lorona began her studies at ASL (it merely alleges when she was accepted, but not when she actually enrolled). Because it is impossible to tell from the face of the TAC exactly when or how the alleged statements at issue were made in relation to Lorona's enrollment at ASL, Counts 1 through 3 should be dismissed.[5]

#### b. Statements Made After Enrollment.

Lorona claims that, after she enrolled at ASL, she continued to rely on and take comfort in certain statistics and statements allegedly contained in marketing materials and the "Viewbook" and conveyed to the Law School Admissions Counsel relating to the admission statistics (i.e., LSAT scores and undergraduate GPAs) of subsequent, incoming

---

[5] As the Court noted in the Order, this missing information is crucial because by failing to specify when she began attending ASL, or pointing out when precisely the statements were made, Lorona cannot adequately allege that she reasonably or detrimentally relied upon such statements in deciding to enroll at ASL. (The Order at 26.) Even though Lorona has now alleged that she reviewed some of those statements at some point *before* enrolling, pleading with particularity requires more. ASL cannot properly defend against a claim for fraud or negligent misrepresentation without knowing precisely how or when the statements at issue were purportedly made.

classes. (TAC ¶ 48-55.) Lorona now suggests that such comfort was in vain, because those "admission statistics" and other "information" misleadingly concealed the fact that the LSAT scores and GPAs of alternative students were not included in those statistics. But Lorona does not identify any of the precise statements made, or detail when those statements were allegedly made.[6]  Lorona's failure to do so, and her additional failure to state whether ASL complied with LSAC's third-party reporting requirements are fatal to her claims for the reasons previously explained by the Court. (See, the Order at 22.)

Furthermore, Lorona's post-enrollment misrepresentation claims – whether based on purported statements regarding the bar passage rate, the caliber of ASL students, admission requirements, or anything else – fail for the additional reason that she has not pled facts plausibly establishing that she relied on those statements in remaining enrolled at ASL. Otherwise stated, Lorona has failed to allege facts that plausibly suggest that had ASL more adequately reported its bar passage rates, the caliber of its students, or its admission requirements after Lorona's enrollment, that Lorona would have immediately dropped out of law school at ASL.

As pointed out by the Court in the Order with respect to the SAC, Lorona failed then (and has again failed) to allege facts suggesting that she had any realistic alternatives, academic or otherwise, to completing her studies at ASL. (The Order at 26.) Lorona attempted to correct this deficiency in the TAC by summarily concluding that "[s]he would have taken an entirely different career path," but that conclusion is not supported by the sort of factual explanation that the Court previously identified in its Order. (TAC ¶ 90.; The Order at 26.)

---

[6] The closest Lorona gets is by providing, by way of "example", that "as of Spring 2008", ASL's website indicated that the median LSAT scores and GPA of incoming undergraduate students were "153 and 3.18, respectively." (Id. ¶ 49.) But Lorona does not claim to have relied upon those specific statistics in continuing her enrollment. Nor does she explain how she could have, or how such statistics, from 2008, would have provided her continued comfort "throughout the time [she] was a student" (Id. 47.) when those statistics were released prior to her application to ASL in 2009.

### 3.     **Lorona Fails to Plead Cognizable Damages.**

Lorona applied for enrollment at ASL knowing full well the cost of attending ASL. This is made evident by the fact that the TAC does not allege that any such information was falsely conveyed to (or concealed from) Lorona prior to or during her tenure as an ASL student.  The TAC similarly does not (because it cannot) allege that ASL promised Lorona or anyone else that they would graduate, pass the bar exam, or receive a high paying, private law firm job.  Rather, ASL, like all law schools, simply promises to provide a legal education for those willing to work to obtain it.  This is precisely what Lorona paid for, and it is precisely what she received.  Not only did Lorona receive a legal education, she received a legal education that has allowed her to pass the Arizona bar examination on the first attempt, obtain her law license, and obtain employment as a lawyer.

But Lorona nonetheless wants ASL to pay her student loans because Lorona subjectively believes – without being able to reasonably trace this belief to any statement made by ASL – that she should have been able to secure a private firm or public sector job paying at least $60,000 per year immediately upon graduation.[7]  Because Lorona has not yet secured such a job, she concludes that the only possible explanation for her misfortunes is the "abysmal reputation of ASLS." (¶ 87.)[8]  To the contrary, Lorona has admitted that she is currently employed as a solo practitioner. (TAC ¶ 88.)  While Lorona apparently believes that such a job does not qualify as "employment"  and does not inherently provide her the "client base she would expect at a private firm or . . . in the

---

[7] Lorona omits from the TAC that ASL reimbursed her some portion of her tuition because of her status as an ASL employee.

[8] Lorona does not consider plausible alternatives, like the fact that she graduated law school during a recessed legal market. And she fails to identify common criteria relating to her marketability as a graduating law student that would suggest she is a good candidate for a private firm (or public sector job) in the first instance, such as her law school grade point average, her law school clubs and affiliations, her law school internships, etc. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 567, 127 S. Ct. 1955, 1972, 167 L. Ed. 2d 929 (2007) (examining "obvious alternative explanations" in deciding whether the plaintiff had stated a plausible claim for relief).

public sector," the American Bar Association (ABA) disagrees that Lorona has been "unable to obtain employment with her ASL[] degree." (TAC ¶¶ 97, 107, 116.) In fact, the ABA places solo practitioners within the "Employed" section of its "Employment Summary Charts," a fact that is clear from ASL's disclosures of the employment statistics for recent graduates. *See e.g.*, ABA Employment Summary Chart for 2012 ASL Graduates, attached hereto as Exhibit "A".[9]

In short, because of ASL, Lorona has a law degree, a bar license, and employment as a lawyer. Lorona, therefore, has not, and cannot, plausibly establish that she has suffered any cognizable damage as a result of ASL's alleged misrepresentations.

## IV. CONCLUSION.

Because Lorona has failed to state a claim upon which relief may be granted, Defendants respectfully request that the Court dismiss Counts 1 through 3 of the TAC with prejudice.

RESPECTFULLY SUBMITTED this 28th day of January, 2016.

> QUARLES & BRADY LLP
> Renaissance One
> Two North Central Avenue
> Phoenix, AZ 85004-2391
>
> By */s/ Michael S. Catlett*
> Nicole France Stanton
> Eric B. Johnson
> Michael S. Catlett
>
> Attorneys for Defendants

---

[9] The Court can consider that document at the 12(b)(6) stage because the employment statistics of ASL, as reported by the American Bar Association, "are central to the complaint." *See Strategic Dev. & Const., Inc. v. 7th & Roosevelt Partners, LLC*, 224 Ariz. 60, 64, 226 P.3d 1046, 1050 (Ct. App. 2010) (citing *Alternative Energy, Inc. v. St. Paul Fire & Marine Ins. Co.*, 267 F.3d 30, 33 (1st Cir. 2001)).

I hereby certify that on January 28, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants in this matter, including:

>Robert T. Mills
>Mills & Woods Law PLLC
>5055 N 12th St., Ste. 101
>Phoenix, AZ 85014
>480-999-4556
>rmills@millsandwoods.com

>Sean Anthony Woods
>Mills & Woods Law PLLC
>5055 N 12th St., Ste. 101
>Phoenix, AZ 85014
>480-999-4556
>swoods@millsandwoods.com

*/s/ Nancy Masterson*

QB\152522.00007\38234670.1