**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Paula C. Lorona,<br><br>  Plaintiff,<br><br>v.<br><br>Arizona Summit Law School, LLC; Infilaw Corporation; Jane and Johns Doe 1–100; Black Corporation 1–100; White Partnership 1–100,<br><br>  Defendants. | No. CV-15-00972-PHX-NVW<br><br>**ORDER** |

Before the Court is Defendant Arizona Summit Law School, LLC's Motion to Dismiss (Doc. 35) and the parties' accompanying briefs. For the reasons that follow, the motion will be granted in part and denied in part.

**I.    BACKGROUND**

On March 2, 2015, Paula Lorona filed a complaint *pro se* in state court against Arizona Summit Law School, LLC ("Arizona Summit Law School" or "the Law School"), Infilaw Corporation ("Infilaw"), and various individuals and entities. (Doc. 1-1 at 1–18.) Lorona then amended her complaint to include federal statutory claims. (Doc. 1-1 at 56–80.)

On May 28, 2015, the defendants removed to federal court. (Doc. 1.) Lorona then obtained counsel (Doc. 14) and amended her complaint again (Doc. 20). That second amended complaint named only Arizona Summit Law School, Infilaw, and fictitious entities as defendants. (Doc. 20 at 1.) It claimed violations of federal employment laws and state fraud laws. (*Id.* at 18–49.) The Court dismissed many of the employment claims and all the fraud claims for failure to state a claim upon which relief may be granted, but permitted Lorona to amend her complaint again. (Doc. 33 at 27–28.)

On January 14, 2016, Lorona filed a third amended complaint. (Doc. 34.) The revised complaint contains federal employment claims against all defendants and state-law fraud and negligent misrepresentation claims against Arizona Summit Law School only. (*Id.* at 14–28.) The Law School moves to dismiss the fraud and negligent misrepresentation claims. (Doc. 35.) Oral argument was held on May 13, 2016.

The relevant allegations in the third amended complaint are summarized below. They are presumed true at this stage.

**A.    Arizona Summit Law School's Representations to Lorona**

In considering whether and where to attend law school, Lorona reviewed Arizona Summit Law School's "Viewbook," a marketing brochure about the Law School. (Doc. 34 at ¶¶ 37–38.) She read a paper copy of the Viewbook on campus, as well as an online copy on the Law School's website. (*Id.*) The Viewbook contained enrollment statistics about the Law School's students, including their median Law School Admission Test ("LSAT") scores and undergraduate grade point averages ("GPAs"). (*Id.* at ¶¶ 38, 49.) LSAT scores and undergraduate GPAs are commonly accepted indicators of a student's likelihood to succeed in law school and pass the bar exam. (*Id.* at ¶ 48.) As of spring 2008, the Viewbook reported a median LSAT score of 153 and median undergraduate GPA of 3.18. (*Id.* at ¶ 49.) The Law School also reported this information to a third party, the Law School Admission Council, which posted the information on its website. (*Id.* at ¶ 38.)

Lorona also reviewed other statements by the Law School about its program. She read on the Law School's website that more than 80% of its graduates passed the bar exam. (*Id.* at ¶ 41.) She read in the Law School's application packet that only two out of 70 graduates who were actively seeking employment were unemployed and that graduates had a median salary of $60,000 and a median student loan debt of $101,310. (*Id.* at ¶ 39.) She read in the Law School's application instructions that the Law School is governed by an American Bar Association standard prohibiting the admission of applicants "who do not appear capable of satisfactorily completing its educational program and being admitted to the bar." (*Id.* at ¶ 40.)

Based on this information, Lorona decided the Law School would be a good school to attend. (*Id.* at ¶¶ 42, 89.) In August 2009, she applied for traditional enrollment and was accepted as a traditional evening student. (*Id.* at ¶ 44.)

As a student, Lorona kept track of the Law School's enrollment statistics, which the Law School updated each year. (*Id.* at ¶¶ 45–47.) In particular, she noted that the Law School's median LSAT scores and undergraduate GPAs remained stable while she was a student and compared favorably to other law schools. (*Id.* at ¶ 48.) Through 2014, the Law School continued to report an "Ultimate" bar pass rate of over 80%. (*Id.* at ¶¶ 61–62.) This rate was based on the number of Law School graduates who passed the Arizona Bar Exam on the first or subsequent attempts. (*Id.* at ¶ 61.) The Law School also continued to report graduates' employment status and average salaries. (*Id.* at ¶ 67.) From 2010 through 2013, the Law School's website stated that the school "places 97% of its graduates into jobs within nine months of graduation." (*Id.* at ¶ 68.) Based on this information, Lorona decided to remain at the Law School. (*Id.* at ¶¶ 48, 63, 69, 90.)

At some unspecified time and place, the Law School described its legal education program as follows:

> We believe by graduation, lawyers should enter the workforce
> professionally prepared to practice law in a variety of diverse
> settings and industries. Summit Law partners with local law

> firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers.**

(*Id.* at ¶ 93 (emphasis in original).)

### B. Shortcomings in Arizona Summit Law School's Representations

Arizona Summit Law School's enrollment statistics did not reflect the LSAT scores or undergraduate GPAs of all its students. In 2005, the Law School began admitting some students via an "Alternative" admissions program that did not require LSAT scores or undergraduate GPAs within the traditional range. (*Id.* at ¶¶ 50–51.) The Law School did not include these Alternative students' LSAT scores or undergraduate GPAs in the enrollment statistics reported in its Viewbook, on its website, or to the Law School Admission Council. (*Id.* at ¶ 52.) The Law School did not specify that its statistics omitted Alternative students, and Lorona did not know of this omission. (*Id.* at ¶¶ 54–55.)

The Law School substantially increased its percentage of Alternative students from 2005 to spring 2011. (*Id.* at ¶ 53.) During the time Lorona was enrolled, most of the students at the Law School were Alternative students. (*See id.* at ¶¶ 53, 57.)[1] The Law School knew that students' LSAT scores and undergraduate GPAs correlate with their likelihood of passing the bar exam. (*Id.* at ¶¶ 46, 70–71.) Thus, the Law School predicted that the more Alternative students it admitted, the fewer of its graduates would pass the bar exam. (*Id.* at ¶¶ 72–73.) The Law School did not disclose this prediction to its students. (*Id.*)

---

[1] The third amended complaint is not clear on exact figures. It alleges that 80% of those who *applied to be* Alternative students in spring 2011 were admitted, but then alleges that 80% of the *overall student population* were Alternative students. (Doc. 34 at ¶¶ 53, 57.) At oral argument, the Law School disputed the latter allegation. In response, Lorona maintained that at least a majority of the students were Alternative students.

The prediction proved true.  In recent years, the percentage of Law School graduates who pass any given administration of the Arizona Bar Exam has fallen, from 72.9% of those who took the February 2013 exam, to 63.3% of those who took the July 2013 exam, to 48.8% of those who took the February 2014 exam, to 49.5% of those who took the July 2014 exam, to 52.6% of those who took the February 2015 exam, to 26.4% of those who took the July 2015 exam.  (*Id.* at ¶¶ 59–60.)

In May 2014, the Law School began to pay graduates who it predicted would fail the bar exam not to take the exam.  (*Id.* at ¶¶ 74–75.)  The predictions were based on students' LSAT scores, undergraduate GPAs, law school GPAs, and other factors.  (*Id.* at ¶ 71.)  In February 2015, for example, the Law School offered students predicted to fail the exam $5,000 and other benefits to defer taking it.  (*Id.* at ¶ 77.)  Eliminating these students from the pool of examinees artificially skewed pass rates in the Law School's favor.  (*Id.* at ¶ 78.)  These more favorable pass rates enabled the Law School to maintain its reputation, accreditation, and federal funding.  (*Id.* at ¶¶ 78–80.)

### C.     Lorona's Inability to Find Employment

Lorona graduated from the Law School in December 2014 and passed the Arizona Bar Exam in 2015.  (*See id.* at ¶ 86; Doc. 33 at 4–5.)[2]  She incurred over $200,000 in student loan debt.  (Doc. 34 at ¶ 81.)  Based on the Law School's representations, she believed that upon graduating she would find gainful employment at a law firm or in the public sector with a salary sufficient to repay this debt.  (*Id.* at ¶ 82.)

This belief turned out to be overly optimistic.  While awaiting bar exam results, Lorona applied for positions that did not require a law license, such as bailiff, clerk, and paralegal.  (*Id.* at ¶ 85.)  She did not receive an interview.  (*Id.*)  After being admitted to the bar, she applied for positions at private law firms and in the public sector, and she enlisted the services of employment placement firms.  (*Id.* at ¶ 86.)  She received one

---

[2] Lorona's present complaint does not specify when she graduated or took the bar exam, but she clarified these dates at oral argument.

interview but no callback. (*Id.*) She is currently attempting to establish a solo practice, without the support or client base she would expect at a private firm or in the public sector. (*Id.* at ¶ 88.)

Lorona attributes her plight to the Law School's reputation, which has recently plummeted due to its graduates' low bar pass rates. (*Id.* at ¶ 87.) Had she known the true value of her law degree, she would not have enrolled in the Law School or would have withdrawn from the Law School and, if necessary, pursued a different career. (*Id.* at ¶¶ 89–90.) She accuses the Law School of common-law fraud, statutory consumer fraud, and negligent misrepresentation (collectively, "fraud claims"). (*Id.* at ¶¶ 91–116.)

## II.   LEGAL STANDARD

Arizona Summit Law School moves to dismiss Lorona's fraud claims for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). (Doc. 35 at 1.)

When considering a motion to dismiss, a court evaluates the legal sufficiency of the plaintiff's pleadings. Dismissal under Rule 12(b)(6) can be based on "the lack of a cognizable legal theory" or "the absence of sufficient facts alleged under a cognizable legal theory." *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990). To avoid dismissal, a complaint need include "only enough facts to state a claim for relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

On a motion to dismiss under Rule 12(b)(6), all allegations of material fact are assumed to be true and construed in the light most favorable to the non-moving party. *Cousins v. Lockyer*, 568 F.3d 1063, 1067 (9th Cir. 2009). However, the principle that a court accepts as true all of the allegations in a complaint does not apply to legal conclusions or conclusory factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged." *Id.* "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* To show that the plaintiff is entitled to relief, the complaint must permit the court to infer more than the mere possibility of misconduct. *Id.* If the plaintiff's pleadings fall short of this standard, dismissal is appropriate.

## III. ANALYSIS

Lorona alleges fraud of three varieties: common-law fraud, fraud under the Arizona Consumer Fraud Act, and negligent misrepresentation. Each deserves brief explanation.

### A. Common-Law Fraud, the Arizona Consumer Fraud Act, and Negligent Misrepresentation

To state a claim for fraud under Arizona common law, Lorona must allege (1) the Law School made a representation to her that was (2) false and (3) material, (4) the Law School knew the representation was false or was ignorant of its truth, (5) the Law School intended that she rely on the representation in the manner reasonably contemplated, (6) she did not know the representation was false, (7) she relied on the representation, (8) her reliance was reasonable, and (9) she was harmed as a result. *See Echols v. Beauty Built Homes, Inc.*, 132 Ariz. 498, 500, 647 P.2d 629, 631 (1982); *accord* Revised Arizona Jury Instructions (Civil), Commercial Torts Instruction 24 (5th ed. 2013). Failing to disclose material information despite an obligation to do so is equivalent to a misrepresentation. *Haisch v. Allstate Ins. Co.*, 197 Ariz. 606, 610 ¶ 14, 5 P.3d 940, 944 (Ct. App. 2000).

The Arizona Consumer Fraud Act is "much broader in its scope" than common-law fraud. *Cearley v. Wieser*, 151 Ariz. 293, 295, 727 P.2d 346, 348 (Ct. App. 1986). The Act defines and prohibits consumer fraud as follows:

> The act, use, or employment by any person of any deception, deceptive act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission

> of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived, or damaged thereby, is declared to be an unlawful practice.

A.R.S. § 44-1522(A). To state a claim for consumer fraud, Lorona must allege (1) the Law School made a false promise or misrepresentation (2) in connection with the sale or advertisement of merchandise, (3) she relied on the representation, and (4) she was harmed as a result. *Kuehn v. Stanley*, 208 Ariz. 124, 129 ¶ 16, 91 P.3d 346, 349 (Ct. App. 2004); *accord* Revised Arizona Jury Instructions (Civil), Commercial Torts Instruction 21 (5th ed. 2013). She need not allege that the Law School intended to deceive her. *See State ex rel. Babbitt v. Goodyear Tire and Rubber Co.*, 128 Ariz. 483, 486, 626 P.2d 1115, 1118 (Ct. App. 1981). Nor need she allege that her reliance was reasonable. *See Kuehn*, 208 Ariz. at 129 ¶ 16, 91 P.3d at 349. Although the Act is limited to the sale or advertisement of merchandise, the Act defines "merchandise" as including "intangibles" and "services." A.R.S. § 44-1521(5). Arizona courts have applied this definition broadly. *See State ex rel. Woods v. Sgrillo*, 176 Ariz. 148, 148–49, 859 P.2d 771, 771–72 (Ct. App. 1993) (information about credit cards is merchandise); *Villegas v. Transamerica Fin. Servs., Inc.*, 147 Ariz. 100, 102, 708 P.2d 781, 783 (Ct. App. 1985) (money is merchandise); *Flower World of Am., Inc. v. Wenzel*, 122 Ariz. 319, 321–22, 594 P.2d 1015, 1017–18 (Ct. App. 1978) (commercial franchise is merchandise). *But see Waste Mfg. & Leasing Corp. v. Hambicki*, 183 Ariz. 84, 87, 900 P.2d 1220, 1223 (Ct. App. 1995) (existing business entity is not merchandise).

Arizona also recognizes the tort of negligent misrepresentation as defined in the Second Restatement of Torts. *St. Joseph's Hosp. v. Reserve Life Ins.*, 154 Ariz. 307, 312, 742 P.2d 808, 813 (1987). The Restatement provides, in relevant part:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance

> of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

Restatement (Second) of Torts § 552 (1977). Accordingly, to state a claim for negligent misrepresentation, Lorona must allege (1) the Law School supplied "false information" to her (2) in a transaction in which it had a "pecuniary interest," (3) the Law School intended that the information would "guid[e]" her in a business transaction, (4) the Law School failed to exercise "reasonable care or competence" in obtaining or communicating the information, (5) she "reli[ed]" on the information, (6) her reliance was "justifiable," and (7) she suffered "pecuniary loss" as a result. *Id.*; *accord* Revised Arizona Jury Instructions (Civil), Commercial Torts Instruction 23 (5th ed. 2013). Negligent misrepresentation is "narrow in scope" because it is premised on the reasonable expectations of a foreseeable user of information supplied in connection with commercial transactions. *St. Joseph's Hosp.*, 154 Ariz. at 312–13, 742 P.2d at 813–14. Whereas fraud imposes a general duty of honesty, negligent misrepresentation imposes a specific duty of care. *See* Restatement (Second) of Torts § 552 cmt. *a*. Not every user of commercial information may hold every supplier to a duty of care. *St. Joseph's Hosp.*, 154 Ariz. at 313, 742 P.2d at 814. The duty of care owed to the foreseeable user in supplying information for use in commercial transactions is a relative standard, "defined

only in terms of the use to which the information will be put, weighed against the magnitude and probability of loss that might attend that use if the information proves to be incorrect." *Id.* (quoting Restatement (Second) of Torts § 552 cmt. *a*). The information supplier's "pecuniary interest" in the transaction usually lies in payment, either in direct exchange for the information or as part of the transaction in which the information is supplied, but it may be of a more indirect character. Restatement (Second) of Torts § 552 cmt. *d*.

For all three claims, Lorona must allege the circumstances constituting fraud "with particularity." Fed. R. Civ. P. 9(b); *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d 1097, 1103 (9th Cir. 2003) ("It is established law, in this circuit and elsewhere, that Rule 9(b)'s particularity requirement applies to state-law causes of action."); *Gould v. M & I Marshall & Isley Bank*, 860 F. Supp. 2d 985, 988 n.2 (D. Ariz. 2012) (applying Rule 9(b) to negligent misrepresentation); *Grismore v. Capital One F.S.B.*, No. CV 05-2460-PHX-SMM, 2007 WL 841513, at *6 (D. Ariz. Mar. 16, 2007) (applying Rule 9(b) to Arizona Consumer Fraud Act). In other words, Lorona must allege "the who, what, when, where, and how" of the misconduct charged. *Vess*, 317 F.3d at 1106.

Some elements are common to all three claims. Other elements are unique to one or two of the claims. The Law School's motion challenges only common elements. It does not, for example, challenge the Arizona Consumer Fraud Act claim or the negligent misrepresentation claim separately from the common-law fraud claim. This order addresses only the elements that the Law School challenges. Those challenges succeed in part and fail in part, as discussed herein.

### B. Lorona Has Stated Fraud Claims Based on Reporting of Deceptively Incomplete Enrollment Statistics.

In short, Lorona alleges: Arizona Summit Law School knowingly and intentionally reported inflated enrollment statistics by omitting LSAT scores and undergraduate GPAs of students admitted through its less rigorous "Alternative"

admissions program. This omission was material because students' LSAT scores and undergraduate GPAs correlate with their likelihood of passing the bar exam, which in turn determines a law school's reputation and bears strongly on the value of its diploma. Unaware of this omission, Lorona relied on these inflated statistics in deciding to attend the Law School. As a result, she spent years and money on a degree that turned out to be worth substantially less than she expected.

The Law School argues that Lorona's allegations concerning misrepresentation of enrollment statistics fall short of fraud in several ways. None of the challenges is persuasive.

### 1. Lorona has pled misrepresentation.

According to the Law School, Lorona's fraud allegations about its inflation of enrollment statistics are conclusory. On its view, Lorona merely assumes that (1) the omission of Alternative students improved the statistics regarding student LSAT scores and undergraduate GPAs, (2) these statistics generally affect the value of a law school's diploma, and (3) there were enough Alternative students at the Law School that this omission had a material effect. But these allegations are reasonably specific and sufficiently plausible to stave off Rule 12(b) dismissal. However, the parties' dispute over how many Alternative students were at the Law School seems easily resolvable and might prove dispositive. Thus, the Court will allow limited discovery on this issue and an opportunity for a summary judgment motion before allowing general discovery as to Lorona's fraud claims.

The Law School also points out that Lorona does not specify whether it violated any third-party reporting requirements. The Court previously viewed this lack of specificity as a reason to dismiss Lorona's claim that the Law School reported misleading data to third parties. (*See* Doc. 33 at 22.) But her current complaint claims that the Law School reported misleading data not only to third parties but also in its marketing

materials to potential students.  Thus, her claim no longer depends on third-party reporting requirements.

The Law School also contends that Lorona fails to specify when it reported its enrollment statistics.  Not true.  She says the Law School reported these statistics in a marketing brochure and on its website, both of which she read when deciding whether to attend.  She even gives an example: as of spring 2008, the Law School reported a median LSAT score of 153 and median undergraduate GPA of 3.18.  She also specifies that the Law School updated these statistics each year and that she kept track of them as a student.  These allegations are specific enough.  The point of requiring specificity is "to give defendants notice of the particular misconduct" so that they can adequately defend against the charge.  *Vess*, 317 F.3d at 1106.  Lorona has provided enough detail to give the Law School notice of the misconduct she is referring to.

### 2. Lorona has pled reliance.

According to the Law School, Lorona fails to allege reliance on its enrollment statistics in *enrolling* in the school, because she does not specify when she decided to enroll or when she began her studies.  But Lorona explicitly states that she reviewed those statistics before deciding to enroll.  Indeed, she specifies what those statistics were as of spring 2008, which was before she applied and was accepted in August 2009.  Although more detail is preferable, it is not necessary.

The Law School also challenges the plausibility of Lorona's claim that she relied on the enrollment statistics in *remaining* at the school—i.e., that she would have dropped out had she discovered the truth.  But this claim is plausible.  Lorona says she was incurring debt in the hope that her law degree would prove valuable enough to repay it.  Had she known the Law School's median LSAT scores and undergraduate GPAs were substantially lower than advertised, she might have predicted a decline in the Law School's reputation and in the corresponding value of her degree, in which case she might have decided to cut her losses.  Of course, discovery in this case might reveal

otherwise—for example, that Lorona knew the true enrollment statistics all along, or that she would have completed the program no matter the cost. But discovery might also reveal that many Arizona Summit Law School students did make the choice to drop out and incur no further debt. Accordingly, the Law School will have the opportunity to investigate and renew its objection at summary judgment.

### 3. Lorona has pled damages.

The Law School argues that even if Lorona relied on incomplete enrollment statistics, she was not damaged because she got what she paid for. Not only did she receive a legal education, but she attained a law degree, passed the Arizona Bar Exam, and is now attempting to establish a solo practice. On the Law School's view, Lorona's attendance at the Law School was beneficial, not damaging.

This argument misunderstands the nature of Lorona's damages claims. Lorona did not attend Arizona Summit Law School to start out as a solo practitioner without experience, clients, training, or income. She went to get a paying job with training in law practice. It turned out that she is unemployable, not even as a paralegal. According to her allegations, she reasonably expected a law degree from a school with enrollment statistics comparable to other schools (before and while she was a student), but she received a law degree from a school with enrollment statistics worse than other schools (during that same time). Thus, she received something less valuable than she paid for, much like a used car buyer who later discovers that the seller rolled back the odometer by 20,000 miles. The damage does not stem from being worse off than before, but from the difference between the advertised product and the actual product.

Admittedly, the fact and the amount of damage will be hard to prove and measure here. Lorona's law school performance will matter, for example. As the Law School points out, damages may not be simply the difference between Lorona's current income and what she would earn at another job, because even if the enrollment statistics had been accurate, there was no guarantee of post-graduation employment. But Lorona is not

suing on a guarantee. She is suing for fraud and related claims. Difficulty in calculating damages does not amount to failure to plead damages.

### C. Lorona Has Not Stated Fraud Claims Based on Other Alleged Misrepresentations.

Lorona claims that the Law School made other misrepresentations beyond inflating its enrollment statistics. None of them gives rise to an independent fraud claim.

#### 1. The alleged representations of an "Ultimate" bar pass rate were not materially false or misleading.

Lorona alleges that through 2014, the Law School reported an "Ultimate" bar pass rate of over 80% based on the total number of graduates who passed the Arizona Bar Exam on the first or subsequent attempts. This rate was higher than the percentage of graduates who passed any recent single administration of the exam. For example, only 48.8% of the graduates who took the February 2014 exam passed, and only 49.5% of those who took the July 2014 exam passed. Moreover, the Law School had recently increased the percentage of students admitted through its Alternative admissions program, and it knew that such students were more likely to fail the exam. Therefore, Lorona claims the Ultimate bar pass rate was "extremely misleading at best." (Doc. 34 at ¶ 65.)

Notably, Lorona does not claim in her third amended complaint that the Ultimate pass rate was false. This is because, as the Court explained in its previous order, the Ultimate pass rate measured something broader than the pass rate of any single exam. (*See* Doc. 33 at 21.) For example, a student might fail the exam four times but pass the fifth time, thereby lowering the pass rates for four exams but raising the Ultimate rate. (*See id.*) In addition, an overall decline in exam pass rates would affect pass rates of recent exams more sharply than the Ultimate rate. (*See id.*)

Perhaps students might confuse the Ultimate pass rate with that of a single exam. But such confusion could not be attributed to the Law School. The Law School clarified that the Ultimate rate was based on graduates who passed the exam on "the first or

- 14 -

subsequent attempts." (Doc. 34 at ¶ 61.) Indeed, the word "Ultimate" indicates its broad focus. Lorona does not claim that the Law School withheld pass rates of single exams. Quite the contrary, her complaint confirms that the Law School disclosed those rates as well as the Ultimate pass rate (*see id.* at ¶ 58) and that such rates are publicly available in any event (*see id.* at ¶ 66).

Perhaps students might assume that the Ultimate pass rate would remain stable, whereas in reality, the Law School was admitting more and more Alternative students likely to lower the pass rate. But the fact that a statement might become false in the future does not render it fraudulent when made. "The general rule is that in order to constitute actionable fraud, the false representation must be of a matter or fact which exists in the present, or has existed in the past . . . ." *Law v. Sidney*, 47 Ariz. 1, 4, 53 P.2d 64, 66 (1936). Lorona does not identify any exception requiring the Law School to warn students of a likely decline in its Ultimate pass rate.

At oral argument, Lorona took the position (for the first time) that the true Ultimate pass rate was lower than what the Law School reported. To support this position, Lorona presented a chart calculating what the Ultimate pass rate, as defined by the Law School, should have been in recent years. Lorona's counsel said he performed these calculations based on data taken from the Arizona Supreme Court website. Lorona did not submit a copy of this chart to the Court before or after oral argument.

Ordinarily the Court would dismiss belated allegations like this one with leave to include them in an amended complaint. But amendment here would be futile. The chart presented by Lorona showed Ultimate pass rates averaging in the 80 percentages, consistent with the Law School's representations. Admittedly, the chart showed a current Ultimate pass rate of only 75.4% in light of recent low pass rates. This variation, however, is too small and occurred too late to plausibly support Lorona's claim that she detrimentally relied on the Law School's contrary representation.

Because Lorona does not plausibly allege that the Law School's reports of its Ultimate bar pass rate were materially false or misleading, she has not stated a fraud claim based on those representations.

### 2. Lorona has not pled reliance or damages with respect to the alleged manipulation of bar exam results.

Lorona alleges that in May 2014, the Law School began paying graduates who it predicted would fail the bar exam not to take the exam. The result, according to Lorona, was to skew bar exam results in the Law School's favor. While this conduct is not an express misrepresentation, it may well be a manipulation of circumstances aimed at creating a false impression of the Law School's quality.

Whether or not such conduct is deceptive in general, it was not fraud against Lorona. She does not allege that she relied on the skewed exam results in deciding to attend or remain at the Law School. Nor could she plausibly so allege. She says the misconduct began in May 2014, but she graduated only seven months later, in December 2014. She could not have known the results of any manipulated exam until her last semester. It is implausible that at that point, she would have relied on the results in deciding to remain at the school.

Moreover, Lorona does not allege that the skewed results harmed her in any way. In fact, her complaint repeatedly suggests the opposite: that the results benefited her as a student and graduate of the Law School. She says the results "enabled" the Law School "to maintain its reputation as a competent law school" and "to retain accreditation and receive other benefits, such as eligibility for Title IV funding from the Department of Education." (Doc. 34 at ¶¶ 78–79.) Thus, her own pleadings prevent an inference of harm.

Perhaps the alleged manipulation of exam results will have evidentiary value in this case. But because Lorona does not plausibly allege that she relied on, or was harmed

- 16 -

by, the skewed exam results, she has not stated a separate fraud claim based on this conduct.

### 3. The other alleged representations or omissions were not materially false or misleading.

Lorona alleges that when she was deciding whether to attend the Law School, she read in the school's application instructions that the school is governed by an American Bar Association ("ABA") standard prohibiting the admission of applicants "who do not appear capable of . . . being admitted to the bar." (Doc. 34 at ¶ 40.) The standard is not demanding; it applies only to applicants who appear *incapable* of becoming attorneys. Arguably the standard is so lax that it cannot give rise to a fraud claim at all. Even assuming a violation could be fraud, that is not this case. Lorona claims the Law School admitted students with substandard LSAT scores and undergraduate GPAs. But she does not specify these scores or GPAs or explain why such students would be incapable of bar admission. Lorona also claims the Law School predicted many of its students would fail the bar exam (on their first attempt). But she does not allege that these predictions were occurring at the relevant time—i.e., when she relied on the ABA standard in deciding whether to attend. Moreover, these predictions did not violate the ABA standard. The predictions were based in part on students' law school performances, which the Law School could not have known when admitting students. And the students predicted to fail were not incapable of passing. Case in point: Lorona passed despite the Law School's prediction otherwise. (*See* Doc. 20 at ¶ 119.) Thus, Lorona does not plausibly allege that the Law School violated the ABA standard at the time she claims to have relied.

Lorona also alleges that when she was deciding whether to attend the Law School, she read in the school's application packet that its graduates had a low unemployment rate, a median salary of $60,000, and a median student loan debt of $101,310. As a student, she read similar statements from the Law School about its graduates' employment status and average salaries. But she does not plausibly allege that this

- 17 -

information was false or misleading. The mere fact that she ended up with a below-median salary and above-median student loan debt does not contradict the Law School's prior, generalized statements about its graduates.

Lorona also alleges that the Law School failed to disclose its prediction that fewer of its graduates would pass the bar exam as more Alternative students were admitted. But this non-disclosure was not fraud. As stated above, fraud is generally limited to "a matter or fact which exists in the present, or has existed in the past." *Law*, 47 Ariz. at 4, 53 P.2d at 66. Lorona does not explain why, contrary to general fraud principles, the Law School had an affirmative duty to state its beliefs about the future. Moreover, Lorona does not claim that these predictions occurred before May 2014. At that time she was already well into her last year. She does not plausibly allege that she would have acted differently had she learned about the Law School's predictions.

Finally, Lorona alleges that at some unspecified time and place, the Law School made the following representation about its legal education program:

> We believe by graduation, lawyers should enter the workforce professionally prepared to practice law in a variety of diverse settings and industries. Summit Law partners with local law firms, courts, municipalities, businesses and non-profits to provide real-world work experiences that foster our students' desire to learn, grow and succeed while creating **well-rounded lawyers who add immediate value to their firms and employers.**

(*Id.* at ¶ 93 (emphasis in original).) As the Court explained in its prior order, this freestanding statement does not give rise to a fraud claim because it is aspirational, not factual, and because the circumstances surrounding the statement have not been pleaded with particularity. (*See* Doc. 33 at 23–24.)

### D. Leave to Amend

Leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). Courts should consider five factors: bad faith, undue delay, prejudice to the

opposing party, futility of amendment, and whether the plaintiff has previously amended the complaint. *Johnson v. Buckley*, 356 F.3d 1067, 1077 (9th Cir. 2004). "Futility alone can justify the denial of a motion to amend." *Id.*

Lorona has already amended her complaint three times. The most recent amendment followed a lengthy Court order dismissing Lorona's fraud claims for reasons similar to those raised by the Law School's present motion. To permit further amendment would drag out the litigation for no foreseeable benefit. Therefore, as to the parts of Lorona's claims that will be dismissed, no further leave to amend will be granted.

IT IS THEREFORE ORDERED that Defendant Arizona Summit Law School, LLC's Motion to Dismiss (Doc. 35) Counts I, II, and III of the Third Amended Complaint (Doc. 34) is granted with prejudice only to the extent those Counts rely on fraud other than misrepresentation in enrollment statistics. The Motion is otherwise denied.

IT IS FURTHER ORDERED that the parties may, as of the date of this order, begin discovery as to how many of the Law School's students were Alternative students during the times relevant to Lorona's fraud claims. This discovery shall conclude no later than Friday, July 15, 2016.

IT IS FURTHER ORDERED that if the Law School deems the outcome of this discovery dispositive of Lorona's fraud claims, it may file a motion for summary judgment to that effect no later than Monday, August 1, 2016. If no such motion is filed, the parties may then begin general discovery as to Lorona's fraud claims.

Dated this 17th day of May, 2016.

Neil V. Wake
United States District Judge